## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION
## CIVIL ACTION NO. 3:16CV-00024-RGJ-RSE

**PHOENIX PROCESS EQUIPMENT CO.**                                    **PLAINTIFF**

**VS.**

**CAPITAL EQUIPMENT & TRADING CORP., et al.**                    **DEFENDANTS**

### MEMORANDUM OPINION
### AND ORDER

Plaintiff Phoenix Process Equipment Company has filed a Motion to Compel Discovery. (DN 119). Defendants Capital Equipment & Trading Corporation, Alexander Chudnovets, and Coralina Engineering, LLC, have responded in opposition (DN 120). Plaintiff has replied. (DN 123). For the following reasons, Plaintiff's Motion is **granted in part and denied in part.**

### I. Background

Plaintiff Phoenix Process Equipment Co. ("Phoenix") is a Kentucky-based company that designs, engineers, manufactures, and services machinery and equipment used for recycling water and other materials used to wash coal. (DN 40, at ¶ 10). Since 1997, Phoenix has had its products distributed in Russia, Ukraine, and other Eastern European countries by an assortment of companies. (*Id.* at ¶ 11). In May of 2009, Phoenix entered into a three-year distribution agreement with Defendant Capital Equipment & Technology Corporation ("Technology"). (*Id.* at ¶¶ 12-14). The agreement granted Technology an exclusive territory to market and sell Phoenix's products. (*Id.* at ¶ 11). Defendant Alexander Chudnovets ("Chudnovets"), the CEO of Technology, signed the distribution agreement on the company's behalf after meeting with Phoenix employees in their Kentucky and Indiana facilities. (*Id.* at ¶¶ 12-14).

The parties dispute the events following the 2009 distribution agreement. Technology dissolved in October of 2011; however, Phoenix claims it was unaware of the dissolution because it continued doing business with a company referred to as CETCO. (DN 57, at p. 2). Instead of Technology, Phoenix claims it was unknowingly doing business with Defendant Capital Equipment and Trading Corporation ("CETCO" or "Trading Corp."), headquartered in Texas, and Defendant Coralina Engineering, LLC ("Coralina"), a limited liability corporation under Russian law. (*Id.*). On July 6, 2012, Phoenix and CETCO entered into what Phoenix believed was a "renewal" of the 2009 distribution agreement. (DN 57, at p. 2). The 2012 agreement was executed by Maria Roberson, the president of CETCO. (*Id.*). Defendants assert that this agreement was not a "renewal" of the 2009 agreement because Phoenix entered into the earlier agreement with "an altogether different entity." (DN 120, at p. 5). Defendants further argue that Phoenix cannot "feign[] confusion" over which Defendant it was doing business with prior to the 2012 agreement because CETCO issued purchase orders with its name clearly set forth and made millions of dollars of payments in its name to Phoenix. (*Id*. at p. 4).

Phoenix continued to receive purchase orders following the alleged renewal of the distributor agreement from Vadim Novak, a Coralina employee. (DN 57, at p. 2). But at some point after entering into the 2012 distributor agreement, Phoenix allegedly obtained information that products very similar to its own were being sold and distributed in the region assigned to CETCO by Coralina and Electrogorsk Metal Factory, a Russian limited liability corporation doing business as Elemet.[1] (*Id.* at p. 3). Phoenix believed that CETCO and Coralina violated the distributor agreements by conducting business with Elemet and selling Elemet's allegedly pirated equipment. (DN 40, at ¶¶ 20-22).

---

[1] Elemet has not been served or otherwise made an appearance in this case.

Based on this information, Phoenix brought suit in Jefferson Circuit Court in November of 2015, which Defendants timely removed to this Court. (*See* DN 1; DN 1-1). Phoenix's Amended Complaint asserted five claims: (1) breach of contract; (2) unfair competition or "passing off;" (3) violation of the Kentucky Uniform Trade Secrets Act (KUTSA); (4) civil conspiracy; and (5) fraud or fraud in the inducement. (DN 40, at ¶¶ 32-51). Phoenix further claims that CETCO and Coralina are "alter ego" companies because Chudnovets served as CEO and on the board of directors at CETCO and was the sole member of Coralina and because the two companies share the same employees and offices. (*Id.* at ¶¶ 18-20, 25-28). According to Phoenix, Coralina branded itself through its website, business cards, and communications with Phoenix as CETCO-Coralina. (*Id.* at ¶¶ 25, 28, 30).

Defendants "emphatically deny" that they participated in any reverse engineering of Phoenix's products or furnished any confidential design information that would allow anyone else to do so. (DN 120, at p. 6). Defendants also state that CETCO, Coralina, and Chudnovets hold no ownership of, affiliation with, or control over Elemet and that Elemet is a "separate and independent company." (*Id.*).

This Court previously dismissed Phoenix's claims for unfair competition and "passing off," fraud and fraud in the inducement, and conspiracy because such claims are preempted by the KUTSA. (DN 57, at pp. 18-20). Almost a year-and-a-half later, Phoenix filed a Second Motion to Amend Complaint, seeking to remove its KUTSA claim and replead its previously dismissed claims. (DN 110). This Court recently denied Phoenix's Second Motion to Amend as futile.[2] (DN 125).

---

[2] Phoenix has filed a Motion for Reconsideration of the Court's Order denying it leave to file a second amended complaint. (DN 126).

The parties have struggled with cooperative discovery for months. During their Rule 26(f) planning conference, the parties agreed that "[e]ach party shall be allowed a maximum of thirty (30) interrogatories . . . . [e]ither party may ask the Magistrate Judge for an additional fifteen (15) interrogatories." (DN 90, at ¶ 3(D)). On November 16-17, 2017, Phoenix propounded its first written discovery, including 28 interrogatories on CETCO, 30 interrogatories on Coralina, and 26 interrogatories on Chudnovets, totaling eighty-four interrogatories, not counting subparts. Because Phoenix did not comply with their agreement to propound a maximum of forty-five interrogatories, the Defendants sought a telephonic conference with the Court. Following this first teleconference, Magistrate Judge Dave Whalin struck a compromise, allowing Phoenix to issue forty-five interrogatories to Trading Corp. (CETCO) and Coralina together and thirty interrogatories to Chudnovets. (DN 97). The Court further directed the parties to continue efforts at resolving the numerosity issues with Phoenix's interrogatory subparts over the next month. (*Id.*).

According to Defendants, Phoenix continued to issue interrogatories to CETCO and Coralina that exceeded the additional amount granted by the Court. (DN 120, at p. 9). Defendants sought a second teleconference with the Court, where Magistrate Judge Whalin again gave the parties additional time to resolve their dispute without court intervention. (DN 104). When the parties still failed to reach an agreement following the two telephonic conferences with the Court and face-to-face meetings among themselves, the Court authorized the parties to file appropriate motions to resolve the dispute. (DN 108).

Before filing a motion with the Court, Defendants responded to Phoenix's most-recent (third) discovery requests and issued objections. (DN 119-3). Phoenix then sent Defendants a twenty-seven-page letter outlining perceived deficiencies with their responses. (DN 119-5). Defendants responded with a thirty-nine-page letter, explaining that Phoenix still exceeded the

numerical limit for its interrogatories to CETCO and Coralina together and providing additional explanation for their objections. (DN 120-2).

Phoenix has now filed a Motion to Compel, seeking responses to its third set of discovery. (DN 119). Phoenix broadly focuses on two alleged deficiencies in Defendants' responses. First, Phoenix alleges that Defendants have "improperly and unilaterally divided" its interrogatories into subparts to increase its total number of interrogatories. (*Id.* at p. 5). Second, Phoenix claims that Defendants have failed to produce any internal communications between themselves and third-parties related to the suit, including records, agreements, contracts, purchase orders, invoices, and other documents. (*Id.*).

## II. Analysis

Trial courts have wide discretion in dealing with discovery matters. *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008); *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981). The "scope of discovery" encompasses "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). Relevance is to be construed broadly to include "any matter that bears on, or that reasonably could lead to other matter that could bear on" any party's claim or defense. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L.Ed.2d 253 (1978) (citation omitted). In analyzing proportionality, the Court must consider the need for the information sought based upon "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Federal Rule of Civil Procedure 37 allows a party to move for an order compelling disclosure or discovery when "a party fails to answer an interrogatory submitted under Rule 33" or "fails to produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(iii), (iv). Under Rule 37, an "evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). When an objection to relevance is raised, the party seeking discovery must demonstrate that the requests are relevant to the claims or defenses in the action. *Anderson v. Dillard's, Inc.*, 251 F.R.D. 307, 309-10 (W.D. Tenn. 2008). If that party demonstrates relevancy, the burden shifts to the party resisting discovery to demonstrate why the information or documents are not discoverable under the Federal Rules. *Id.*

A. Numerosity of Interrogatories

i. Applicable Law

Rule 33 provides that unless otherwise stipulated and ordered by the court, a party may serve on another party "no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. P. 33(a)(1). Neither Rule 33 nor this Circuit identifies a precise formulation for determining when discrete, separate subjects should be treated as multiple interrogatories. *See Perez v. KDE Equine, LLC*, No. 3:15-CV-00562-CRS, 2017 WL 56616, at *3 (W.D. Ky. Jan. 4, 2017) (citing *State Farm Mut. Auto Ins. Co. v. Pain & Injury Rehabilitation Clinic, Inc.*, No. 07-CV-15129, 2008 WL 2605206, at *2 (E.D. Mich. June 30, 2008)).

District courts and treatise writers have formulated various tests for defining "discrete subparts." One test asks whether a subpart of an interrogatory "introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it." *Ott v. Mortgage Investors Corp. of Ohio, Inc.*, No. 3-14-cv-645, 2015 WL 691643, at *1 (D. Or. Feb. 17, 2015); *Kline v. Berry*, 287 F.R.D. 75, 79 (D.D.C. 2012). This test, however, essentially

6

restates the term "discrete subpart" and "does not add much by way of resolving power." *Erfindergemeinschaft Uropep GbR v. Eli Lilly & Co.*, 315 F.R.D. 191, 195 (E.D. Tex. 2016).

Some courts have invoked the "common theme" standard, developed from a leading treatise. *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2015 WL 1221924, at *2 (N.D. Cal. Mar. 17, 2015); *Pouncil v. Branch Law Firm*, 277 F.R.D. 642, 646 (D. Kan. 2011). This treatise states that "an interrogatory containing subparts directed at eliciting details concerning a common theme should be considered a single question." 8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, <u>Federal Practice & Procedure</u> § 2168.1, at 39-40 (2010). There are two main problems with this test. First, what constitutes "a common theme" is subject to widely divergent views. *Eli Lilly & Co.*, 315 F.R.D. at 196. Second, if "a common theme" is broadly interpreted, there could be limitless use of multiple subparts qualifying as a single interrogatory. *Id.*

Most courts have followed the "related question" approach. This test generally states that subparts that are "logically or factually subsumed within and necessarily related to the primary question should not be treated as separate interrogatories." *Kendall v. GES Exposition Servs., Inc.*, 174 F.R.D. 684, 685 (D. Nev. 1997) (citation omitted); *see also Gilmore v. Lockard*, No. 1:12-cv-925, 2015 WL 5173170, at *8 (E.D. Cal. Sept. 3, 2015); *Klein v. Fed. Ins. Co.*, No. 7:03-cv-102, 2014 WL 3408355, at *6 (N.D. Tex. July 14, 2014); *Perez v. Aircom Mgmt. Corp.*, No. 12-60322, 2012 WL 6811079, at *1 (S.D. Fla. Sept. 24, 2012). Courts have further articulated this approach as: "if the first question can be answered fully and completely without answering the second question" then the second question is totally independent of the first and not factually subsumed within it. *Paananen v. Cellco Partnership*, No. Co8-1042 RSM, 2009 WL 3327227, at *2 (W.D. Wash. Oct. 8, 2009) (quoting *Estate of Manship v. United States*, 232 F.R.D. 552, 555 (M.D.

La.2005)); *see also F.T.C. v. Think All Pub., L.L.C.*, No. 4:07-cv-011, 2008 WL 687455, at *1 (E.D. Tex. Mar. 11, 2008).

Regardless of which verbal formulation of "discrete subparts" is used, these tests must be tempered by a "pragmatic approach" that asks whether an interrogatory "threatens the purpose of Rule 33" by combining several lines of inquiry into one interrogatory. *Warren v. Bastyr Univ.*, No. 2:11-cv-1800, 2013 WL 1412419, at *1 (W.D. Wash. Apr. 8, 2013). Under this pragmatic approach, courts must evaluate "discrete subparts" by balancing the competing purposes of Rule 33(a)(1): allowing reasonable latitude in formulating an inquiry to elicit as complete an answer as possible, while at the same time not allowing the multiplication of interrogatories which would defeat the purposes of Rule 33's limits. *Eli Lilly & Co.*, 315 F.R.D. at 196-97 (citing *Williams v. Bd. of Cty. Comm'rs of the Unified Gov. of Wyandotte Cty. & Kan. City, Kan.*, 192 F.R.D. 698, 701 (D. Kan. 2000)).

In *Perez v. KDE Equine,* this Court discussed the various "discrete subparts" tests utilized by district courts but declined to adopt a single approach.[3] 2017 WL 56616, at *3 (citing *Paananen*, 2009 WL 3327227, at *2; *Singleton v. Hedgepath*, No. 1:08-cv-00095, 2011 WL 1806515, at *7 (E.D. Cal., May 10, 2011); *Estate of Manship*, 232 F.R.D. at 555). Here, after comprehensively reviewing these tests, the Court finds the "related question" approach, combined with pragmatic considerations, will allow for the most faithful adherence to the policies of Rule 33. *See, e.g., Eli Lilly & Co.*, 315 F.R.D. at 197. The Court acknowledges, however, that the issue of counting "discrete subparts" cannot reliably be captured in a verbal formula and must be assessed based on

---

[3] The Court disagrees with Defendants' characterization that *Perez v. Equine* applied only the "related question" approach. (DN 120, at pp. 12-13). Rather, the Court discussed both the "related question" approach and the "common theme" standard but did not clearly articulate which approach it used to analyze the disputed interrogatories. 2017 WL 56616, at *4.

the particular circumstances in a case. *See Allen v. Mill-Tel, Inc.*, 283 F.R.D. 631, 637 (D. Kan. 2012).

ii. Analysis of Challenged Interrogatories to CETCO and Coralina

Here, the Court permitted Phoenix to tender 45 interrogatories to CETCO and Coralina together. (DN 97). Phoenix's third production of discovery included 20 numbered interrogatories to CETCO and 17 numbered interrogatories to Coralina. (*See* DN 119-2; DN 119-3). Defendants refused to answer Interrogatory Nos. 7-17 to Coralina based on their "Universal Objection 12," which states that the interrogatories "exceed the numerical limitations" set by the Court. (DN 119-3, at p. 5). This objection further states that by answering all of Phoenix's interrogatories to CETCO, which totaled 37 interrogatories (including subparts), Defendants would only respond to the first 8 of Phoenix's interrogatories containing subparts to Coralina. (*Id.*).

In its Motion to Compel, Phoenix explains why it believes Defendants improperly treated Interrogatory Nos. 2, 7, 8, 9, 10, 11, 13, 15 and 16 to CETCO as containing discrete subparts. (DN 119, at pp. 8-13). Phoenix claims that these Interrogatories "describe details sought in the original question" and that each interrogatory is "based upon a common theme." (*Id.* at pp. 7-8). Defendants defend their decision not to answer Phoenix's final ten interrogatories to Coralina by explaining why each of the above Interrogatories was appropriately divided into discrete subparts. (DN 120, at pp. 14-17). The Court will address these disputed interrogatories in turn.

**Interrogatory No. 2:**
*For both Capital Equipment and Trading Company and Capital Equipment and Trading Corporation, state all trade names or assumed names by which each has ever been known and identify the names of all affiliate, parent, and subsidiary organizations. (DN 119-2, at p. 7).*

Defendants assert that the "potential trade names or assumed names" of Trading Corp. ("CETCO") and "the identity of any affiliate, parent, or subsidiary organization" are stand-alone questions, independent of one another. (DN 120, at p. 14). This Court does not agree. These

questions are both related to corporate structure and are meant to clarify whether other businesses are merely connected to CETCO versus identical to CETCO. Because these two inquiries are logically subsumed, the Court counts Interrogatory No. 2 as a single inquiry.

### Interrogatory No. 7:

*Please explain Alexander Chudnovets' status and role at CETCO since 2009, including his employment status, job title(s), ownership interest, and his relationship and/or employment history with any other Defendant in this lawsuit. As part of your answer, please fully explain Chudnovets' role and job duties at CETCO in relation to Phoenix. (DN 119-2, at p. 9).*

Defendants argue this Interrogatory contains three discrete subparts: (1) Chudnovets' status and role at CETCO . . .; (2) his relationship and/or employment history with any other Defendant in this lawsuit; and (3) his role and job duties at CETCO relating to Phoenix. (DN 120, at pp. 14-15). Defendants are correct. The first question asks for general information regarding Chudnovets' status and role at Trading Corp. (CETCO). The second question, "his relationship and/or employment history with any other Defendant," is not necessarily related to the primary inquiry. While Phoenix may believe that Chudnovets' role at Trading Corp. is factually related to his role with other Defendants in the lawsuit, the Court finds the primary inquiry can be answered fully and completely without answering this secondary inquiry. Likewise, the second sentence of the Interrogatory, asking for a full explanation of Chudnovets' role and job at Trading Corp. "in relation to Phoenix" is independent from the first inquiry because Defendants could fully answer the initial inquiry without any reference to Phoenix. This Interrogatory, therefore, will be counted as three interrogatories.

### Interrogatory No. 8:

*Describe the nature and extent of Capital Equipment and Trading Company's and Capital Equipment and Trading Corporation's business activities since 2009, including all of their business functions and activities, as well as the locations of each of the business operations/facilities and/or offices. (DN 119-2, at p. 11).*

This is one Interrogatory. The primary question asks for the nature and extent of CETCO's business activities. The clause that Defendants argue constitutes an independent inquiry, "the locations of each business operations/facilities and/or offices" seeks additional explanation or detail for the original information sought. A full description of a business's "nature" and extent" would logically include the location of such business.

**Interrogatory No. 9:**

*Please state all facts, evidence, and list all documents upon which you rely for the statement in your Answer to Phoenix's First Amended Complaint that CETCO and Capital Equipment and Technology Corporation were and always have been separate legal entities and your denial that there is a predecessor/successor relationship between the CETCO and Capital Equipment and Technology Corporation. (DN 119-2, at p. 12).*

Defendants argue that an interrogatory asking for information related to an event and then also requesting documents or evidence pertaining to that event constitute two discrete requests. (DN 120, at pp. 13-14). Courts are divided on this issue. *See Engage Healthcare Comms., LLC v. Intellisphere, LLC*, No. 12-cv-00787(FLW)(LHG), 2017 WL 2371834, at *6 (D.N.J. Feb. 10, 2017). As Defendants assert, several courts have found that a demand for information and a demand for documents pertaining to that information should be counted as two separate interrogatories. *See, e.g., Cook v. City of Dallas*, No. 3:12-CV-3788-N, 2017 WL 9534098, at *2 (N.D. Tex. Apr. 10, 2017); *Smith v. Café Asia*, 256 F.R.D. 247, 254 (D.D.C. 2009); *Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 7, 10 (D.D.C. 2004). One court noted that interrogatories seeking both facts and documents are "really a fugitive request for production of documents" and discovery would be better served in that format. *Kendall v. GES Exposition Servs., Inc.*, 174 F.R.D. 684, 686 (D. Nev. 1997). But other courts have found that this type of interrogatory should not be divided into discrete subparts because the facts and documents regarding a specific contention or affirmative defense are "logically or factually related." *See, e.g., Engage Healthcare*, 2017 WL 2371834, at *6-7; *Synopsys, Inc. v. A TopTech, Inc.*, 319 F.R.D. 293, 297 (N.D. Cal. 2016).

Here, the Court is more persuaded by the second line of cases. Phoenix has not asked Defendants to produce evidence or documents in this Interrogatory. Phoenix, instead, seeks Defendants "state" the facts and evidence and "list" the documents it relied on for a specific contention from their Answer. To conclude they are discrete subparts would hamstring this complex case. This conclusion allows reasonable latitude for Phoenix to formulate an inquiry to elicit as complete an answer as possible. *See Eli Lilly Corp.*, 315 F.R.D. at 197. Although Phoenix's Interrogatory relates to both Defendants' contention that CETCO and Technology were always separate legal entities and their denial that a predecessor/successor relationship exists between the two, because the same facts, evidence, and documents would likely be used to respond to both inquiries, this Interrogatory is considered one for purposes of Rule 33.

The Court, accordingly, counts this as one interrogatory because the "facts, evidence, and documents" are subsumed within the interrogatory as logically related to its primary topic, e.g., the basis for Defendants' contention that CETCO and Technology Corp. are separate entities. *See Synopsys, Inc.*, 319 F.R.D. at 299.

### Interrogatory No. 10:
*Please list all business addresses, phone numbers, fax numbers, and website domains that CETCO has used at any time since 2009 and for each identify the dates of usage. (DN 119-2, at p. 14).*

Because Defendants explain in their response that they only counted Phoenix's Interrogatory No. 10 as one interrogatory, the parties no longer dispute the characterization of this Interrogatory.

### Interrogatory No. 11:
*Please state all facts and evidence that you rely upon for your defense that a valid Distributorship Agreement or contract does not and did not exist between CETCO and Phoenix and that the 2012 Distributor Agreement was not executed by an authorized person. Further, please identify who executed the 2012 Distributor Agreement on behalf of CETCO, and why that person was not allegedly authorized to execute the same on behalf of CETCO. (DN 119-2, at p. 15).*

Like their argument regarding Interrogatory No. 9, Defendants assert that Interrogatory 11 constitutes two discrete inquiries because Phoenix requests both "facts" and the relied upon "evidence." (DN 120, at p. 16). Again, Phoenix's request that Defendants "*state* facts and evidence" related to defenses is not an elusive request for production of documents and will not be counted as two discrete subparts. (DN 119-2, at p. 15 (emphasis added)). Further, since the primary question asks for "all facts and evidence" relied upon regarding the alleged invalidity of the 2012 Distributorship Agreement, a complete response would include both who executed the agreement on CETCO's behalf and why that person was not authorized to do so. This constitutes a single interrogatory.

### Interrogatory No. 13:

*Please identify any and all parent and/or subsidiaries of CETCO, including but not limited to all entities that comprise the "CETCO group of companies," (as described on Coralina Engineering LLC's website coalprep.ru). (DN 119-2, at p. 17).*

Defendants argue that the identity of any purported "parents or subsidiaries of CE&T Corp." and what entities comprise "the CETCO group of companies" are distinct and independent questions. (DN 120, at p. 16). Phoenix explains that the "CETCO group of companies" is a subset of all the possible subsidiary and parent corporations of CETCO and was meant to specify what companies should be included in Defendants' response. (DN 119, at p. 12). This Court agrees. While Phoenix and Defendants clearly dispute the existence of "the CETCO group of companies," the Court does not interpret Phoenix's use of such term as a discrete inquiry. Interrogatory No. 13 will be considered one interrogatory for purposes of numerosity.

### Interrogatory No. 15:

*Please explain Vadim Novak's status and role at CETCO since May 1, 2009, including his employment status, job title(s), ownership interest, and his relationship and/or employment history with any other Defendant in this lawsuit. If Novak was not an employee of CETCO, please identify the person(s) that authorized him to directly participate in negotiating the Distributor Agreements with Phoenix and in what capacity he was authorized to participate in those negotiations. (DN 119-2, at p. 18).*

Defendants count four discrete subparts in the above Interrogatory. They separate (1) Vadim Novak's status and role at CETCO . . .; (2) his relationship and/or employment history with any other Defendant in this lawsuit; (3) if not employed by CETCO, the person that authorized Novak to participate in negotiating the Distributor Agreements with Phoenix; and (4) in what capacity he was authorized to participate in those negotiations. (DN 120, at p. 16). Each of these questions, Defendants argue, can be answered completely without answering the other. (*Id.*). Phoenix opposes this division because the "overarching theme" is "Novak's role at CETCO, whether that be as an employee or some other capacity. (DN 119, at pp. 12-13).

While Phoenix is correct that these questions share a common theme in Novak's role at CETCO, such a theme is too broad for purposes of Rule 33. The Court agrees with Defendants' division of the Interrogatory into four subparts. Like in Interrogatory No. 7, Phoenix's request for information regarding Novak's status and role at CETCO can be answered completely without addressing his "relationship and/or employment history with any other Defendant in the lawsuit." Additionally, the identity of the individual that authorized Novak to participate in negotiating the Distributor Agreement and what capacity Novak was authorized to participate in those negotiations are each considered a separate subpart as they are not factually subsumed within the initial inquiry as to Novak's status and role at CETCO.

**Interrogatory No. 16**:
*Please explain Maria Roberson's status and role at CETCO since May 1, 2009, including her employment status, job title(s), ownership interest, office address(es) and her relationship and/or employment history with any other Defendant in this lawsuit. Please include in your answer the date Roberson's employment with CETCO began and when it ceased. (DN 119-2, at p. 19).*

Defendants again count four discrete subparts in this interrogatory: (1) Maria Roberson's status and role at CETCO . . .; (2) her relationship and/or employment with any other Defendant in this lawsuit; (3) the date her employment with CETCO began; and (4) the date her employment

with CETCO ceased. (DN 120, at p. 17). For the same reasons as above, Roberson's relationship and/or employment with any other Defendant in the lawsuit is not factually subsumed within the first inquiry – her status and role at CETCO. However, the start and end dates for her employment at CETCO are logically related to her status and employment with CETCO and will not be considered independent inquiries. This Interrogatory, therefore, consists of two discrete subparts under Rule 33.

Based on these determinations, Phoenix submitted 26 interrogatories to CETCO, inclusive of discrete subparts. Phoenix, accordingly, has 19 remaining interrogatories to direct at Coralina before the Court-imposed limit of 45 interrogatories is met. Defendants previously objected to Interrogatory Nos. 7-17 to Coralina because they claimed Phoenix had already exceeded the total number authorized by the Court. (*See* DN 119-3, at p. 5). Because the Court disagrees with Defendants' calculations, they are ordered to respond to Interrogatory Nos. 7-17 from Phoenix's third amended production of discovery to Coralina. The Court declines to evaluate whether Phoenix's unanswered interrogatories to Coralina also contain discrete subparts because this issue has not been briefed by the parties. If additional disputes arise as to the numerosity of subparts in Phoenix's interrogatories to Coralina, Phoenix shall amend its interrogatories to comply with the Court-imposed limit based on the principles set forth in this Opinion.

B. Defendants' Substantive Objections to Discovery

Phoenix's Motion to Compel also takes issue with Defendants' substantive responses and objections to certain interrogatories and requests for production ("RFP") of documents propounded on CETCO, Coralina, and Chudnovets. (DN 119, at p. 14). Phoenix specifically argues that Defendants' responses to Interrogatory No. 7 and RFP Nos. 3, 4, and 6 to Coralina, Interrogatory

Nos. 4, 5, and 13 and RFP Nos. 5, 6, 8 and 10 to CETCO, and Interrogatory Nos. 6 and 7 and RFP Nos. 3, 4, 5, 13, 14, and 15 to Chudnovets are insufficient or incomplete. (*Id.* at pp. 14-25).

Defendants argue that they have disclosed significant information responsive to Phoenix's requests but that Phoenix simply wants them to rewrite their responses tailored to Phoenix's story of the lawsuit. (DN 120, at p. 18). Because Defendants believe Phoenix failed to identify specific issues with their objections to discovery, they claim Phoenix has not met its burden to compel such information. (*Id.* at pp. 18, 23). Defendants maintain the sufficiency of their responses by arguing that: (1) producing certain documents or information would violate Russian law; (2) no additional responsive information or documents exist to certain requests; and (3) Phoenix seeks information for unreasonable time periods beyond the scope of this case. The Court will address these substantive objections below.

### i. Potential Liability Under Russian Civil and Criminal Laws

Defendants object to Interrogatory No. 7[4] and RFP Nos. 3, 4, and 14 to Coralina, and RFP Nos. 3 and 5 to Chudnovets because providing the requested information and documents would allegedly subject them to civil and criminal liability under Russian law. (DN 120, at pp. 25-30). These requests essentially seek information or documents relating to Coralina's sale of equipment to third-parties within "the territory" specified in the 2009 and 2012 distributor agreements, including descriptions of equipment, its manufacturer, model number, and serial number, the date sold, and the seller and purchaser of the equipment. (DN 119-3, at pp. 5, 20). Additionally, Phoenix's requests seek production of contracts, assignments, transfers of ownership, sales of stock, and communications between Coralina and CETCO, and Coralina and the other Defendants, that evidence a business or financial relationship or involve the sale of equipment within the

---

[4] Phoenix incorrectly references "Interrogatory No. 8" in its Motion to Compel, when the substance of its argument involves Interrogatory No. 7 to Coralina. (*See* DN 119, at pp. 14-15).

territory. (*Id.* at pp. 5, 19, 20, 25; DN 119-4, at pp. 27-28).

Defendants claim that by responding to Phoenix's requests relating to commercial transactions with Elemet or other third-party purchasers Coralina "may face civil liability" under its Non-Disclosure Agreement with Elemet and Article 15 of the Russian Civil Code. (DN 120, at p. 25). Similarly, if Chudnovets, a Russian citizen, produces the requested information or documents, Defendants allege he "may face civil liability under Article 15 of the [Russian] Civil Code" and "may also face criminal liability under the Russian Criminal Code." (*Id.*). Defendants explain that they sought Elemet's permission to produce the requested documents without violating Russian law, but Elemet refused the requests and demanded the material be protected as commercial secrets. (*Id.* at pp. 20-21). Based on Elemet's reaction, Defendants believe that other third-parties "may deem" the documents Phoenix seeks as commercial secrets, which prevents their disclosure unless the third-party consents. (*Id.* at p. 26).

To support their position, Defendants provide a twenty-one page declaration from an attorney, Sergey S. Sokolov, who practices law in Russia, along with English translations of Russian civil and criminal laws relating to "commercial secrecy[;]" "information, information technologies, and protection of information[;]" "invasion of personal privacy;" and "compensation of damages[.]" (DN 120-1, at pp. 23-43). Defendants ask that if the Court determines production of these documents is necessary that such requests be processed through letters rogatory issued by the Court to diplomatic channels in Russia or by the Russian courts. (*Id.* at p. 29).

a. Applicability of the Hague Evidence Convention

Phoenix argues that the Hague Evidence Convention of 1972 is not the proper avenue for obtaining responses to the disputed discovery requests because Russia has refused to comply with this Convention in relation to American litigants. (DN 123, at p. 6). The taking of discovery from

foreign entities in civil litigation pending in the United States federal courts is generally regulated by two sets of rules: The Federal Rules of Civil Procedure ("Federal Rules") and the Hague Evidence Convention. *See St. Jude Med. S.C., Inc. v. Janssen-Counotte*, 104 F. Supp. 3d 1150, 1160 (D. Ore. 2015). The Hague Evidence Convention provides a mechanism for obtaining foreign discovery by outlining "certain procedures by which a judicial authority in one contracting state may request evidence located in another contracting state." *District Title v. Warren*, No. 14-1808ABJ/DAR, 2016 WL 10749155, at *4 (D.D.C. Dec. 23, 2016) (quoting *Estate of Klieman v. Palestinian Auth.*, 272 F.R.D. 253, 255 (D.D.C. 2011)); *see also Societe Nationale Industrielle Aerospatiale v. United States Dist. Ct. for the So. Dist. of Iowa*, 482 U.S. 522, 524 (1987). In *Aerospatiale*, the United States Supreme Court explained that the Hague Evidence Convention's procedures are a "permissive supplement, not a pre-emptive replacement for other means of obtaining evidence abroad." 482 U.S. at 536. The Court further explained that the Hague Convention procedures do not deprive United States District Courts of their jurisdiction to order production from foreign national parties. *Id.* at 539-40.

Russia acceded to the Hague Evidence Convention in 2001. (*See* DN 120-1, at p. 55). Yet, as of the current date, the United States has not declared acceptance of Russia's accession. Because "[a]n accession is effective only between the acceding country and those contracting states that have accepted the accession," the United States and Russia are not treaty partners in the Hague Evidence Convention. *See, e.g., Viteri v. Pflucker*, 550 F. Supp. 2d 829, 833 (N.D. Ill. 2008) (discussing principles of accession and acceptance as to the Hague Convention on International Child Abduction). The procedures for requesting judicial assistance with foreign discovery pursuant to the Hague Convention are, therefore, inapplicable to this case. *See, Warren*, 2016 WL 10749155, at *4; *In re Vitamins Antitrust Litigation*, 120 F. Supp. 2d 45, 55-57 (D.D.C. 2000)

(citing *McKesson Corp. v. Islamic Repub. of Iran*, 185 F.R.D. 70, 78-79 (D.D.C. 1999)). Relatedly, the Supreme Court's holding in *Aerospatiale* has limited applicability to this case. *See McKesson*, 185 F.R.D. at 78-79 (finding that although *Aerospatiale* addressed foreign discovery under the Hague Convention, the Supreme Court's fact-sensitive approach could be applied in analyzing foreign discovery for non-signatories).

District courts have less guidance in making foreign discovery determinations when the Hague Evidence Convention does not apply. The district court in *In re Vitamins* employed a two-step analysis. 120 F. Supp. 2d at 55. First, it considered whether there was in fact any conflict between the laws of the foreign nations and the United States. *Id.* Second, if a conflict existed, it would analyze the principles of comity to determine the weight to be given to the foreign jurisdiction's law. *Id.* Despite the inapplicability of the Hauge Evidence Convention, the district court retains the authority to request the assistance of foreign tribunals, through "letters rogatory," under 28 U.S.C. § 1781(b), if it finds the foreign nation's law must be afforded deference. *See, e.g., Warren*, 2016 WL 10749155, at *4 (citing *DBMS Consultants Ltd. V. Computer Assocs. Int'l, Inc.*, 131 F.R.D. 367, 369 (D. Mass. 1990) (citing *United States v. Reagan*, 453 F.2d 165 (6th Cir. 1971)). In the absence of controlling case law within this Circuit, the Court will follow *In re Vitamins*' two-step analysis to determine whether letters rogatory to Russian tribunals must issue to obtain the requested discovery.

### b. Conflict Between United States and Russian Laws

The party claiming the "shelter of foreign law" bears the burden of establishing that foreign law in fact bars production. *St. Jude Med. S.C., Inc. v. Janssen-Counotte*, 104 F. Supp. 3d 1150, 1161-62 (D. Ore. 2015) (citing *United States v. Vetco, Inc.*, 691 F.2d 1281, 1289 (9th Cir. 1981)); *BrightEdge Techs. Inc. v. Searchmetrics, GmbH,* No. 14-cv-01009-WHO, 2014 WL 3965062, at

*2 (N.D. Cal. Aug. 13, 2014)). To make such a showing, "the party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Trust Co.*, No. 14-CV-04394 (AJHN), 2017 WL 7512815, at *4 (S.D.N.Y. Dec. 29, 2017) (citing *Wultz v. Bank of China Ltd.,* 298 F.R.D. 91, 96 (S.D.N.Y. 2014) (citations omitted)). This includes "the provisions of foreign law, the basis for its relevance, and the application of foreign law to the facts of this case." *Id.* (internal quotation marks and citation omitted).

Mr. Sokolov identifies in his Declaration several civil and criminal Russian laws he believes could be violated if Defendants produce the requested information and documents. He specifically claims Coralina and Chudnovets could be liable under Article 15 of the Russian Civil Code and Chudnovets could be liable under Articles 137 and 183 of the Russian Criminal Code for violating Federal Law No. 98-FZ of July 29, 2004 ("On commercial secrecy") and Federal Law No. 149-fz dated July 27, 2006 ("On information, information technologies, and protection of information").

Federal Law No. 98-FZ of July 29, 2004 ("On commercial secrecy") regulates the establishment and maintenance of the regime of commercial secrecy – a set of requirements that must be met before a piece of information can qualify as a commercial secret. To qualify as a commercial secret, the piece of information must enable its possessor to derive some commercial benefit and such actual or commercial value must be unknown to third persons. (DN 120-1, at p. 31, Article 3 (1), (2)). The holder of such information must establish five measures to protect the confidentiality of the commercial trade secret: (1) defining a list of information constituting commercial secrets; (2) a procedure for handling the information; (3) record keeping for persons

who have access to that information; (4) regulations on the use of the information in contracts; and (5) labeling of such documents as commercial secrets.[5] A state power body, other state authority, or body of local self-government may request a commercial secret from its holder or from a court order. (DN 120-1, at pp. 31-32, Article 6 (1), (2), (3)). Violation of this law may result in civil or criminal liability "as is envisaged under the legislation of the Russian Federation." (*Id.* at p. 32, Article 15).

Federal Law No. 149-fz dated July 27, 2006 ("On information, information technologies, and protection of information") regulates the right to search, receive, transfer, produce, and disseminate information. Information is defined as "data (reports, records) irrespective of the form of their representation." (DN 120-1, at p. 36, Article 2 (1)). The holder of information under this law has the right to allow or restrict access to information, determine the procedure and terms of that access, transfer information to other persons under a contract or other legally-established grounds, and protect his or her rights in the case of illegal receipt or use of information by other persons. (*Id.*, Article 6, 3. (1), (3), (4)).

Article 15 of the Russian Civil Code provides for "Compensation of Damages" to individuals whose rights are violated. These damages include full recovery of the expenses, loss or damage done to his property, and any missed profits. (*Id.* at p. 43). In the Russian Criminal Code, Article 137 provides penalties for "invasion of privacy" – the illegal collection or spreading of information about the private life of a person, which constitutes personal or family secrets, without his consent. (*Id.* at p. 39). Violation of this Article shall be punishable by fine or the salary or income of the convicted person, compulsory works, corrective labor, vacating of office, or

---

[5] Mr. Sokolov's Declaration does not include a translation of Article 10 of this law. This translation was taken from the World Intellectual Property Organization's website: https://wipolex.wipo.int/en/legislation/details/7205.

imprisonment for up to two years. (*Id.*). Article 183 of the Russian Criminal Code governs the illegal disclosure or use of commercial secrets, and likewise punishes violations with fines, the salary or income of the convicted person, corrective labor, compulsory works, vacating of office, or imprisonment for up to three years. (*Id.* at p. 40).

For the United States, Rule 26 of the Federal Rules of Civil Procedure applies. Section (b)(2) of this Rule defines the scope of discovery as "any nonprivileged matter that is relevant to the party's claim or defense and proportionate to the needs of the case . . . unless otherwise limited by a court order." Fed. R. Civ. P. 26(b)(1). The rules of discovery are interpreted broadly with a "liberal spirit." *Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991). This stems from the general principle in American courts that litigants have "a right to every man's evidence, and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993); *see also Bennett v. Mammoth Resource Partners, Inc.*, No. 1:07CV-00168-JHM, 2009 WL 10681444, at *1 (W.D. Ky. Aug. 31, 2009) (citing *United States v. Nixon*, 418 U.S. 683, 710 (1974) (explaining that exceptions to "every man's evidence" are neither created lightly nor expansively construed)).

The Russian laws described above relate to the confidentiality of certain proprietary or confidential information. These statutes result from Russian legislators enacting strong protections for commercial secrets and personal data privacy but do not exist solely to impede the enforcement of United States' laws. *See, e.g., In re 28 U.S.C. 1782 of Okeon B.V. & Logistic Solution Intern. To Take Discovery of Charbourne & Parke LLP*, No. 12 Misc. 104(PAE), 2013 WL 4744817, at *3 (S.D.N.Y. Sept. 4, 2013) (finding that Russian "Advokat Secrecy law" and personal data protection laws were not enacted to prevent enforcement of U.S. laws). These statutes are distinct from the so-called blocking statutes that other courts have found specifically prohibit discovery,

such as bank secrecy laws or laws impeding the enforcement of United States' anti-trust laws.[6]

Article 6 of the Law on Commercial Secrets is the single provision that gives this Court pause regarding a potential conflict in the laws. This Article provides that a holder of a commercial secret must furnish the secret upon "a motivated request of a state power body, other state authority, [or] body of local self-government[.]" (DN 120-1, at pp. 31-32). The agency that acquires the commercial secrets shall be obligated to furnish the information "at the request of courts of law, investigating agencies, agencies in charge of a pretrial inquest regarding cases handled by them" as stipulated under the legislation of the Russian Federation. (*Id.*). This provision could plausibly govern discovery of commercial secrets in foreign litigation. But without definitions of "court of law" or "investigating agencies," or any case law interpreting these provisions, it is unclear whether this law would apply to discovery and litigation outside of Russia. If the Court credits Defendants' interpretation, a conflict could exist between Russia's Law on Commercial Secrecy and the United States' Federal Rules of Civil Procedure in that any order from this Court compelling production of commercial secrets should be directed to a Russian court under procedures dictated by Russia.

But even crediting Defendants' interpretation, the Court finds their argument still fails to present a "true conflict" in Russian and United States' law. While Mr. Sokolov's Declaration is helpful in educating the Court on various Russian laws, he merely asserts that Coralina and Chudnovets *may* face civil and/or criminal liability if they violate the Non-Disclosure Agreement

---

[6] Oftentimes, foreign states use "blocking statutes" to "prohibit[] the disclosure, copying, inspection, or removal of documents located in the territory of the enacting state in compliance with the orders of foreign authorities." Restatement (Third) of Foreign Relations Law § 442. These blocking statutes are designed to take advantage of the "foreign government compulsion defense." Countries such as France, China, Malaysia, the Netherlands, Canada, and Germany have enacted blocking statutes which indirectly affect the relatively broad scope of American discovery. *In re: Xarelto (Rivaroxaban) Products Liability Litigation*, MDL No. 2592, 2016 WL 3923873, at *6 (E.D. La. July 21, 2016).

with Elemet or other third-parties or if it produces records or information comprising confidential information or commercial secrets. (*See, e.g.,* DN 120-1, at p. 5). Mr. Sokolov does not definitively conclude that the requested documents or information qualify as commercial secrets under Federal Law No. 98-FZ or as confidential information under Federal Law No. 149-fz. In fact, Mr. Sokolov did not review any of the documents Defendants are withholding based on potential violation of Russian laws, except an "extract containing confidentiality clause from a copy of Coralina's sales contract." (*See id.* at p. 2-3). He, therefore, declined to find that the disputed documents are "unknown to third persons" and meet all five requirements of the "regime" of commercial secrecy.

Nor does Mr. Sokolov conclude that any of the Russian laws cited "truly conflict" with the United States' laws of discovery. Selectively citing to Russian laws that may or may not impact the production of the requested documents is insufficient to establish a forthcoming violation of Russian law. Elemet's alleged statements to Defendants that the requested information constitutes "commercial secrets" similarly does not suffice.[7] For these reasons, Defendants have not carried their burden of establishing that Russian law truly conflicts with United States' laws or bars production of the specific documents at issue.

### c. Comity Analysis

Because the Court finds no true conflict exists, there is no need for a comity analysis. *See Royal Park Investments,* 2017 WL 7512815, at *10 (citing *Yukos Capital S.A.R.L. v. Samaraneftegaz*, 592 F. App'x 28, 29 (2d Cir. 2015) (quoting *In re Maxell Comm'n Corp.*, 93 F.3d 1036, 1049 (2d Cir. 1996)) ("International comity comes into play only when there is a true conflict

---

[7] The Court finds an excerpt from the Columbia Business Law Review helpful: "The problem is that while there is a general obligation to preserve the confidentiality of commercial secrets, the definition of commercial secrets consists of a list of specific types of information, and does not include all of the information that a company might want to keep as confidential." Bernard Black, et al., *Legal Liability of Directors and Co. Officials Part 1: Substantive Grounds for Liability (Report to the Russian Securities Agency)*, 2007 Colum. Bus. L. Rev. 614, 748-49 (2007).

between American law and that of a foreign jurisdiction.")). But were a comity analysis required, the Court's conclusion remains the same.

The comity analysis is meant to "assess the interests of each nation in requiring or prohibiting disclosure and determine whether disclosure would 'affect important substantive policies or interests' of either the United States or [other nations]." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1476 (9th Cir. 1992) (citation omitted). In making this comity determination, courts consider the following factors from the Restatement (Third) of Foreign Relations Law:

> (1) The importance to the investigation or litigation of the documents or other information requested;
> (2) The degree of specificity of the request;
> (3) Whether the information originated in the United States;
> (4) The availability of alternative means of securing the information; and
> (5) The extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located.

*Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 552 (S.D.N.Y. 2012). Several courts construing the holding from *Aerospatiale* have considered two additional factors:

> (6) The hardship of compliance on the party or witness from whom discovery is sought; and
> (7) The good faith of the party resisting discovery.

*Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 419-20 (S.D.N.Y. 2016) (quoting *Wultz*, 910 F. Supp. 2d at 420); *see also Trueposition, Inc. v. LM Ericsson Telephone Co.*, No. 11-4574, 2012 WL 707012, at *2 (E.D. Pa. Mar. 6, 2012); *S.E.C. v. Standford Intern. Bank, Ltd.*, 776 F. Supp. 2d 323, 330 (N.D. Tex. 2011) (citation omitted).

The first two factors support Phoenix's position. Production of contracts or other business communications between Coralina and Elemet or other third-parties for the sale of equipment

within "the territory" could form the basis of Phoenix's breach of contract and KUTSA claims. Communications between Coralina and other Defendants could further support Phoenix's allegations of alter ego liability among the Defendants. Additionally, Phoenix's requests are specific and tailored to discovering any equipment sold by Coralina within the territory to Elemet or other third parties, the details of such sales, and any business communications between Coralina and other Defendants in this action.

The third factor supports Defendants' position because the information and documents are currently located in Russia, making it likely that much, if not all, of the requested information and documents originated outside of the United States.

Factor four favors Phoenix. While the procedures of the Hague Convention are not available because the United States and Russia are not treaty partners, the Court retains discretion to make requests through letters rogatory using Russian diplomatic channels. Phoenix, however, cites to the United States' Department of State website, which explains that:

> The United States has not accepted the Russian Federation's accession to the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters because the Russian Federation did not name a central authority at the time of its accession, and did not make any specific declarations or reservations regarding methods of obtaining evidence. Due to the Russian Federation's unilateral suspension of judicial cooperation in civil and commercial matters, requests for evidence submitted via diplomatic channels in the form of letters rogatory are not executed by Russian authorities.

(DN 123, at p. 14 (citing U.S. Department of State – Bureau of Consular Affairs, Judicial Assistance Country Information, https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/RussianFederation.html)).

Mr. Sokolov's Declaration confirms Russia's convoluted procedures for foreign discovery inquiries, stating that because Russia did not appoint a central authority when acceding to the Convention, all inquiries or requests of foreign courts "are delivered for execution to the territory

in Russia through the diplomatic channels to the Ministry of Foreign Affairs[,]" then are forwarded to the Ministry of Justice, and finally are forwarded through "its Main Directorates in the regions of the Russian Federation for execution by the competent Russian court." (DN 120-1, at pp. 12-13). There is, therefore, a real possibility that Phoenix would not be able to obtain its requested discovery through letters rogatory.[8] *See I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko,"* No. 18-5194, 2018 WL 6446601, at *2 (E.D. Pa. Dec. 10, 2018) ("[A]lthough the Department of State is prepared to transmit letters rogatory for service or evidence to Russian authorities via diplomatic channels, in the department's experience, all such requests are returned unexecuted."); *see also Ahrens v. Pecknick*, No. 2:15-cv-02034-JAD-NJK, 2016 WL 6806328, at *1 n.2 (D. Nev. Nov. 16, 2016).

The fifth factor is the most important in that it "directly addresses the relations between sovereign nations." *Laydon*, 183 F. Supp. 3d at 422 (quoting *S.E.C. v. Gibraltar Glob. Sec., Inc.*, No. 13 Civ. 2575 (GBD)(JCF), 2015 WL 1514746, at *5 (S.D.N.Y. Apr. 1, 2015) (add'l citations omitted)). To start, courts have repeatedly recognized that "the United States has an 'obvious interest' in having its own procedural rules applied to discovery. *Id.* at 423 (quoting *Tansey v. Cochlear Ltd.*, No. 13-CV-4628, 2014 WL 4676588, at *4 (E.D.N.Y. Sept. 18, 2014) (add'l citations omitted)). The more vital the discovery is to the litigation, the stronger the United States' interest. *See Tansey*, 2014 WL 4676588, at *4. The United States' interests in permitting efficient discovery under the Federal Rules are, therefore, "considerable and fundamental." *St. Jude*, 104 F. Supp. at 1162.

---

[8] This conclusion is supported by the Court's earlier Memorandum, Opinion and Order granting Phoenix's Motion for Authorization of Substituted Service. (DN 75). The Court there found that information provided on the State Department's website demonstrated that Russia's Central Authority would not deliver any process based on Russia's unilateral suspension of judicial cooperation with the United States in civil matters. (*Id.* at pp. 15-16). As with service of process in Russia, "futility is almost certain to result" from attempts to comply with Russian procedures relating to foreign discovery. (*Id.*).

In evaluating Russia's interests, the Court looks to "expressions of interest by the foreign state, the significance of disclosure in the regulation of the activity in question, and indications of the foreign state's concern for confidentiality prior to the controversy." *Id.* Defendants seem to argue that the United States' interests are outweighed by Russia's interests in enforcing its laws. This Court agrees that Russia has an important interest in enforcing its data protection and commercial secret laws and protecting non-disclosure agreements entered into by Russian companies. But, as discussed above, whether the Russian Federal Laws are actually threatened is speculative in this case. *See Laydon*, 183 F. Supp.3d at 423 ("[W]hether the [Data Privacy Act in the U.K.] and duty of confidentiality are actually implicated here . . . is not entirely clear.") (citing *Alfadda v. Fenn*, 149 F.R.D. 28, 35 (S.D.N.Y. 1993) (finding the U.S.'s interest outweighed Switzerland's interest in bank secrecy where "the applicability of the Swiss secrecy laws to the facts involved in the instant motion is not at all clear"); *see also St. Jude*, 104 F. Supp. 3d at 1162-64 ("[T]he variety of . . . provisions [in Germany's Federal Data Protection Law] permitting disclosure – several of which appear on their face to encompass disclosure under court order for litigation purposes – demonstrate that [Germany's data privacy] interest is not all-consuming.").

Some courts have considered whether the foreign government has raised an objection to the discovery sought in assessing that nation's interests. *See Laydon*, 183 F. Supp. 3d at 424 (citing *Alfadda*, 149 F.R.D. at 34) ("[W]hen foreign governments . . . have considered their vital national interest threatened, they have not hesitated to make their own objections . . . ."); *see also Gucci Am., Inc. v. Curveal Fashion*, No. 09 Civ. 8458 (RJS) (THK), 2010 WL 808639, at *6 (S.D.N.Y. Mar. 8, 2010) ("[T]he Malaysian government has not voiced any objections to disclosure in this case, which . . . militates against a finding that strong national interests of the foreign country are at stake."). The Russian government voiced no objection to the requested discovery here, which

somewhat "militates against a finding that strong national interests of [Russia] are at stake." *See United States v. First Nat'l City Bank*, 396 F.2d 897, 904 (2d Cir. 1968).

Moreover, Russia's interest here seems mitigated by the Confidentiality Agreement that the parties have in place in this case. *See Laydon*, 183 F. Supp. 3d at 425 (citing *St. Jude*, 104 F. Supp. 3d at 1164). As Phoenix notes, the parties' agreement protects any proprietary and commercially valuable information disclosed in this lawsuit, which should alleviate concerns of this information falling into the public or any non-parties' hands. (DN 123, at pp. 14-15). For these reasons, the United States' national interests in this case outweigh those of Russia.

The sixth factor also favors Phoenix. Defendants seem to argue hardship based on the potential liability Coralina and Chudnovets could face for violating Russian federal laws. But Defendants fail to cite a single instance in which a Russian enforcement action was taken against an entity for violating the Russian commercial secrets law or other data protection laws by complying with discovery demands in the United States. Again, it is far from certain that producing the requested documents or information would actually cause Defendants to violate the cited Russian Federal laws. If the mere risk of violating Russian data protection regimes was sufficient to preclude the use of the Federal Rules of Civil Procedure, then letters rogatory would in fact be a pre-emptive replacement for the Federal Rules. Such an outcome is inconsistent with the particularized, case-by-case comity analysis. The speculative liability in this case is not a hardship so significant as to displace the Federal Rules of Civil Procedure.

The final factor, the good faith of the resisting party, is either neutral or slightly weighs in Defendants' favor. Although the Court does not accept Defendants' speculative theories of liability under Russian law as a legitimate way to avoid discovery, the Court finds insufficient evidence to ascribe bad faith to Defendants.

Five of the factors clearly support application of the Federal Rules of Civil Procedure, while only two support requiring production be sought through Russian diplomatic channels or Russian courts. On balance, the Court declines to issue "letters rogatory" to Russian Courts for this information. Instead, the Court will apply the Federal Rules of Civil Procedure in compelling Coralina to produce information and documents responsive to Interrogatory No. 7 and RFP Nos. 3, 4, and 14, and Chudnovets to produce responsive information and documents to RFP Nos. 3 and 5. The Court will address Defendants' additional objections to these discovery requests in the following sections.

### ii. Objections to Specific Interrogatories and Requests for Production

To streamline the many interrogatories and requests for production at issue, the Court will address the remainder of Defendants' objections categorically.[9]

### a. No Responsive Documents Exist

Defendants object to numerous discovery requests, including RFP Nos. 5, 13, 14, and 15 to Chudnovets, RFP Nos. 5, 6, and 10 to CETCO, and Interrogatory No. 7 and RFP Nos. 3 and 4 to Coralina by stating that no additional responsive information or documents exist.[10] While Rule 34 requires a party to produce existing documents in their possession, custody, or control, a responding party is not required "to create a document in response to a request for production." *Harris v. Advance Am Cash Advance*, 288 F.R.D. 170, 174 (S.D. Ohio 2012) (citing *In re Porsche Cars, N.A., Inc.*, No. 2:11-md-2233, 2012 WL 4361430, at *9 (S.D. Ohio Sept. 25, 2012)); Fed. R. Civ. P. 34(a)(1). Put otherwise, a responding party's obligations under Rule 34 do not extend

---

[9] The Court notes that Defendants' brief does not respond to each disputed Interrogatory or Request for Production individually.

[10] RFP No. 5 to CETCO, RFP No. 3 to Coralina, and RFP No. 3 to Chudnovets essentially seek the same documents but from the different defendants. Likewise, RFP no. 6 to CETCO, RFP No. 4 to Coralina, and RFP No. 4 to Chudnovets seek the same documents from the different defendants.

to non-existent materials. *See Commins v. NES Rentals Holdings, Inc.*, No. 3:16cv-00608-GNS, 2018 WL 3186983, at *10 (W.D. Ky. June 28, 2018) (citation omitted)).

In supervising discovery, courts are "often confronted by the claim that the production made is so paltry that there must be more that has not been produced or that was destroyed." *Hubbard v. Potter*, 247 F.R.D. 27, 29 (D.D.C. 2008). A party's speculation that more discovery exists is not sufficient because the theoretical possibility that more documents exist would render discovery never-ending. *Id.* Instead, a moving party must demonstrate that the documents previously produced "permit a reasonable deduction that other documents may exist or did exist and have been destroyed." *Id.* (citing *Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309, 313 (S.D.N.Y. 2003)).

Defendants claim the "communications" that Phoenix seeks in RFP Nos. 5, 13, 14, and 15 to Chudnovets have all been produced. (DN 120, at p. 30). These requests seek communications between Chudnovets and Maria Roberson, Vadim Novak, and Ken Wyzykowski relating to Phoenix for the past ten years and communications with any other Defendant in the lawsuit regarding the purchase or sale of equipment within the territory. (DN 119-4, at pp. 28, 31-32). Defendants state they have diligently searched for additional responsive communications but none have been discovered. (DN 120, at p. 30). According to Defendants, many of the communications among the Defendants and with their representatives occur in person or by phone. (*Id.*). While this information may be relevant to Phoenix's claims, Defendants cannot produce documents that do not exist. Phoenix's speculation, without more, does not permit the inference that additional documents exist or existed. But to the extent that Defendants are withholding responsive documents to these Requests based on attorney-client privilege or work product privilege, Defendants must produce a privilege log to Phoenix.

For RFP Nos. 5, 6 and 10 to CETCO, Defendants explain that many paper files and archives from its Houston office were destroyed in Hurricane Harvey in August of 2017 and that CETCO has otherwise produced electronic copies of all "non-objected" documents. (*Id.* at pp. 30-31). These requests seek documents and communications (contracts, assignments, transfers, e-mails, etc.) that evidence a business relationship between CETCO and any other Defendant or that relate to the sale or purchase by CETCO of any equipment within the territory since 2009. (*See* DN 119-2, at pp. 3-4, 6). Defendants again cannot produce documents that no longer exist, especially when such documents have been unintentionally destroyed by natural disaster. However, if CETCO is still withholding existing documents responsive to these Requests based on boilerplate objections (vague, overbroad, unduly burdensome, etc.), Defendants must produce these documents because they are relevant to Phoenix's breach of contract and KUTSA claims and alter ego allegations.

For Interrogatory No. 7 to Coralina, Phoenix claims Coralina has only produced purchase orders between Coralina and CETCO and that these purchase orders do not include the purchaser's identity or the sale date. (DN 119, at p. 15). Because Coralina has produced some purchase orders, and this information is relevant to Phoenix's claims, Defendants are required to supplement their response by producing information about all equipment Coralina purchased or sold within the territory, including the equipment's description, manufacturer, model number, serial number, date sold, and purchaser, if they have not previously done so.

For RFP Nos. 3 and 4 to Coralina, Phoenix claims that documents are missing despite ample evidence from previous discovery that such documents exist. (*Id.* at p. 16). These requests seek production of the same documents as RFP Nos. 5 and 6 to CETCO. (DN 119-3, at pp. 19-20). Phoenix alleges that email communications between Coralina and other Defendants, documents evidencing a business relationship between Coralina and Technology, contracts relating to

equipment Coralina purchased, marketed, or sold to other Defendants or third parties, and documents relating to the relationship between the Defendants and Cuna Industrial Technologies ("Cuna"), are all being withheld. (DN 119, at pp. 16-17). Defendants argue that Phoenix is improperly expanding the scope of their discovery requests because Phoenix did not originally seek information or documents involving Cuna. (DN 120, at p. 32). Once more, Defendants are not required to produce non-existent documents. Although Phoenix states that ample evidence demonstrates the requested documents exist, it failed to attach most of this evidence to its Motion to Compel.[11] Without this evidence, the Court cannot conclude that additional responsive documents exist regarding any relationship between Defendants and Cuna.

However, Phoenix's reference to Coralina's response to Interrogatory No. 2, stating that Coralina was a wholly owned subsidiary of Technology from November 2006 to March 2008, permits the inference that documents and communications could exist between Coralina and Technology involving the sale and purchase of equipment in the territory described by the 2009 and 2012 distributor agreements. Moreover, Coralina's objections to producing documents responsive to these requests based on potential liability under Russian law demonstrate that additional documents, including contracts and purchase orders with other Defendants or third parties, are likely being withheld. Because the documents sought by Phoenix form the basis of its claims, Defendants must produce any existing, responsive documents to RFP Nos. 3 and 4 to Coralina.

---

[11] For instance, Phoenix cites to "Defendants [sic] Production Bates stamped 000364, 000376, 000402, 000407, [and] 000455" in referencing Cuna documents and "Defendants' Document Production 000353; 000201; 000208; 000251; 002511; 002461; [and] 002272" in referencing Coralina employees assisting with Phoenix purchase orders. (DN 119, at pp. 16-17). But Phoenix did not attach any of these Bates stamped documents to either its Motion to Compel or Reply.

RFP Nos. 3 and 4 to Chudnovets are worded nearly identically to RFP Nos. 5 and 6 to CETCO and RFP Nos. 3 and 4 to Coralina. As the Court has already found these documents with respect to Coralina are relevant to Phoenix's claims and production is not prohibited by Russian law, without further objection, Chudnovets must produce any existing responsive documents.

### b. Time Barred Responses

In responding to Phoenix's discovery, Defendants generally objected that the requests were "not limited to any relevant scope of time with respect to the issues in the case." (*See, e.g.,* DN 119-2, at p. 7). Defendants responded to Phoenix's requests to Coralina and CETCO by limiting the "Relevant Period" from 2009, when CETCO was first organized as a corporation until June 30, 2016, the latest date of the purported distributor agreement, and responded to Phoenix's requests to Chudnovets by limiting the "Relevant Period" from April 1, 2009, the date the earlier distributor agreement began, to December 31, 2015, the initiation of this lawsuit. (*See id.*; DN 119-3, at p. 7; DN 119-4, at p. 7).

In broadly viewing these objections, the Court agrees that it was appropriate for Defendants to limit the responsive time frame. An unlimited time frame, as contemplated by Phoenix, is overly broad and not proportional to the claims in this case. Phoenix entered into the first distributor agreement at issue with Technology in May of 2009. The latest date for the second distributor agreement to have effect was June 30, 2016. That range of dates accurately captures the events surrounding this lawsuit and serve as a reasonable time frame for most of Defendants' responses.[12] Accordingly, unless otherwise discussed below, the Court agrees with the time limitations imposed in Defendants' responses.

---

[12] While Defendants initially limited Chudnovets' responses from April 1, 2009 to December 31, 2015 (the initiation of the lawsuit), the Court finds it appropriate for Defendants to respond to the requests for all Defendants using a "Relevant Period" of May of 2009 to June 30, 2016.

In its Motion to Compel, Phoenix specifically identifies Interrogatory No. 4 and RFP No. 8 to CETCO, RFP No. 6 to Coralina, and Interrogatory Nos. 6 and 7 to Chudnovets as improperly time barred by Defendants.[13] Several of these requests, aimed at discovering information related to Phoenix's alter ego liability theory, should extend beyond the last effective date of the later distribution agreement. RFP No. 8 to CETCO and RFP No. 6 to Coralina, for instance, seek communications between CETCO or Coralina's website administrators and other persons authorized to modify their websites relating to changes in website content, domain name, or e-mail addresses for employees since the beginning of this lawsuit. (DN 119-2, at p. 26; DN 119-3, at p. 21). Both CETCO and Coralina explicitly limited their responses to communications from April 1, 2009 to June 30, 2016. (*Id.*). But it appears that because Phoenix only requested communications after the lawsuit was filed, CETCO and Coralina only agreed to produce communications from December of 2015 (lawsuit's initiation) to June 30, 2016. Regardless of this restrictive time frame, Phoenix asserts that CETCO and Coralina produced no documents responsive to these requests. Defendants explain that they do not "regularly maintain records regarding revisions to their respective websites or communications with persons who revise their respective websites." (DN 120, at p. 33).

The requested communications are relevant to Phoenix's allegation that Defendants have altered their websites since the lawsuit began to remove information supporting its claims of alter ego liability. (DN 119, at p. 6, 22). Phoenix states that the link to "history of the company" on Coralina's website directs users to a website for the allegedly dissolved Technology and provides screenshots from the websites "coralina.ru/about/" and "coalprep.ru." (DN 123-7; DN 123-8). Phoenix also produces evidence demonstrating that Coralina's website formerly identified it as a

---

[13] The Court notes that while Defendants mounted time bar objections to almost every discovery request submitted by Phoenix, this Opinion only specifically addresses those time bar objections briefed by the parties.

subsidiary of CETCO but that all such references have now been removed. (*See* DN 123-6; DN 123-9). Phoenix has put forth enough information to create an inference that communications are likely to exist between website administrators and those persons authorized to modify the websites regarding changes in the website content or domain names. CETCO and Coralina are, therefore, required to produce the requested communications from the start of litigation to the present day. If, after searching for documents responsive to this additional time frame, CETCO and Coralina again find that no records or communications have been maintained, they must communicate such finding to Phoenix.

Phoenix also takes issue with Defendants' time limits in responding to Interrogatory Nos. 6 and 7 to Chudnovets. These requests both seek information relating to Technology's dissolution. No. 6 seeks business assets or property of Technology transferred to any other Defendant "prior to or immediately following" Technology's dissolution. (DN 119-4, at p. 9). No. 7 seeks details regarding Technology's ownership at dissolution and "all previous owners and shareholders" of Technology. (*Id.* at p. 10). Defendants objected that these requests were overly broad because Technology dissolved in October of 2011, and information prior to such dissolution could date back to Technology's formation in 1997. Defendants now assert that they have produced all relevant documents in connection with Technology after its dissolution but that many documents no longer remain in its possession because of its communication retention policy. (DN 120, at p. 30). Phoenix submits that Defendants are withholding responsive documents because previous discovery demonstrates that "Altayr Technologies Ltd owned 1125 shares of Technology stock" in 2005 but Defendants have produced no documents disclosing the owners of Altayr. (DN 119, at p. 23).

While Technology's ownership prior to dissolution and transfer of Technology's assets prior to or immediately following Technology's dissolution are relevant to Phoenix's claims, the Court agrees Defendants should not be required to produce such information dating back to 1997. Phoenix entered into the first distributor agreement at issue with Technology in 2009. An appropriate time frame for responding to these requests is from the start of Phoenix and Technology's business relationship under the distributor agreement in April of 2009 to October of 2013, two years after Technology's dissolution. To the extent that Defendants have not produced responsive documents for this time, Defendants must supplement their answers. Defendants are not required to produce further evidence regarding Altayr Technologies Ltd. unless it falls within this period.

In Interrogatory No. 4 to CETCO, Phoenix requested the identities of all officers, directors, investors, owners, and shareholders of CETCO since 2009. (DN 119-2, at p. 8). CETCO found this request was not limited to a relevant scope of time and time-barred its response from April 1, 2009 to June 30, 2016. (*Id.* at pp. 8-9). Phoenix now argues that the answer to this question is relevant to the present and to its allegations of alter ego liability. (DN 119, at pp. 19-20). Defendants counter that because Phoenix's claims derive from the obligations in the distributor agreement, which ended on June 30, 2016, any information regarding ownership past that date does not support alter ego liability during the life of the distributor agreement. (DN 120, at pp. 21-22). Although responsive information is relevant to Phoenix's alter ego liability claims, the Court finds Defendants' response is appropriately limited from April 1, 2009 to June 30, 2016.

### c. Remaining Objections

Interrogatory No. 5 to CETCO seeks the identity of all individuals who have made changes to CETCO's websites for the past five years, including website administrators. (DN 119-2, at p.

9). CETCO asserted numerous objections, including that the inquiry was overbroad, not proportional to the needs of the case, and did not distinguish between minor changes, like grammatical corrections, versus major changes. (*Id.*). Without waiving those objections, CETCO stated that changes to the website were made by Alexander Chudnovets. Again, because Phoenix has produced evidence that Defendants' websites have been substantively changed following the start of litigation, the Court finds this request is relevant to Phoenix's alter ego liability claims. CETCO must supplement its response to indicate whether Chudnovets was also the website's administrator and, if not, to identify the website administrator for the last five years.

Interrogatory No. 13 to CETCO seeks "any and all parent and/or subsidiaries of CETCO, including but not limited to all entities that comprise the 'CETCO group of companies,' (as described on Coralina Engineering LLC's website coalprep.ru)." (DN 119-2, at p. 17). Defendants objected that Phoenix was assuming facts not in evidence and disputed that a "CETCO group of companies" exists. (DN 119-2, at p. 17). In its reply, Phoenix produces marketing materials from Coralina that reference "[t]he international CETCO Group" (DN 123-6, at p. 4), and screenshots from Coralina's website stating "CETSO [sic] Group of Companies" (DN 123-7). Because Phoenix demonstrates that the disputed term, "CETCO Group," was used in marketing materials and on various websites, CETCO must supplement its response by identifying those companies that comprise the CETCO Group or by explaining the meaning of the disputed term in the marketing materials and on the websites.

III. Conclusion

Phoenix's Motion to Compel and Defendants' Response outline a multitude of discovery disputes resulting from Phoenix's discovery requests. As to the numerosity of Phoenix's

Interrogatories to CETCO and Coralina, the Court finds that Phoenix submitted 26 interrogatories to CETCO, leaving it 19 interrogatories for Coralina. Defendants must respond to Interrogatory Nos. 7-17 from Phoenix's third amended production of discovery to Coralina.

As to Defendants' assertions that responding to Interrogatory No. 7 and RFP Nos. 3, 4, and 14 to Coralina and RFP Nos. 3 and 5 to Chudnovets could subject them to civil or criminal liability, the Court finds Defendants have not demonstrated a true conflict between Russian and United States laws. Defendants' speculation that the requested documents may constitute commercial secrets or confidential information under Russian law is insufficient to disturb the Federal Rules of Civil Procedure's applicability to these discovery disputes.

Despite objecting to many of Phoenix's requests, Defendants have produced a significant amount of information in discovery, and the Court finds that several of Defendants' objections to specific interrogatories or RFPs have merit. For instance, Defendants cannot produce and will not be required to produce documents that it claims do not exist after performing searches for such information. Further, most of Defendants' time-barred responses are reasonable in relation to the events comprising this litigation. However, to the extent outlined above, Defendants must supplement their responses to Interrogatory Nos. 5 and 13 and RFP No. 8 to CETCO, Interrogatory No. 7 and RFP Nos. 3, 4, and 6 to Coralina, and Interrogatory Nos. 6 and 7 and RFP Nos. 3 and 4 to Chudnovets.

## ORDER

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Compel (DN 119) is **GRANTED IN PART and DENIED IN PART** to the extent outlined above. Defendants shall supplement their responses to Plaintiffs' Third Amended Discovery Requests within thirty (30) days entry of this Order. The parties shall submit a joint status report within thirty (30) days entry of this Order to update the Court as to the parties' compliance with this Memorandum Opinion and Order.

Regina S. Edwards, Magistrate Judge
United States District Court

March 18, 2019

Copies:        Counsel of Record