UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:16-CV-00024-CHB

**PHOENIX PROCESS
EQUIPMENT COMPANY**                                                  **PLAINTIFF**

**VS.**

**CAPITAL EQUIPMENT
& TRADING CORPORATION, et al.**                            **DEFENDANTS**

<u>**MEMORANDUM OPINION
AND ORDER**</u>

This trade secret litigation has been plagued by discovery disputes for the better part of three years. Most recently, the parties have filed lengthy motions to compel. Plaintiff Phoenix Process Equipment Company ("Phoenix") says in its sixty-two-page motion that Defendants Capital Equipment & Trading Corporation, et al., ("Defendants") are improperly withholding or destroying information and documents. (DN 182). Defendants say in their thirty-nine-page motion that Phoenix has not provided complete and proper responses to their discovery requests. (DN 185). Both parties have also filed motions to seal (DN 181; DN 183; DN 191; DN 202) and motions for leave to file excess pages (DN 184; DN 192; DN 195; DN 198; DN 200). These motions were referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(A). (*See* DN 4; DN 117). Fully briefed, they are ripe for disposition.

<u>I. BACKGROUND</u>

Phoenix is a Kentucky-based company that designs, engineers, manufactures, and services machinery and equipment that recycles water and other materials used to wash coal. In 2009, Phoenix entered into a distribution agreement that granted Capital Equipment and Technology Corporation ("Technology Corp.") an exclusive territory to market and sell Phoenix's products. In

2012, Phoenix thought it was renewing its distribution agreement with Technology Corp. but instead entered into a new agreement with Capital Equipment and Trading Corporation ("Trading Corp." or "CETCO" or "CE&T Corp.").[1] Phoenix claims that at some point after entering into the 2012 agreement, it obtained information that Coralina Engineering, LLC ("Coralina") and Electrogorsk Metal Factory ("Elemet") were selling and distributing products very similar to Phoenix's in the region covered by its distribution agreement with Trading Corp.[2]

Based on this information, Phoenix initiated this lawsuit against Technology Corp., Trading Corp., Coralina, Elemet, and Alexander Chudnovets ("Mr. Chudnovets") in November of 2015.[3] (*See* DN 1-2). Several of Phoenix's claims were previously dismissed by the District Judge. (*See* DN 57; DN 75). Remaining are its claims of breach of contract (Count I) and violation of the Kentucky Uniform Trade Secrets Act (KUTSA) (Count III). (*See* DN 40, at ¶¶ 32-36, 41-45). Phoenix further alleges that Trading Corp. and Coralina are "alter-ego" companies because Mr. Chudnovets served as CEO and on the board of directors at Trading Corp. and was the sole member of Coralina and because the two companies share employees and offices. (*Id.*, at ¶¶ 18-20, 25-28).

Discovery has been a contentious and fragmented process. The undersigned and the former magistrate judge in this case have held at least eight discovery-dispute conferences. (*See* DN 97; DN 104; DN 142; DN 150; DN 157; DN 164; DN 166; DN 180). Due to the multitude of disputes

---

[1] Phoenix's Motion to Compel refers to Defendant Capital Equipment and Trading Corporation as "CETCO Trading;" whereas, Defendants' Motion to Compel identifies this entity as "CE&T Corp." For purposes of this motion, the Court will simply refer to Defendant Capital Equipment and Trading Corporation as Trading Corp., but in doing so, makes no statement as to the Defendants' names related to Phoenix's alter-ego claims.

[2] For a more comprehensive summary of the facts in this case, please see the undersigned's Opinion filed on March 19, 2019 (DN 127) or the District Judge's Opinion filed on January 13, 2017 (DN 57).

[3] The Court will collectively refer to Technology Corp., Trading Corp., Coralina, and Alexander Chudnovets as "Defendants" for purposes of these motions since they are all represented by the same counsel unless it is necessary to distinguish between specific discovery requests and objections.

mounting earlier in the litigation, the Court granted Phoenix leave to file a motion to compel. (DN 119). The Court issued a Memorandum Opinion and Order ("Opinion") on March 19, 2019, granting Phoenix's motion in part and requiring Defendants to supplement their responses to several discovery requests. (DN 127).

Unfortunately, the parties' discovery disputes persisted. Although the Court repeatedly encouraged the parties to compromise and resolve their issues without judicial intervention, they could not do so. (*See, e.g.,* DN 137; DN 150). Fact discovery closed on January 31, 2020. After unsuccessful settlement negotiations (DN 178), the Court again granted the parties leave to file discovery motions (DN 180). Now, Phoenix (DN 182) and Defendants (DN 185) have filed motions to compel, with accompanying motions for leave to file excess pages (DN 184; DN 192; DN 195; DN 198; DN 200).[4]

## II. STANDARD

Trial courts have wide discretion in dealing with discovery matters. *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008); *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981). The "scope of discovery" encompasses "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). Relevance is construed broadly to include "any matter that bears on, or that reasonably could lead

---

[4] Defendants timely filed their motion for leave to exceed page limitations (DN 184) on the same day they filed their motion to compel. Phoenix, on the other hand, didn't request leave to file excess pages until almost a month after it filed its 62-page motion to compel. (DN 195). Phoenix commented in its motion that it needed to exceed the relevant page limits by thirty-seven pages because of the "multitude of issues the Magistrate Judge asked the parties to address in said Motion." (DN 195). While the Court asked Phoenix to include its request to extend its rebuttal expert witness deadline in its motion to compel, such argument only comprises six pages of Phoenix's sixty-two-page motion. Otherwise, much of Phoenix's Motion is repetitive, stating and then restating its three main arguments in the introduction, background, and analysis sections. (DN 182).

Verbosity does not necessarily equate to persuasion. The page limits imposed by the Local Rules encourage the parties to be focused and concise in their arguments to allow the Court to swiftly resolve motions. Although the Court disapproves of Phoenix's tardy request for excess pages, it will grant all parties' motions for leave to file excess pages (DN 184; DN 192; DN 195; DN 198; DN 200) in the interest of moving this case forward and comprehensively resolving all remaining discovery issues in this Opinion.

to other matter that could bear on" any party's claim or defense. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) (citation omitted). In analyzing proportionality, the Court must consider the need for the information sought based upon "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Federal Rule of Civil Procedure 37 allows a party to move for an order compelling disclosure or discovery when "a party fails to answer an interrogatory submitted under Rule 33" or "fails to produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(iii), (iv). Under Rule 37, an "evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." *Id.* (a)(4).

### III. PHOENIX'S MOTION TO COMPEL (DN 182)

Phoenix's Motion carries two components. First is its Motion to Compel, setting forth three main issues: (1) Defendants' failure to comply with the Court's March 19, 2019 Opinion compelling discovery; (2) Defendants' boilerplate objections and refusal to produce documents responsive to Phoenix's second set of discovery requests; and (3) Defendants' failure to provide a timely privilege log. Phoenix seeks Defendants be sanctioned for their "repeated refusals to comply with Phoenix's relevant Discovery Requests." (DN 182, at p. 53). The second component involves Phoenix's issues with expert discovery. Phoenix seeks permission to designate a rebuttal expert and requests Defendants be compelled to respond to its expert discovery requests. (*Id.* at p. 54).

Defendants make several broad claims as to why Phoenix's Motion to Compel should be denied. They claim Phoenix has not met its initial burden of proving relevance by failing to attach

4

the disputed discovery requests and responses and that Phoenix has failed to provide the alleged ample evidence supporting its claims that responsive documents exist. (*Id.* at pp. 8-9). Phoenix's Motion should also be denied, according to Defendants, because Phoenix mischaracterized the evidence, made unsupported, conclusory statements, failed to serve sealed exhibits on Defendants, and improperly disclosed information designated as confidential.[5] (*Id.* at pp. 10-16). The Court will address Defendants' broad arguments while analyzing the specific discovery responses that Phoenix feels are inadequate.

## A. Fact Discovery

### 1. Defendant's Failure to Comply with the Court's March 19, 2019 Opinion

In March of 2019, the undersigned issued an Opinion, granting in part and denying in part a motion to compel filed by Phoenix. (DN 127). This Opinion required Defendants to supplement their responses to Interrogatory ("INT") Nos. 5 and 13 and Request for Production ("RFP") No. 8 to Trading Corp.; INT No. 7 and RFP Nos. 3, 4, and 6 to Coralina; and INT Nos. 6 and 7 and RFP Nos. 3 and 4 to Mr. Chudnovets. (*Id.* at p. 39). The Court also rejected Defendants' assertions that they should not be required to respond to INT No. 7 and RFP Nos. 3, 4 and 14 to Coralina and RFP Nos. 3 and 5 to Mr. Chudnovets because producing such information or documents could subject them to civil or criminal liability in Russia. (*Id.*).

These discovery requests sought information or documents relating to Coralina's sale of equipment to third parties within "the territory" specified in the 2009 and 2012 distributor

---

[5] Not only did Phoenix fail to serve sealed exhibits to its Motion and Reply on Defendants, it also failed to provisionally file these sealed exhibits in the record with its Motions to Seal. The Court ordered Phoenix to comply with this District's administrative rules on sealed exhibits by electronically filing Exhibits 2, 4, and 6 to its Motion to Compel and Exhibits 2 and 3 to its Reply under provisional seal. (DN 205). While Phoenix complied with the Court's Order, it failed to appropriately label the sealed exhibits to correspond with the numbered exhibits in its Motion to Compel and Reply. These failures prolonged adjudication of Phoenix's motion to compel.

Regardless, the Court will grant all pending motions to seal (DN 181; DN 183; DN 191; DN 202) related to this motion practice.

agreements, including descriptions of the equipment, its manufacturer, model number, serial number, the date sold, and the seller and purchaser of the equipment. (DN 119-3, at pp. 5, 20). These requests also sought contracts, assignments, transfers of ownership, sales of stock, and communications between Coralina and Trading Corp. and Coralina and the other Defendants that evidence a business or financial relationship or involve the sale of equipment within the territory. (*Id.* at pp. 5, 19, 20, 26; DN 119-4, at pp. 27-28).

Phoenix claims that Defendants are either withholding or have destroyed additional responsive documents in violation of the Court's Opinion. (DN 182, at pp. 25-26). Defendants explain that they have supplemented their responses and document production on five occasions since then. (DN 193, at p. 5). Defendants have further represented to Phoenix that they have produced all responsive documents in their possession, custody, and control or have certified that no additional documents exist. (*Id.* at p. 6). To support these assertions, Defendants highlight that: (1) Hurricane Harvey destroyed many documents in Trading Corp.'s Houston office; (2) Technology Corp. ceased doing business in 2011; and (3) Coralina's "standard practice" is to retain communications for two years and contracts for five years.  (*Id.*).

Oftentimes during discovery, one party will claim that the production made by the other party is "so paltry that there must be more that has not been produced or that was destroyed." *Hubbard v. Potter*, 247 F.R.D. 27, 29 (D.D.C. 2008). Ordinarily the representation of the responding party's attorney that no additional documents exist "is sufficient to defeat a motion to compel absent credible evidence that the representation is inaccurate." *Snyder v. Fleetwood RV, Inc.*, No. 2:13-cv-1019, 2016 WL 339972, at *6 (S.D. Ohio Jan. 28, 2016); *see also MRM Rest. Grp., LLC v. Frontline Ins. Unlimited Co.*, 3:20cv1872-MCR-HTC, 2020 WL 5881050, at *3 (N.D. Fla. May 29, 2020) (citing *Harris v. Koenig*, 271 F.R.D. 356, 370 (D.D.C. 2010)). Credible

evidence is more than mere speculation that additional discovery exists. *Snyder*, 2016 WL 339972, at *6; *Hubbard*, 247 F.R.D. at 29. The moving party must demonstrate that the documents previously produced "permit a reasonable deduction that other documents may exist or did exist and have been destroyed." *Hubbard*, 247 F.R.D. at 29 (citing *Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309, 313 (S.D.N.Y. 2003)). Credible evidence might include presentation of responsive, but withheld, documents that the moving party obtained from another source or testimony demonstrating knowledge of the existence of responsive documents. *See id.* (collecting cases).

a. Documents Relating to Belt Filter Press and Equipment Sales

Phoenix claims that Defendants responded to requests seeking information related to Defendants' sales and purchases of equipment from entities other than Phoenix by producing a spreadsheet listing twenty-five Elemet-manufactured belt filter presses. (DN 182, at p. 26). Phoenix offers three reasons why it believes additional responsive documents exist or existed beyond this extremely limited production. (*Id.* at p. 27). First, because Defendants have produced ample documents relating to purchases and sales with Phoenix during the relevant time period, Phoenix reasons that documents relating to Defendants' purchases and sales with other entities should exist as well. (*Id.*). Next, Phoenix states that Defendants' earlier indications that production would violate their non-disclosure agreement with Elemet or would violate Russian law suggest that such documents exist or existed. And lastly, Phoenix argues Defendants are withholding documents based on their representations in June of 2019 that they were still working to produce their contracts with Elemet but then never produced such contracts. Phoenix references deposition testimony from Maria Gordon ("Ms. Gordon"),[6] stating that the manuals associated with three Elemet-manufactured belt filter presses were mailed to Coralina's office. This allegedly

---

[6] Maria Gordon, formerly Maria Roberson, testified both individually and as Trading Corp.'s corporate representative. (*See* DN 193, p. 9 n. 7-8).

7

demonstrates that these manuals and similar responsive documents were in Coralina's possession at the time litigation in this case was anticipated. (*Id.* at p. 31).

Defendants respond that in addition to the Excel spreadsheet, their fourth supplemental production included additional contracts and purchase orders involving the sale of belt filter presses and related parts with Trading Corp., Coralina, and Elemet. (DN 193, at p. 20). Defendants explain that they have now produced the materials that they previously feared would create Russian liability and violate their non-disclosure agreements with Elemet. (*Id.* at p. 21). Defendants further explain that documents with entities other than Phoenix were not maintained because those parties had not filed suit against Defendants. (*Id.* at pp. 23-24). In other words, Defendants claim they were not on notice to maintain each communication and document ever exchanged in the course of business simply because Phoenix filed a lawsuit. (*Id.* at p. 24). Phoenix's mere conjecture, Defendants argue, does not permit a reasonable deduction that responsive documents exist or are being improperly withheld. (*Id.*).

In reply, Phoenix cites to and attaches deposition testimony from Ms. Gordon discussing a ten-million-dollar sale of Elemet equipment from Trading Corp. to DTEK, an unrelated third party, in August of 2014. (DN 199, at pp. 4-5). Phoenix claims that despite Ms. Gordon's testimony that Trading Corp. and Coralina worked together to fulfill this sales contract, Defendants have produced only the contract and purchase order but no emails or other documents relating to this project. (*Id.*). These documents or communications, Phoenix asserts, should not have been destroyed by Coralina's document destruction policy. (*Id.*). Phoenix further emphasizes that Defendants did not have a duty to preserve each and every communication or document ever exchanged with others but that they were on notice to preserve each and every document and communication relating to the Defendants' assisting Elemet with developing copies of Phoenix's

belt filter presses; their alter-ego relationship with each other; and any violations of the parties' distributor agreements, including the purchase of Elemet or other non-Phoenix belt filter presses and the sale of non-Phoenix equipment to third parties. (*Id.* at pp. 8-9).

First, Phoenix misrepresents that Coralina never mentioned its document retention/destruction policy until September 27, 2019. Coralina, in fact, disclosed this policy one year earlier when it responded to Phoenix's first motion to compel. (*See* DN 120, at p. 30).[7] While Defendants should have mentioned Coralina's policy when responding and objecting to Phoenix's initial discovery requests, Phoenix clearly had knowledge of this policy since September of 2018 and cannot disprove Coralina's objection on this basis. Coralina certainly cannot produce documents that were destroyed due to this policy, just as Trading Corp. cannot produce documents that were destroyed by Hurricane Harvey.

But the question that remains is whether Coralina's "standard practice" was applied here. Defendants admit that once Phoenix filed suit, they were on notice to maintain their communications and documents exchanged with Phoenix and allege they satisfied this obligation. Based on the allegations in Phoenix's Complaint, however, Defendants should have maintained more than this narrow category of documents. Phoenix's Complaint alleged that Defendants reverse engineered Phoenix's machines and equipment by pirating its confidential designs, information, and trade secrets and that Elemet began manufacturing machines and equipment nearly identical to Phoenix's products. (*Id.* at ¶ 20). It further alleged that Trading Corp., through its alter ego Coralina, directly violated its distributor agreements with Phoenix by marketing, distributing, and selling Elemet's pirated machines and equipment. (*Id.* at ¶ 20). These allegations

---

[7] The Response stated: "Coralina's standard corporate practice is to only retain communications for two (2) years and only retain contracts for five (5) years. Accordingly, because Phoenix filed this lawsuit more than five (5) years after Technology was dissolved, Coralina has provided the only relevant documents it still has in its possession."

put Defendants on notice in December of 2015 that, at the very least, documents relating to sales and purchases between Defendants and Elemet would be relevant to this action and should be maintained.

As for Phoenix's reference to Ms. Gordon's deposition testimony and to missing communications between Trading Corp., Elemet, and DTEK, the Court agrees Phoenix is relying primarily on conjecture. But Phoenix has understandably resorted to conjecture in claiming that further responsive documents must exist due to Defendants' constant objections to producing documents over the past several years. The documents Phoenix seeks are undoubtedly relevant to its claims and proportional to the needs of this case because Phoenix's Complaint identified Elemet and alleged that Trading Corp.'s business relationship with Elemet violated Phoenix and Trading Corp.'s distribution agreements. (DN 1-2, at ¶ 19).

Based on this discussion, the Court will require Coralina and Trading Corp. to provide sworn declarations that no additional documents exist or existed but were destroyed. If documents were destroyed, Coralina and Trading Corp. shall detail how and why specific documents were destroyed and why they do not exist in electronic format. Phoenix may submit an additional interrogatory to Coralina regarding its document destruction policy generally, and as applied to responsive documents in this litigation, within seven days entry of this Opinion. Coralina will then have seven days to respond and is prohibited from asserting boilerplate objections.

b. Documents Relating to Spare and Lost Part Sales

Phoenix believes Defendants are also withholding documents relevant to "lost part sales" based on a decline in Phoenix's replacement part sales in 2013. (DN 182, at p. 34). Specifically, because Phoenix's spare part sales in the territory in 2011 and 2012 averaged $574,886.00 but dropped in 2013 to $63,105.00, Phoenix claims that documents demonstrating that Defendants

began buying these parts from other suppliers must exist. (*Id.*). According to Phoenix, "[t]he fact that [its] spare parts sales dropped significantly indicates that the Defendants began buying these parts from someone else." (*Id.*).

Defendants respond that Phoenix has failed to provide any evidentiary support for its belief that additional spare part sales information exists beyond what has been produced. (DN 193, at p. 25). Defendants state that "other market factors" would explain why Phoenix saw a decrease in spare part sales and why their spreadsheet did not show more sales by Defendants. (*Id.*). Several of these market factors include the tendency and inclination for Russian end users to substitute domestically made equipment for imported equipment driven by threats of sanctions, the exchange rate for the US dollar against the ruble, and state policy of import substitution. (*Id.* at pp. 25-26). Phoenix's assumptions, Defendants assert, fail to consider the other competitors in the territory. (*Id.* at p. 26). Even so, Defendants claim their experts have provided explanation as to why Phoenix's part sales decreased during this time. (*Id.*).

In reply, Phoenix highlights Defendants' failure to identify end users of the parts in their spreadsheet and production of extremely limited documentation relating to these sales. (DN 199, at pp. 10-11). Phoenix further asserts that the issue isn't that its part sales should not have significantly declined but is whether another manufacturer, such as Elemet, was providing these parts. (*Id.* at p. 11). And, Phoenix continues that if the parts were being purchased from Elemet, the alleged market factors Defendants identified would not have affected sales. (*Id.*).

The spreadsheet Phoenix produced that allegedly reflects a decrease in lost-part sales is difficult to decipher. It appears that this spreadsheet only reflects part sales by Elemet to unknown purchasers. It does not list part sales between Phoenix and Trading Corp. in the territory or demonstrate that Phoenix's part sales decreased starting in 2013. This spreadsheet does not

constitute credible evidence that Phoenix's lost part sales in the territory decreased in 2013 that would create an inference that Defendants are withholding or destroyed relevant documents.

Yet Defendants' arguments regarding "other market factors" as an excuse for non-production are not persuasive. These market factors do not eliminate Defendants' obligation to produce documents of lost part sales and purchases with other entities in the territory during the relevant period. This information is relevant to one of the primary allegations in this case – that Trading Corp. violated its agreements with Phoenix by conducting transactions with other entities in the designated territory. Defendants are therefore directed to supplement the spreadsheet to identify the purchaser and end users of the lost part sales and to produce any existing documents related to such sales. If Defendants do not have such information, they must submit a sworn declaration detailing why.

c. Documents Relating to Business and Financial Relationships Between the Parties

Phoenix cites to several documents it believes establish that further documentation relating to the business and financial relationships between the parties relevant to its alter-ego theory are being withheld. First, Phoenix claims that Defendants produced documents showing that Coralina sold 18.88% of its assets to Elemet for 30,780,000 rubles based upon a corporate resolution dated June 9, 2009 and that an earlier corporate resolution between the two approved the purchase of an apartment in Elektrogorsk, the city in which Elemet is owned. (DN 182, at p. 36). Despite these corporate resolutions, Defendants have produced no transfers of assets or stock, no contracts, and no further communications relating to this relationship. Next, to support that a substantial business relationship between Coralina and Elemet exists, Phoenix cites to an article in Coal Magazine, where Elemet's CEO allegedly stated that Coralina originally owned Elemet and supplied Elemet with technology to assist with its startup. Lastly, Phoenix points to Ms. Gordon's testimony that

Trading Corp. made payments to Coralina relating to the assistance Coralina employees provided to Trading Corp. employees "from time to time" and that she had the ability to generate a report showing all payments Trading Corp. made to Coralina for these services. (*Id.* at p. 37). Phoenix says Defendants have not produced these payment documents or the report Ms. Gordon referenced.

Defendants take issue with the evidence Phoenix submits, claiming that Phoenix failed to attach the alleged corporate resolution and deposition testimony as exhibits and that the translation of the "Coal Magazine" article is unauthenticated and unreliable under Federal Rule of Evidence 604. (DN 193, at p. 27). As to Ms. Gordon's testimony, Defendants assert that they were not required to create a Quickbooks report as to payments between Trading Corp. and Coralina to satisfy Phoenix's discovery requests. (*Id.* at p. 29). Defendants further respond that they have produced evidence of the financial relationship between the two entities by producing thousands of pages of purchase orders and agreements. (*Id.*). None of this evidence, Defendants claim, shows that they have or had additional documents concerning the business and financial relationships between defendants in this lawsuit. (*Id.*).

Phoenix replies that Defendants do not deny that such documents exist but, instead, attack Phoenix's evidence on procedural technicalities. (DN 199, at pp. 11-12). Phoenix contests Defendants' response that thousands of pages of purchase orders and agreements between Trading Corp. and Coralina were produced because such documents merely demonstrate that the parties purchased and sold equipment to and from each other. (*Id.* at p. 13). Phoenix clarifies that it is seeking documents demonstrating that Trading Corp. purchased labor from Coralina and extensively utilized Coralina's employees as its own, as proved by Ms. Gordon's testimony. (*Id.*).

As an initial matter, the Federal Rules of Evidence do not bar the Court's consideration of the translated corporate resolution and Coal Magazine article. Several courts have addressed

whether exhibits containing hearsay can be considered when adjudicating discovery motions and concluded that concerns about admissibility are not significant at the discovery stage. *See, e.g., EmployBridge, LLC v. Riven Rock Staffing, LLC*, Civ. No. 16-833 WJ/KK, 2017 WL 4271329, at *3 (D.N.M. Jan. 26, 2017) (citing *Arista Records, LLC v. Does 1-27*, 584 F. Supp.2d 240, 254-56 (D. Me. 2008) (Federal Rules of Evidence are not applicable to discovery motions); *Rogers v. Quality Carriers, Inc.*, No. 4:15-CV-22-JD-JEM, 2016 WL 3413766, at *2 (N.D. Ind. June 21, 2016) (citing *Coan v. Nightingale Home Healthcare, Inc.,* No. 1:05-CV-0101-DFH-TAB, 2005 WL 1799454, at *1 n. 1 (S.D. Ind. June 29, 2005) (denying motion to strike hearsay and noting that "[a]t this preliminary stage and for these preliminary purposes, plaintiffs need not come forward with evidence in a form admissible at trial.")). It follows that Defendants' concerns in this case with the authentication of Phoenix's translated exhibits are unfounded at this juncture. *See, e.g., Reliastar Life Ins. Co. v. Laschkewitsch,* No. 5:13-CV-210-BO, 2013 WL 12144047, at *2 (E.D.N.C. Nov. 1, 2013) ("The fact that the information may not ultimately be admissible at trial does not negate its discoverability[.]") (citing *Frank Betz Assoc., Inc. v. Jim Walter Homes, Inc.*, 226 F.R.D. 533, 536 (D.S.C. 2005) (standard for whether to allow motion to compel discovery not limited by whether the information is admissible under the rules of evidence.)). Since the issue at this stage is discoverability, not admissibility, Phoenix was not required to authenticate its translations of the Coal Magazine article or the corporate resolution it submits in support of its claim that additional responsive documents exist.[8]

Defendants claim the corporate resolutions and Coal Magazine article are inaccurate but fail to elaborate. The translation of the Coal Magazine article describes an interview with Elemet's

---

[8] The Court makes no findings as to whether these exhibits will be considered admissible if attached to a dispositive motion or if presented during trial.

General Director, Mr. Ksenofontov, where he noted that until 2013, "Coraline Engineering" was the exclusive line supplier of products to Elemet and did so under the trademark CETCO. (DN 12-6, at p. 15). The translation of the corporate resolution from June 30, 2009 references a "Partnership" involving Coralina that made a sale of business property to Elemet. (*See* DN 206-2). These documents demonstrate business connections between Trading Corp., Coralina, and Elemet over several years, which is a key issue in this case. (*See* DN 1-2, at ¶¶ 5, 17-18, 21 (Phoenix's alter-ego allegations)).

As for Ms. Gordon's deposition testimony, Phoenix cited to "Dep. Of Maria [Gordon], Vol. 2, at 89-92," but failed to attach the testimony.[9] Defendants, however, attached Ms. Gordon's relevant testimony to its Response. (DN 193-19). During the deposition, Phoenix's counsel asked Ms. Gordon whether a report could "be generated from CETCO Trading's QuickBook reports [sic] such a report showing all the payments that CETCO Trading made to Coralina Engineering?" to which Ms. Gordon responded: "Yes." (*Id.* at p. 7). Following up, Phoenix's counsel inquired whether Ms. Gordon would "have the ability to do that from [her] CETCO Trading computer in Jamaica," to which Ms. Gordon again responded: "Yes." (*Id.*).

Defendants are correct that Ms. Gordon's mere reference to being able to generate a report showing all payments Trading Corp. employees made to Coralina for employment services did not require the creation of such a report. *See Snyder*, 2016 WL 339972, at *6. But Ms. Gordon's testimony generates an inference that there are likely documents or data available evidencing the financial transactions from which Ms. Gordon could create the discussed report. Ms. Gordon's

---

[9] Phoenix's failure to produce the cited deposition testimony is perplexing considering the Court's previous admonishment for this same behavior in its March 19, 2019 Opinion. (*See* DN 127, at p. 33 ("Although Phoenix states that ample evidence demonstrates the requested documents exist, it failed to attach most of this evidence to its Motion to Compel. [footnote omitted] Without this evidence, the Court cannot conclude that additional responsive documents exist regarding any relationship between Defendants and Cuna.")).

testimony, combined with the translations of the corporate resolution and Coal Magazine article, permits the reasonable deduction that more responsive documents to these discovery requests exist that Defendants have not produced. Defendants, therefore, are required to conduct additional searches, including of Ms. Gordon's computer, and produce responsive documents. Defendants are prohibited from asserting boilerplate objections. If Defendants still maintain that no responsive documents exist, they must submit sworn declarations with detailed explanations as to why their comprehensive searches do not yield responsive documents.

### d. Communications Between and Amongst Defendants

Phoenix next claims that Defendants have only produced one document responsive to its requests for communications between and amongst the Defendants. (DN 182, at p. 38). Phoenix finds it inconceivable that no emails exist between Defendants and Elemet since Defendants purchased 25 belt-filter presses from Elemet between 2010 and 2014 for millions of dollars and because it is cheaper and easier to send documents and communicate by e-mail. (*Id.* at p. 39). Phoenix cites to Ms. Gordon's testimony that she communicated with Mr. Chudnovets and Vadim Novak ("Mr. Novak"), a Coralina employee, by email as evidence that email communications between the parties must exist. (*Id.*).

Defendants again highlight that Phoenix failed to include the deposition testimony it references. (DN 193, at p. 30). Defendants further disagree with Phoenix's characterization of such testimony, noting that Ms. Gordon only discussed that she had access to Trading Corp. emails saved from 2015 on her computer at home but does not know how far back those saved emails go. (*Id.* at pp. 30-31). Because Phoenix has offered only a theoretical possibility that additional documents exist or existed and has provided no evidence countering Defendants' explanations for the gaps in production, Defendants argue Phoenix has not met its burden. (*Id.* at p. 31). Defendants

16

also claim that because the Court's March 19, 2019 Opinion did not mention RFP No. 8 to Coralina, no additional response is necessary. (*Id.* at p. 30).

First, the fact that the Court's March 19, 2019 Opinion did not address RFP No. 8 to Coralina has no practical effect on this issue. The Court's Opinion addressed RFP No. 10 to Trading Corp., which is identical to RFP No. 8 to Coralina, and essentially requests all email communications between the Defendants and their representatives regarding sales of equipment within the territory. (*See* DN 119-2, at p. 28; DN 119-3, at p. 23). It is unclear why Trading Corp. cannot produce the requested communications because they have not asserted a document destruction policy similar to Coralina's. Nor is destruction via Hurricane Harvey a viable excuse here since Phoenix is expressly seeking email communications.

Although Ms. Gordon did not mention communicating with Mr. Chudnovets or Mr. Novak by email as Phoenix alleges,[10] she testified that she has access to whatever emails she saved since 2015 on her CETCO Trading Computer. (DN 193-18, at p. 3). She indicated, however, that she did not know how far back the computer saved emails. (*Id.*). Ms. Gordon's access to her work emails creates a reasonable inference that responsive emails may exist that have not been produced. The Court finds unbelievable that corporations conducting million-dollar equipment sales would rarely communicate by e-mail. Commonsense dictates that at least some email communications between the Defendants exist or existed relating to the purchase and sale of equipment within the territory. There is a difference between a requesting party's pure speculation that more documents exist and a party's reliance on commonsense, along with other evidence. Accordingly, Trading Corp. is required to fully respond to RFP No. 10, including a comprehensive search of the emails

---

[10] Perhaps Ms. Gordon testified to this elsewhere in her deposition; unfortunately, Phoenix did not attach this testimony to its Motion. The Court, therefore, must rely on Ms. Gordon's deposition testimony as produced by Defendants.

on Ms. Gordon's CETCO Trading Computer.

e. Internal Communications Between the Parties

Phoenix again references Ms. Gordon's deposition testimony that she communicated with Mr. Chudnovets by email as evidence that Defendants have not produced internal communications. (DN 182, at pp. 39-40). Phoenix also identifies one email disclosed by Coralina in which Mr. Novak forwarded an email from a Phoenix employee to Mr. Chudnovets relating to the 2012 distributor agreement, that was sent internally to Ksenia Ovchinnikova and copied to other employees. (*Id.* at p. 40). This email directed Ms. Ovchinnikova to change the name of the contracting party from CETCO Technology to CETCO Trading and stated that he would sign, scan, and send the agreement back to Mr. Novak. Phoenix finds it unfathomable that this email involving four Coralina employees is the only internal email that Coralina employees ever sent one another regarding business relationships with Phoenix, Elemet, or third-party end users of the equipment. (*Id.*). Phoenix also doubts Coralina's document destruction policy since it did not appear to apply to the emails exchanged with Phoenix personnel. (*Id.* at p. 41).

Defendants first note that Phoenix only cites to RFP Nos. 13-15 to Mr. Chudnovets in its Motion to Compel and that Mr. Chudnovets was not personally involved in communications between Defendants' respective representatives. (DN 193, at p. 31). According to Defendants, they have diligently searched for responsive communications but haven't located any likely because "many of the communications between Defendants' respective representatives occurred either in person or via phone[.]" (DN 193, at p. 31). Defendants once more argue that outside of failing to attach, mischaracterizing evidence, and offering pure speculation, Phoenix has not submitted evidence that additional responsive documents exist or were improperly destroyed. (*Id.* at p. 33).

By producing an email from a Phoenix employee to Mr. Chudnovets that copied other

18

Trading Corp./Coralina employees internally, Phoenix has carried its burden of producing credible evidence that more responsive documents likely exist or existed. (*See* DN 199-7). This email casts doubt on Defendants' argument that responsive documents do not exist because the communications primarily occurred by phone or in person. However, because this argument is only directed at RFPs to Mr. Chudnovets, he alone will be required to comprehensively search for responsive documents. If after this search Mr. Chudnovets still maintains that not a single internal email exists between him, Ms. Gordon, Mr. Novak, and Mr. Wyzkowski related to the claims in this action, Mr. Chudnovets must provide a sworn declaration that he does not generally communicate by email and noting specific instances where employees communicated by phone or in person.

### f. The "Relevant Period" for Discovery Responses

Lastly, Phoenix is concerned with Defendants using the "Relevant Period" to define every discovery response. Phoenix believes it is entitled to discover sales of all Elemet-manufactured equipment through the present day in order to calculate its unjust enrichment damages under the KUTSA. (DN 182, at p. 42). Similarly, Phoenix thinks documents showing Coralina was purchased by Technology Corp. in 2006 and became an independent entity again in 2008 permit Phoenix to discover Mr. Chudnovets' involvement in this transaction. (*Id.*).

Defendants respond that this Court previously determined that May 2009 to June 30, 2016 serves as a reasonable time frame for most of Defendants' responses. (DN 193, at p. 33). Defendants explain that Phoenix's requested deviations from this "Relevant Period" do not identify specific discovery requests and appear to be "nothing more than a thinly veiled attempt to relitigate this discovery issue[.]" (*Id.*). Regardless, Defendants find Phoenix's requests meritless because Trading Corp. was not formed until March of 2009.

The Court's March 19, 2019 Opinion found it was appropriate for Defendants to generally limit their responses to information and documents from May of 2009, when Phoenix entered into the first distributor agreement, to June 30, 2016, the latest effective date for the second distributor agreement. (DN 127, at p. 34). The undersigned, however, made several exceptions to this time frame for specific disputed requests. (*See id*. at pp. 35-37). In its current motion, Phoenix simply claims that documents from outside the "Relevant Period" are relevant to Phoenix's alter-ego theory. While that may be true, Phoenix fails to identify which specific discovery requests it believes should extend beyond the "Relevant Period."  Phoenix has not supported its general request to expand the "Relevant Period," and the Court will not require Defendants to supplement their responses on these grounds.

2. Defendants' Objections and Responses to Phoenix's Second Set of Discovery Requests

Phoenix propounded a second set of discovery requests following the Court's March 19, 2019 Opinion. Without identifying the substance of its requests, Phoenix claims Defendants have refused to produce any documents responsive to RFP Nos. 3, 7, and 10 to Trading Corp. and RFP Nos. 3, 4, and 7 to Coralina based on boilerplate objections and with no supporting facts. (DN 182, at p. 43). Because Defendants have not denied the existence of responsive documents to these requests, Phoenix seeks they be compelled to produce relevant documents. (*Id.*).

Defendants respond that Phoenix is incorrectly using the Court's earlier Opinion to try to overrule every objection by Defendants to its second discovery requests. (DN 193, at pp. 35-36). Phoenix's failure to attach the relevant requests and objections to its Motion, Defendants assert, should bar consideration of its arguments. (*Id.*). Defendants further claim that Phoenix failed to prove the requested documents are relevant, appropriate, or proper. (*Id.* at p. 36).

In reply, Phoenix explains that although it did not attach the relevant requests to its Motion,

it accurately quoted the relevant requests. (DN 199, at p. 16). Phoenix further claims that while Defendants have now explained the reasoning behind their objections, they cannot amend their discovery responses through motion practice. (*Id.*). Since baseless, unexplained objections are not grounds for failing to answer discovery requests, Phoenix maintains that Defendants should be required to fully and completely respond. (*Id.*).

It is well-established that the party seeking discovery be compelled bears the initial burden of proving the requested information is relevant. *Hendricks v. Hazzard*, No. 2:11-cv-399, 2013 WL 4052873, at *3 (S.D. Ohio Aug. 12, 2013) (quoting *Guinn v. Mount Carmel Health Sys.*, No. 2:09-cv-0226, 2010 WL 2927254, at *5 (S.D. Ohio July 23, 2010) (add'l citations omitted)). But when the information sought "appears to be relevant, the party resisting production has the burden of establishing that the information either is not relevant or is so marginally relevant that the presumption of broad disclosure is outweighed by the potential for undue burden or harm." *Id.* (citing *Guinn,* 2010 WL 2927254, at *5; *Vickers v. Gen. Motors Corp.*, No. 07-2172 Ml/P, 2008 WL 4600997, at *2 (W.D. Tenn. Sept. 29, 2008)).

Both parties have acted deficiently with respect to Phoenix's second set of discovery requests. Phoenix neither attached nor quoted the disputed discovery requests, and both its Motion and Reply are silent as to the relevancy of these requests. This Court has previously warned Phoenix regarding its failure to attach supporting evidence for its arguments.

Yet Defendants have inappropriately relied on boilerplate objections and only provided more detailed objections in responding to Phoenix's Motion.[11] Defendants' repeated reliance on boilerplate objections is particularly troublesome at this point in the litigation. While the Court's

---

[11] Disputes regarding these second set of RFPs could have been avoided had Defendants lodged the specific objections it now outlines in responding to Phoenix's Motion to Compel in their responses to Phoenix's discovery requests.

earlier discovery opinion was directed at specific discovery requests, the Opinion should have placed Defendants on notice that boilerplate objections were not appropriate. (*See* DN 127, at p. 32 ("[I]f CETCO is still withholding existing documents responsive to these requests based on boilerplate objections (vague, overbroad, unduly burdensome, etc.), Defendants must produce these documents because they are relevant.")).

Not only are boilerplate objections not permitted under the Federal Rules, this District has commented that their usage is "nothing less than 'a waste of effort and the resources of both the parties and the court.'" *Burell v. Duhon*, No. 5:18-CV-00141-TBR-LLK, 2019 WL 5260481, at *4 (W.D. Ky. Oct. 17, 2019) (quoting *Wesley Corp. v. Zoom T.V. Products, LLC*, No. 17-10021, 2018 WL 372700, at *4 (E.D. Mich. Jan. 11, 2018) (internal citation omitted)). One judge in this District deemed waived a defendant's objections to discovery requests due to overreliance on boilerplate objections. *See Mitchell v. Universal Music Grp. Inc.*, No. 3:15-CV-174-JHM, 2018 WL 1573233, at *5 (W.D. Ky. Mar. 30, 2018) (overruled in part on other grounds) (noting that it is "high time" that the tradition of preserving boilerplate objections be ended).

In this instance, the Court declines to deem waived Defendants' objections due to their use of boilerplate language because both parties glaringly erred in their motion practice as to Phoenix's second discovery requests. The Court instead will briefly evaluate each of the disputed requests.

RFP No. 3 to both Trading Corp. and Coralina, requesting production of all documents relating to the loans reported on financial statements labeled Defendants 3974-4005, do not appear to be relevant. (*See* DN 193-7, at p. 6; DN 193-8, at p. 6). Neither Phoenix's Motion nor Reply identifies or includes attachments of the financial statements labeled Defendants 3974-4005. Without this information or any supporting argument, the Court cannot ascertain the relevancy of such request, and Defendants will not be required to further respond.

The remainder of the disputed requests, however, are ostensibly relevant. RFP No. 7 to both Trading Corp. and Coralina request production of all receipts, contracts, communications, and other documents relating to the design of its logo, website, and other marketing materials from 2009-present. RFP No. 4 to Coralina similarly requests production of all receipts, contracts, communications, and other documents relating to its purchase and/or use of the domain cetco.us from 2009-present. (DN 193-8, at pp. 6-7).

Included in Trading Corp. and Coralina's boilerplate objections is the argument that these requests seek documents "outside the Relevant Period." (*Id.*). Again, although the Court found in its prior Opinion that May of 2009 to June 30, 2016 was generally an appropriate period for discovery requests in this case, exceptions could be warranted. As to these requests, the Court agrees with Phoenix that information dating back to May of 2009 could be relevant to its alter-ego liability claims. But the Court also heeds Defendants' arguments that "other marketing materials" could encompass information beyond the scope of this litigation. Trading Corp. is therefore ordered to produce responsive documents to RFP No. 7, and Coralina is required to produce responsive documents to RFP Nos. 4 and 7, from May of 2009-present day, but limited to documents related to Phoenix's claims regarding the business relationships between Defendants.

Lastly, RFP No. 10 to Trading Corp. requested Defendants produce:

> All documents relating to the "assistance and facilitation" the following Coralina employees provided to Capital Equipment and Trading Corporation as described in Coralina's Response to Phoenix's 3rd Amended Interrogatory No. 7: Vadim Novak, Polina Tekucheva, Lyudmila Romashina, Marina Yurchenko, Inga Fattakhova, Katya Moukhortova, Evgeniya Tsoy, Dmitry Rudenko, and Anna Lopatina. As part of your answer, please include all contracts, agreements, authorizations, evidence of payment, 1099s, W2s, and any other documents between the two companies that are related to these Coralina employees providing assistance to Capital Equipment and Trading.

(DN 193-7, at p. 9). Defendants claim this Request would have been more properly directed at

Coralina and that Trading Corp. has no documents responsive to this request. (DN 193, at pp. 39-40). But Phoenix directed this same request to Coralina and received similar boilerplate objections. (*See* DN 193-7, at p. 9; DN 193-8, at pp. 8-19). The Court finds the request was properly directed at both Trading Corp. and Coralina. While the Court agrees with Defendants that the request is broad, it is undoubtedly relevant to Phoenix's alter-ego theory and the other claims in the case. Trading Corp., therefore, must produce responsive documents to RFP No. 10 but may limit such production to all contracts, agreements, authorizations, evidence of payment, 1099s, W2s, and any other documents reflecting the business relationship between Coralina and Trading Corp. or otherwise related to Phoenix's claims.  If Defendants maintain that no responsive documents exist after completing searches according to the above limitation, they must provide a sworn declaration to this effect, explaining in detail why such documents do not exist.

### 3. Defendants' Privilege Log

On March 19, 2018, Defendants responded and objected to Phoenix's first set of discovery requests. (*See* DN 119-2; 119-3; 119-4). To RFP Nos. 5, 13, 14 and 15 to Mr. Chudnovets, Defendants asserted attorney-client privilege and/or work-product privilege. (DN 119-4, at pp. 28, 30, 31). These requests sought all communications between Mr. Chudnovets and Ms. Gordon, Mr. Novak, and Mr. Wyzkowski relating to Phoenix for the past ten years and with any other Defendant in the lawsuit regarding the purchase or sale of equipment within the territory. (*Id.*).

Phoenix challenged these objections in its earlier motion to compel. (DN 119). The Court's Opinion stated: "to the extent that Defendants are withholding responsive documents to these Requests based on attorney-client privilege or work-product privilege, Defendants must produce a privilege log to Phoenix." (DN 127, at p. 31). Almost a year later, during a telephonic conference, Phoenix informed the Court that Defendants never produced a privilege log. (*See* DN 166).

Defendants explained that Phoenix also had failed to produce a privilege log during the litigation. The Court, accordingly, ordered both parties to "produce privilege logs for any documents being withheld based on privilege . . ." within fourteen days. (*Id.*).

On March 13, 2020, Defendants produced a privilege log to Phoenix identifying 24 email communications they claim are privileged, some of which were previously produced with redactions. (*See* DN 182-4). Phoenix alleges that Defendants' privilege log is untimely and insufficient. (DN 182, at pp. 44-53). Phoenix seeks the Court deem Defendants' claims of privilege waived because of their "overwhelming delay and blatant defiance" of the Court's March 19, 2019 Opinion. (*Id.*, at p. 44). Defendants assert that the Court ordered them to produce a privilege log following the February 27, 2020 teleconference and they timely complied. (DN 193, at p. 42).

Rule 26(b)(5) requires that a party asserting privilege when withholding information otherwise discoverable must not only "expressly make the claim" but also "describe the nature of the documents" withheld and do so in a manner that will enable the requesting party to assess the validity of the claim. Fed. R. Civ. P. 26(b)(5)(A)(i)-(ii); *see also* Fed. R. Civ. P. 45(d)(2)(A) (providing the same requirements for withholding privileged information as Rule 26(b)(5)). Generally, the party claiming the privilege must provide a privilege log to meet the commands of Rule 26(b)(5).  *See, e.g., SPX Corp. v. Bartec USA, LLC*, 247 F.R.D. 516, 527 (E.D. Mich. 2008).

The withholding party's privilege log should contain enough detail to enable the Court to "assess whether each element of the asserted privilege or protection is satisfied." *Graff v. Haverhill N. Coke Co.*, No. 1:09-cv-670, 2011 WL 13078603, at *3 (S.D. Ohio Aug. 8, 2011) (citing *Cooey v. Strickland*, 269 F.R.D. 643, 649 (S.D. Ohio 2010)). Assertions of attorney-client privilege must be detailed enough to prove "that the communications in question were in fact confidential communications relating to legal advice." *Cooey*, 269 F.R.D. at 649. *Cooey* expounds that a Rule

25

26(b)(5) privilege log need not be "onerous and may be satisfied by as little as a statement . . . explaining the nature of the legal issue for which advice was sought." *Id.* Still, conclusory statements or "cryptic privilege logs" will not satisfy this standard if "review of the documents themselves fails to reveal whether they were produced or transmitted in the course of legal representation." *Id.* (citing *In re Search Warrant Executed at Law Offices of Steven Garea*, Case No. 97-4112, 1999 WL 137499, at *2, 5-7 (6th Cir. Mar. 5, 1999)).

A party's failure to timely produce a privilege log may result in waiver of the claimed privilege. *McCall v. Procter & Gamble Co.*, No. 1:17-cv-406, 2019 WL 3997375, at *8 (S.D. Ohio Aug. 22, 2019); *Brown v. Tax Ease Lien Servicing, LLC*, No. 3:15-CV-208-CRS, 2017 WL 6939338, at *14 (W.D. Ky. Feb. 16, 2017). Determining whether waiver is appropriate requires a case-by-case inquiry. *Id.* Given the seriousness of privilege waiver, courts generally find it only applies in cases involving unjustified delay, inexcusable conduct[,] and bad faith." *Id.* (quoting *Barger v. First Data Corp.*, No. 1:17-CV-4869, 2018 WL 6591883, at *7 (N.D. Ala. Dec. 14, 2018)). This District has applied the Ninth Circuit's four-factor test to guide whether waiver applies to a privilege:

> [(1) T]he degree to which the assertion of privilege enables the litigant seeking discovery and the court to evaluate whether each of the withheld documents is privileged . . . [(2)] the timeliness to the assertion of privilege and accompanying information about withheld documents . . . [(3)] the magnitude of the document production; and [(4)] other particular circumstances of the litigation that make responding to discovery unusually easy . . . or unusually hard.

*Mitchell*, 2018 WL 1573233, at *5 (quoting *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005)).

Defendants' privilege log does not satisfy the requirements of Rule 26(b)(5)(A)(ii). Where Defendants have asserted "attorney-client communication" as the type of "privilege," they have failed to identify which sender or recipient is an attorney. The "description" category is also

26

lacking. Simply noting that a document is an internal email communicating Phoenix's allegations does not allow the Court to assess whether each element of work-product protection is satisfied. For fourteen of the documents listed Defendants have produced redacted versions they claim contain sufficient information to demonstrate the elements of the claimed privilege. But without reviewing those redacted documents, the Court cannot ascertain whether this is true.

Defendants' privilege log is also untimely. The Court's March 19, 2019 Opinion unequivocally ordered Defendants to produce a privilege log for any documents they were withholding based on attorney-client or work-product privilege. (DN 127, at p. 31). It was not until one year later, when the Court again ordered the parties to produce privilege logs, that Defendants complied. (*See* DN 166). Defendants provide no justification for their delay; in fact, their response brief does not mention the Court's March 19, 2019 directive.[12]

The circumstances of this case, however, are anything but ordinary. The Court's March 19, 2019 Opinion did not set a deadline for Defendants to provide the privilege log. And during this year-long delay, discovery and the parties' accompanying disputes persisted. Phoenix propounded additional discovery requests on Defendants during this time. It may have been understandable if Defendants were waiting until they responded to all of Phoenix's discovery requests before submitting a privilege log. Unfortunately, Defendants do not make this argument or any other substantive argument justifying their delay. One year is a significant period for inexplicably failing to comply with a court order. *See, e.g., Ritacca v. Abbott Labs.,* 203 F.R.D. 332, 336 (N.D. Ill. 2001) (finding that a defendant's five-month delay in raising its privilege objection was

---

[12] Defendants attempt to justify their behavior by claiming that Phoenix has failed entirely to produce a privilege log. Phoenix defends that it is not withholding any documents based on privilege, except for communications with its attorney of record, which are clearly protected. The Court will assess Phoenix's failure to produce a privilege log when addressing Defendants' Motion to Compel later in this Opinion.

inexcusable and unjustified, where the defendant had never mentioned its assertion of privilege).

The Court does not find waiver appropriate under these circumstances. While Defendants behavior is blameworthy, the Court will not lightly cast aside the sacred protections offered by the work-product and attorney-client privilege doctrine. *See McCall*, 2019 WL 3997375, at *9 (citing *Johnson v. City of Cincinnati*, 119 F. Supp. 2d 735, 742 (S.D. Ohio 2000) ("The law protects confidentiality and sanctity of the attorney-client relationship."), *aff'd*, 310 F.3d 484 (6th Cir. 2002)). The Court instead orders Defendants to supplement their privilege log as outlined above within thirty days entry of this Opinion. Failure to appropriately do so will result in waiver.

### B. Request for Extension of Rebuttal Expert Deadline

Phoenix also seeks permission to designate and call a Certified Public Accountant from Carpenter, Mountjoy, and Bressler, P.S.C. in rebuttal to one of Defendants' experts. (DN 182, at p. 54). Defendants object to this request, claiming that every scheduling order entered in this case has been completely silent on rebuttal expert disclosures or rebuttal expert designations. (DN 193, at p. 55 (citing DN 93, DN 131, DN 157)).

Generally, a scheduling order's failure to set a deadline for the disclosure of rebuttal expert witness reports does not mean that such reports are prohibited. *See, e.g., Telepak Networks, Inc. v. City of Memphis*, No. 2:14-cv-02027-SHM-cgc, 2014 WL 5795499, at *2 (W.D. Tenn. Nov. 6, 2014); *Teledyne Instruments, Inc. v. Cairns*, No. 6:12-cv-854-Orl-28TBS, 2013 WL 5781274, at *17 (M.D. Fla. Oct. 25, 2013) (collecting cases and noting that this is the "prevailing rule . . . throughout the country"). Rather, if the scheduling order does not "expressly prohibit[] rebuttal expert testimony or provid[e] a different time to disclose rebuttal experts, the deadline in Rule 26(a)(2)(D)(ii) applies." *Telepak Networks*, 2014 WL 5795499, at *2. Rule 26(a)(2)(D)(ii) provides that evidence intended solely "to contradict or rebut evidence on the same subject matter

28

identified by another party" must be disclosed within 30 days of the other party's disclosure.

The Court, accordingly, does not construe the silence on this issue in any of the case's scheduling orders to mean that rebuttal experts were precluded. The question then is whether Phoenix complied with Rule 26(a)(2)(D)(ii). Under this Rule, Phoenix was required to disclose a rebuttal expert if it desired by April 29, 2020. Phoenix did not file a motion to extend this deadline until May 4, 2020. (DN 171). When a motion for extension is filed after a deadline has passed, the heightened standard of Federal Rule of Civil Procedure 6(b) applies. *See Pogue v. Northwestern Mut. Life Ins. Co.*, No. 3:14-CV-598-CRS-CHL, 2016 WL 3124649, at *4 (W.D. Ky. June 1, 2016). Rule 6(b) requires the requesting party demonstrate "good cause" and "excusable neglect" for its failure to meet the deadline. Fed. R. Civ. P. 6(b)(1)(B); *see Century Indemnity Co. v. Begley Co.*, 323 F.R.D. 237, 241-42 (E.D. Ky. 2018). The Sixth Circuit balances several factors in assessing excusable neglect, including potential prejudice to the nonmoving party; the length of the delay; the reason for the delay; and whether the late-filing party acted in good faith." *Nafziger v. McDermott Int'l Inc.*, 467 F.3d 514, 522 (6th Cir. 2006).

Phoenix vaguely cites the COVID-19 pandemic as a reason for its non-compliance. While the pandemic has presented unique challenges in case management, it does not explain why Phoenix did not timely file a motion to extend this deadline. The pandemic did not pause this or any other civil litigation. And Defendants' lack of response to Phoenix's email requesting extension of the deadline, while frustrating, did not relieve Phoenix of its duty to formally request the deadline extension from the Court. Phoenix's reasons for delay are not persuasive.

The remainder of the factors do not support a finding of excusable neglect. Phoenix's motion for extension was filed six days after the deadline expired. This delay, while not excessive, is concerning considering that Phoenix was aware of its approaching deadline when it contacted

Defendants on April 16, 2020, almost two weeks before its deadline expired. As to prejudice, the Court finds that allowing further delay in this protracted litigation will negatively impact Defendants. And, while the Court cannot say that Phoenix was acting in bad faith by filing its motion six days late, Phoenix's behavior throughout the litigation has raised questions as to its abilities to conform to the scheduling order deadlines. (*See, e.g.*, DN 164 (deeming Phoenix's third set of requests for production as untimely)). For these reasons, Phoenix's request to extend its rebuttal expert deadline is denied.

## IV. DEFENDANTS' MOTION TO COMPEL (DN 185)

Defendants have also filed a motion to compel that seeks Phoenix be required to provide complete and proper responses to Defendants' Interrogatories, First and Second Requests for Production, and Requests for Admission. (DN 185, at pp. 1-2). Defendants claim that although Phoenix represented on numerous occasions to Defendants and the Court that it would cure issues with its discovery responses, Phoenix is now unwilling to admit there are issues or cure its deficiencies. (*Id.*). Phoenix responds that Defendants' Motion is merely a petty attempt at diverting the Court's attention from the Defendants' own repeated discovery abuses. (DN 190, at p. 1).

### A. Phoenix's Deficient Interrogatory Responses

#### 1. Phoenix's Trade Secrets and Confidential Information

Defendants argue that Phoenix has not sufficiently identified the alleged trade secrets it claims Defendants have misappropriated or misused. (DN 185, at p. 10). According to Defendants, Phoenix fails to provide a detailed narrative description of its trade secrets or an identification of the documents that constitute the alleged trade secrets. (*Id.* at p. 10). Defendants seek Phoenix's trade secrets be excluded from the lawsuit or, alternatively, that Phoenix be required to amend its responses to provide detailed narrative descriptions of each trade secret and identify the documents

constituting the alleged trade secrets by bates-label numbers. (*Id.* at pp. 11).

Phoenix responds that there is no requirement under the Federal Rules that it provide bates-label numbers for documents it identifies as trade secrets or as describing the processes, procedures, or cost/price data claimed as trade secrets. (DN 190, at pp. 7-8). Phoenix explains that all documents comprising its trade secrets were provided under the terms of the parties' contract and then again during discovery. (*Id.* at p. 8). No narrative description of its trade secrets is required or necessary, Phoenix asserts, because it has disclosed the actual documents and files containing the alleged trade secrets. (*Id.* at p. 9).

Defendants reply that Phoenix's blanket claims that "the trade secrets you took are the ones we say you took," are not sufficient. (DN 201, at p. 6). Defendants suggest that if Phoenix seeks to rely only on documents, rather than narrative descriptions, to identify its trade secrets, Phoenix must identify the responsive documents by bates-label number. (*Id.* at p. 8).

Parties alleging misappropriation of a trade secret are generally required to identify with reasonable particularity the matter which it claims constitutes a trade secret. *See N. Harris v. Computer Corp. v. DSI Investments, LLC*, No. 1:19-CV-00142, 2020 WL 6066172, at \*6 (W.D. Ky. Oct. 14, 2020). The identification must be "particular enough as to separate the trade secret from matters of general knowledge in the trade or special knowledge of persons skilled in the trade." *Babcock Power, Inc. v. Kapsalis*, No. 3:13-CV-717-DJH-CHL, 2015 WL 9257759, at \*3 (W.D. Ky. Dec. 17, 2015) (quoting *Safety Today, Inc. v. Roy*, No. 2:12-cv-510, 2014 WL 1049962, at \*10 (S.D. Ohio Mar. 17, 2014)). Merely pointing to documents described as proprietary, confidential, and/or a trade secret or identifying broad categories of information is not enough. *Babcock*, 2015 WL 9257759, at \*3; *see also Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, No. 3:13-cv-82-CRS, 2017 WL 4799815, at \*3-4 (W.D. Ky. Oct. 24, 2017). In

*Babcock*, the court determined that a plaintiff's identification of trade secrets was insufficient and directed the plaintiff to produce a "detailed narrative description" of each trade secret and also identify which documents produced constituted those trade secrets. *Id.* at *4.

When asked in Defendants' First Set of Interrogatories to identify and describe each trade secret it claims Defendants misappropriated or wrongfully used, Phoenix responded:

> Without limitation, Phoenix's trade secrets consist of processes, methods, data, information for application, simulation, modeling, equipment selection, region selection and process optimization for the use in designing, developing, fabricating and manufacturing Belt Filter Press systems used in the dewatering of coal refuse slurry.

(DN 185-6, at p. 2). Almost a year and a half later, Phoenix provided a supplemental response that more specifically described the trade secrets initially identified. (DN 185-7, at p. 4). Phoenix's supplemental response indicated that "[d]ocuments relevant to these trade secrets are attached" (*Id.* at pp. 4-5). Defendants, unsatisfied with Phoenix's responses, brought the issue to the Court's attention in several discovery dispute calls. (*See, e.g.,* DN 164). The Court suggested that if Phoenix believed it had provided everything responsive to Defendants' requested trade secret discovery, Phoenix could provide a sworn certification reflecting that. (DN 157; DN 164).

After reviewing Phoenix's supplemental response, the Court finds that while Phoenix's identification of trade secrets remains vague, it has issued a sworn declaration from Gary Drake indicating Phoenix has produced all information and documents relating to trade secret identification. Despite Defendants' concerns as to the sufficiency of this declaration, the Court finds Mr. Drake's declaration holds him accountable in his capacity as corporate representative of Phoenix for the verification of his responses. Phoenix, however, will be required to identify by bates-label numbers which documents previously produced constitute its identified trade secrets. By doing so, Phoenix will fulfill its obligation to identify its trade secrets with reasonable

particularity.

Defendants have the same concerns regarding Phoenix's identification of "Confidential Information." Phoenix's supplemental responses listed the following broad categories as confidential information: (1) installations, operations, and maintenance (IO&M) manuals and maintenance information provided to Phoenix's customers; (2) sales training manuals and sales information; (3) in person, on site, training by Phoenix employees; (4) equipment and parts pricing; and (5) specifications for belt filter press equipment and parts. (DN 185-6). Defendants request Phoenix be compelled to provide narrative descriptions for information and documents it claims are confidential and identify the documents by bates-label number. (DN 185, at pp. 12-13). Phoenix defends that it has already described with particularity the documents it believes are confidential. (DN 190, at pp. 10-11). For the same reasons discussed above, Phoenix must identify the documents comprising its "Confidential Information" by bates-label number.

    2. Additional Deficiencies with Phoenix's Responses to Trade-Secret Discovery

Defendants also challenge Phoenix's responses to subparts (C)-(G) within INT No. 1. (DN 185, pp. 13-15). Defendants generally feel these responses contain incomplete descriptions and conclusory statements. (*Id.*). Phoenix responds that its "Amended and Supplemental Itemization of Damages" produced on May 21, 2020 cures many of the issues raised by Defendants and that it does not have further detail to offer to these responses. (DN 190, at pp. 14-15).

Subpart (C) asks where and how Phoenix's trade secrets were acquired and developed. (DN 185-7, at p. 6).  Phoenix responded that "[t]he initial belt filter press machine design and drawings and process designs were developed by Gary Drake in Phoenix's Florida Office and subsequent designs and related drawings were developed over 35 years by the engineers and designers identified above in Phoenix's Kentucky office." (*Id.*). Phoenix also responded that all trade secrets

were developed internally, and the only consideration paid was to Phoenix's own staff for internal development work. (*Id.*). Defendants believe Phoenix should identify the manners, methods, and processes used to develop its claimed trade secrets to determine whether Phoenix copied or incorporated aspects of previously patented or unpatented belt filter presses. (DN 201, at p. 11). Phoenix responds that Defendants had the opportunity during Mr. Drake's deposition to inquire on these issues but did not. (DN 190, at p. 12).

Mr. Drake's deposition did not obviate Phoenix's duty to respond fully to this interrogatory. And Phoenix's general statements do not sufficiently respond to how the trade secrets were developed. Phoenix is therefore required to supplement its response to INT No. 1(C) by identifying specific dates during the development of its initial and subsequent designs, aspects of other designs used in the development process, and any other specific information regarding the development and re-design of Phoenix's trade secrets.

Subpart (D) requested Phoenix identify the cost and components incurred to acquire and develop the trade secrets. (DN 185-7, at p. 7). Phoenix's response estimated that the labor costs to develop these secrets totaled five million dollars. (*Id.*). Defendants assert that Phoenix must include the figures it used to calculate its estimate. (DN 185, at p. 14). Phoenix counters that it has nothing more to add because Mr. Drake did not rely on any documents in calculating the estimated five million dollars in labor costs. (DN 190, at pp. 12-13). Even if Mr. Drake did not rely on documents in making his estimate, Phoenix must still supplement its answer by breaking down how Mr. Drake reached this figure. If Mr. Drake simply formed this estimate from his own knowledge as Phoenix's President without using any calculations, then Phoenix's supplemental response should reflect that.

Subparts (E) and (F) respectively seek the current independent economic value of the trade

secret to Phoenix, the components and calculation of that value, and all competitive advantages the trade secret gives Phoenix and others entitled to use it. (DN 185-7, at pp. 7-8). As to (E), Phoenix did not identify a numeric value for its trade secrets and instead highlighted that its trade secrets give it goodwill in the industry and a competitive advantage because it produces products superior to any others in the industry and profits from these sales. (*Id.*). Phoenix's response to (F) largely parrots its response to (E). (*Id.*).

Phoenix's conclusory responses to (E) and (F), in Defendants' opinion, do not satisfy Phoenix's obligation to provide specific descriptions of the independent economic value and competitive advantages relating to its trade secrets. (DN 185, at p. 14). Phoenix reinforces that its responses were adequate but stresses that its May 21, 2020 "Amended and Supplemental Itemization of Damages" cures any alleged deficiencies. (DN 190, at pp. 13-14). Defendants reply that Phoenix's May 21, 2020 damages report only offers inadmissible narratives that do not respond to alleged independent economic value or competitive advantages of Phoenix's purported trade secrets.[13] (DN 201, at p. 12). After reviewing Phoenix's Exhibit 1, the Court agrees with Defendants that Phoenix's mere reference to this damages report does not satisfy its discovery obligations. Phoenix will therefore be required to supplement its responses, providing more than vague and conclusory statements as to the independent economic value and competitive advantages of its trade secrets.

Subpart (G) asked Phoenix to identify all persons that have had access under an agreement to its trade secret and for each person, the nature of the agreement, the terms, the parties, and the date and length of the agreement. (DN 185-7, at p. 9). Phoenix responded that all 227 employees that have worked for Phoenix over the past thirty-five years were granted access to trade secrets

---

[13] Defendants indicate that they will be supplying separate objections to Phoenix's untimely disclosure of Exhibit 1 in another filing. (DN 201, at pp. 12-13).

on a "need to know" basis to perform their job duties and that each signed confidentiality and non-disclosure agreements. (*Id.*). Phoenix further identified that: (1) all sales agents were bound by confidentiality provisions in their agreements; (2) that Phoenix never entered into a distributor agreement beyond those with Technology and Trading Corp., subject to this lawsuit; and (3) that its fabrication supplier, Munich Welding, has access to proprietary manufacturing drawings of Phoenix's belt filter press under a non-disclosure agreement. (*Id.* at p. 10).

Defendants assert that Phoenix must identify all distributors/sales agents and clients/end users that it furnished trade secrets to outside of Trading Corp. because they are entitled to know all persons who Phoenix disclosed its allegedly protected information to and the circumstances surrounding these disclosures. (DN 185, at pp. 14-15). Phoenix contends that no further response is required because Trading Corp. is the only distributor Phoenix ever furnished trade secrets to under the confidentiality provisions that Phoenix alleges were violated in this case. (DN 190, at p. 14). Phoenix goes on to state that although it disclosed confidential drawings to customers outside of the territory subject to this lawsuit, they were subject to confidentiality restrictions. It would be overly burdensome and irrelevant, Phoenix claims, to disclose each end user outside of the territory when the breach at issue occurred within the territory. (*Id.*). Defendants reply that Phoenix did not object to this INT as overly burdensome or irrelevant and, consequently, waived such objections. (DN 201, at p. 13).

The Court will not deem Phoenix's objections to burden and relevancy waived;[14] however, Phoenix's arguments supporting their late objections are not persuasive. While the claims in this case relate to Phoenix's distributor agreements with Technology and Trading Corps. in the

---

[14] Earlier in this Opinion, the Court declined to find objections asserted by Defendants to Phoenix's discovery responses as waived despite the objections or explanations being provided for the first time in response to Phoenix's Motion to Compel. (*See supra* (III)(A)(2)).

territory, whether Phoenix disclosed the trade secrets at issue to any agents, end-users, or other individuals is highly relevant to Defendants' defense that Phoenix did not properly maintain its trade secrets or confidential information. Phoenix also fails to support why producing the names and circumstances of all recipients of the trade secrets at issue would be overly burdensome. Although Phoenix identifies over one hundred sales that included transfer of trade secrets or confidential information, Phoenix hasn't clarified whether these sales include repeat customers or end users. Phoenix is therefore required to supplement its response to INT No. 1(G).

3. Phoenix's Amendments, Supplementation, and Verification of Interrogatory Responses

Phoenix submitted a verification page from its President Gary Drake almost two weeks after issuing its supplemental responses that states: "I, Gary Drake, as an authorized representative of Phoenix Process Equipment Co. in the above-referenced Action, verify that the foregoing Answers to Interrogatories are true and correct to the best of my personal knowledge and belief, as of the date hereof." (DN 185-10). Defendants claim this verification is defective because Mr. Drake relies on his personal knowledge, information, and belief.  (DN 185, at p. 15). Relying on a 1958 case out of the Southern District of New York, Defendants claim this type of verification provides "convenient avenues of evasion" and avoids the requirement that Mr. Drake state under oath whether he is able to answer, whether he has the information necessary to answer, and that all answers reflect the information available to him. (*Id.* (citing *Nagler v. Admiral Corp.*, 167 F. Supp. 413, 415 (S.D.N.Y. 1958)). Because Mr. Drake was verifying the responses issued to Trading Corp., not to him personally, Defendants request Mr. Drake's reword his verification to state that the interrogatory responses are based on all information available to the company and not just one individual's knowledge. (*Id.* at p. 17).

Phoenix responds that *Nagler* is distinguishable; the court there found a verification was

defective because numerous plaintiffs answered consolidated interrogatories and only provided a blanket verification without each plaintiff separately verifying the responses. (DN 190, at p. 16). Phoenix clarifies that Mr. Drake was swearing the answers were true to the best of his knowledge in his representative capacity as the president of Phoenix. (*Id.* at pp. 16-17). Defendants' nit-picking of semantics, according to Phoenix, borders on harassment. (*Id.* at p. 17).

Federal Rule of Civil Procedure 33 provides that when the responding party is a public or private corporation, the interrogatories must be answered "by an officer or agent, who must furnish the information available to the party." Fed. R. Civ. P. 33(b)(1)(B). Because Mr. Drake identified that he was verifying the answers as an authorized representative of Phoenix, the word "personally" does not render the verification defective. And, while the Rule states that the officer or agent must furnish the information available to the party, there is no requirement that a sworn verification quote that language. There is no evidence that Phoenix's verification leaves it with "avenues of evasion," like the court found in *Nagler,* 167 F. Supp. at 415. Mr. Drake's verification is sufficient as is.

Defendants also claim that Phoenix improperly attempted to supplement or amend its responses through unverified letters on two occasions. (DN 185, at pp. 16-17). Phoenix defends that these letters were bates labeled and indicated which interrogatories it was supplementing or amending. (DN 190, at p. 17). Phoenix also points out that Defendants have supplemented their responses in the same manner through informal letters to Phoenix. (*Id.*). The "they did it first" or "they did it too" defenses from both sides to justify their deficient behavior during discovery are not at all persuasive. One party's failure to comply does not excuse the other side from meeting its discovery obligations. Setting that aside, the Court agrees with Defendants that Phoenix must properly verify the supplemental responses it provided in the March 25, 2019 and July 26, 2019

38

letters and in any future supplemental responses. Phoenix's failure to do so will result in such supplemental information or amendments being excluded.

### B. Phoenix's Response to Trading Corp.'s First Set of Requests for Production

From the outset, the Court notes that several of Defendants' complaints with Phoenix's responses to Trading Corp.'s First RFPs involve Phoenix's failure to identify responsive documents by bates-label number. Federal Rule of Civil Procedure 34 requires a party producing documents or electronically stored information to do so "as they are kept in the usual course of business or . . . organize and label them to correspond to the categories in the request." Fed. R. Civ. P. 34(b)(2)(E)(i). This Rule is meant to "prevent a party from obscuring the significance of documents by giving structure to the production." *FDIC v. Cuttle*, No. 11-CV-13442, 2012 WL 5990284, at * (E.D. Mich. Nov. 30, 2012) (citing *Nolan, LLC v. TDC Int'l Corp.*, No. 06-cv-14907, 2007 WL 3408584, at *2 (E.D. Mich. Nov. 15, 2007) (add'l citation omitted)). The producing party bears the burden of demonstrating that the documents were produced in the usual course of business. *Id.* A party may do so by identifying "where the documents were maintained, who maintained them, and whether the documents came from one single source or multiple sources and files." *Id.* When the producing party meets this burden, Rule 34 imposes no further duty on the party to organize and label the documents to correlate to the particular request to which they are responsive. *Id.*

But, generally, when a party refers to other documents in its interrogatory responses, it must provide specific bates-label references. *Neale v. Coloplast Corp.*, No. 1:18-cv-00274-TRM-SKL, 2020 WL 6948361, at *6 (E.D. Tenn. Nov. 2, 2020) (citing *Spinks v. Home Tech Servs. Co.*, No. 03 CV 2568 D/P, 2005 WL 8156556, at *3 (W.D. Tenn. May 24, 2005)). Similarly, when a party claims it has already provided responsive documents to a challenged request, the party must

provide relevant bates-label numbers. *CUCS Unlimited Contracting Servs., Inc. v. Comdata Inc.*, No. 3:17-cv-01158, 2019 WL 483313, at *7 (M.D. Tenn. Feb. 7, 2019) (citing *Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 509-10 (N.D. Tex. 2016) (requiring defendants to provide the bates numbers of responsive documents after defendants referenced hundreds of pages of seemingly irrelevant documents in response to plaintiffs' production requests)). A party's production of documents that does not include such references, otherwise known as a "document dump," does not comply with its discovery obligations. *Neale,* 2020 WL 6948361, at *6 (citing *Stooksbury v. Ross*, 528 F. App'x 547, 550 (6th Cir. 2013)). Where a voluminous production is easily searchable, however, and there is no burden on the receiving party to wade through masses of unresponsive documents, bates-label references may not be necessary. *Id.* The Court will apply these principles in addressing Trading Corp.'s specific arguments against Phoenix's production of documents.

### 1. Waiver Due to Untimeliness

Defendants claim that Phoenix waived its responses to Trading Corp.'s first RFPs by failing to respond until almost two weeks after its deadline passed and never providing a justification for missing its deadline. (DN 185, at p. 17). Phoenix responds by asking the Court to excuse its tardiness because it responded in good faith to Defendants 134 RFPs by providing complete responses and not using boilerplate objections. (DN 190, at p. 19). Defendants reply that Phoenix has failed to establish good cause or excusable neglect for its late responses. (DN 201, at pp. 15-16). While Phoenix should have sought an extension of time to provide its discovery responses, the Court will not deem its responses waived at this late stage of litigation. The Court finds good cause for Phoenix's delay based on the numerosity of Defendants' requests for production of documents and Phoenix's endeavors to fully comply with such requests.

40

2. Phoenix's Refusal to Produce Financial Records

Defendants next claim that despite seeking lost profits damages in excess of five million dollars, Phoenix refuses to produce financial documents relevant to its alleged damages and mitigation thereof. (DN 185, at pp. 17-18). Defendants specifically seek:

> (1) Phoenix's financial statements including annual income statements and balance sheets from 2004 to present (or at least until April 18, 2018, the date this request was issued);
>
> (2) Proformas [sic] and projections:
>
> (a) prepared prior to October 2015 for the sale of Equipment (including parts) in the Territory and for Phoenix generally;
>
> (b) prepared after October 2015 and covering any time period Phoenix will claim lost sales or lost profits; and
>
> (c) prepared at any time regarding expected parts sales following a sale of a belt filter presses [sic];
>
> (3) Phoenix's source financial records/information (not after the fact compilations made for the purpose of this lawsuit) regarding past sales for Phoenix by any of the Defendants, including documents regarding the cost of sales and costs of goods sold and selling, general and administrative expenses;
>
> (4) Information about the market, and/or competitors, with respect to the sale of belt filter presses and parts, that Gary Drake referenced at least one market report during one of his deposition [sic] in this lawsuit that should be produced; and/or
>
> (5) Documents regarding the costs of shipping, currency exchange, customs clearance, duties and tariffs, distributor or agent commissions, and governmental approvals regarding use or sales of belt filter presses and parts in Russia and the CIS Countries.

(DN 185, at p. 18).

As to (1), Phoenix responds that its income statements and balance sheets have no relevance to its breach of contract damages because Phoenix is not claiming any damages outside of the May 2009 to June 2016 period when the distributor agreements were in effect. (DN 190, at pp. 18-19). Nor are these documents relevant to its claims for unjust enrichment, Phoenix continues, because such damages are based on the benefits Defendants derived from their allegedly

41

illegal actions. (*Id.* at p. 19). Defendants reply that Phoenix's income statements and balance sheets are unquestionably relevant because Phoenix is seeking lost profits in its breach of contract claims. (DN 201, at p. 17). Defendants specify that financial documents reflecting Phoenix's attempts to sell belt filter presses and related parts in the territory after the contractual period support their mitigation of damages defense to Phoenix's unjust enrichment claims. (*Id.*).

The Court agrees with Defendants that Phoenix's income statements from the period during which the distributor agreements were in place could bear on Phoenix's breach of contract damages. The same is not true for Phoenix's financial documents postdating the distributor agreements. Defendants have not demonstrated how these documents are relevant to either Phoenix's unjust enrichment claim or their mitigation of damages defense. Phoenix, therefore, will only be required to produce its income statements and balance sheets from May of 2009 to June of 2016, the period during which the distributor agreements were in effect.

As to (2) and (4), Phoenix claims no responsive documents exist. As noted throughout this opinion, a party cannot be required to produce documents that do not exist. Because Defendants have not produced evidence to the contrary, the Court accepts Phoenix's explanations to (2) and (4) that it has no pro formas or projections and does not prepare market reports about competitors. However, Phoenix's statement that it "believes" it produced the report referenced by Mr. Drake during his deposition does not suffice. Phoenix must confirm that it previously produced the report by providing the document's bates-label number or must supplement its response by producing the referenced report.

As to (3), Phoenix states it has fully complied by running reports from accounting software and producing invoices. (*Id.* at pp. 19-20). Defendants argue that Phoenix still must produce the source financial records that underlie such reports. (DN 201, at p. 18). If Phoenix has not produced

these underlying financial records, including for transactions between Phoenix and its vendors, which are relevant here, it must do so.

As to (5), Phoenix claims the sought information is irrelevant, as Trading Corp. was responsible for coordinating and paying for all customs and shipping costs. (*Id.* at pp. 20-21). Considering that Defendants did not further address this subpart in their reply, the Court finds Phoenix's explanation to be persuasive and will not require supplementation.

### 3. Phoenix's Claims of Confidentiality

Defendants argue that Phoenix improperly objected to several RFPs based on the information being confidential and/or proprietary. (DN 185, at p. 19). Defendants explain that the parties' confidentiality agreement in this case provides sufficient protection to address any alleged confidentiality and/or proprietary concerns by a party.   (*Id.*). Specifically, Defendants seek Phoenix produce copies of manufacturing assembly and subassembly drawings that embody Phoenix's alleged trade secrets to support their defense that the "general arrangement" drawings are not detailed enough for manufacturing knock-off belt filter presses. (*Id.* at pp. 19-20).

 Phoenix claims the issue here is more of relevancy than confidentiality; it believes it should only be required to disclose the actual trade secrets it alleges that Defendants misappropriated and that it provided to Defendants during the course of their business relationship. (DN 190, at p. 21). Phoenix explains that it has produced the "general assembly" drawings Defendants requested in CAD form but will not produce the subassembly drawings because Defendants never had access to such drawings, making them irrelevant in this lawsuit. (*Id.*).

Certainly, possessing Phoenix's more-detailed trade secrets could support Defendants "we didn't do it" defense. But any potential relevance of these undisclosed trade secrets to their defense is outweighed by the severe prejudice Phoenix would face from producing trade secrets that

Defendants never had access to. Only those trade secrets disclosed to Defendants pursuant to the distributor agreements are relevant in this case. Defendants can defend their position based on the alleged lack of detail in the drawings they were provided under the distributor agreements. Phoenix will not be required to produce the requested subassembly or manufacturing assembly drawings.

4. Phoenix's Refusal to Produce Agreements with Confidentiality Provisions

Defendants requested copies of agreements containing confidentiality provisions between Phoenix and its customers, employees or representatives, and other third parties entered into involving the alleged trade secrets and confidential information at issue in this case. Defendants claim that Phoenix has only produced "example" or "sample" responsive documents, which does not satisfy its obligations under the Federal Rules. (DN 185, at p. 21). Defendants point out that not all of Phoenix's agreements contained confidentiality provisions, as revealed by Phoenix's agreement with Conn-Weld Industries. (*Id.*).

Phoenix responds that these confidentiality agreements are only relevant if the other party to the agreement was given the trade secrets and confidential information at issue in this case. (DN 190, at pp. 21-22). Because it does not provide manufacturer's representatives with trade secrets or confidential information, Phoenix states that these requests do not lead to any discoverable information. (*Id.* at p. 22). Defendants reply that Phoenix only addressed confidentiality agreements with manufacturer's representatives but did not resolve its failure to produce all confidentiality agreements with any persons or entities that Phoenix has granted access or right to use the trade secrets and confidential information subject to this lawsuit. (DN 201, at pp. 20-21).

Phoenix's production of example agreements does not seem elusive; it is likely that Phoenix does not draft new and distinct confidentiality agreements for every third-party purchaser, end user, etc. that is given access to its trade secrets or confidential information. But the existence

of confidentiality agreements between Phoenix and other entities beyond Defendants is relevant to Defendants' theory that Phoenix did not properly maintain and protect its trade secrets. Despite this relevance, the Court again finds Phoenix would be unreasonably prejudiced by being required to produce confidentiality agreements covering trade secrets not at issue in this litigation.

Phoenix, therefore, is required to produce all confidentiality agreements with any persons or entities where Phoenix granted access to any of its trade secrets or confidential information currently at issue in this litigation. For those agreements that Phoenix has used repeatedly, Phoenix may submit a list of all individuals or entities that would have been bound by a particular agreement. Phoenix will also be required to produce a list of individuals or entities that received access to the trade secrets or confidential information at issue in this case without entering a confidentiality agreement.

### 5. Phoenix's Failure to Produce a Privilege Log

Defendants argue that Phoenix's responses contained several assertions of privilege but that Phoenix has not produced a privilege log even though the requests concerned Phoenix's internal communications or communications shared with third parties, not Phoenix's attorneys. (DN 185, at p. 22). Phoenix responds that because it is only claiming that attorney-client communications between Phoenix and counsel of record are privileged, a privilege log was not necessary. (DN 190 at p. 22). Phoenix maintains that Defendants did not provide for the same type of communications in their privilege log. (*Id.*).

As an initial matter, neither party needs to list every communication between the client and attorney of record in a privilege log. Looking to RFP Nos. 46 and 47, which sought internal communications concerning the distributor agreements or the subject matter of the lawsuit, the Court finds Phoenix's responses were appropriate. Although Phoenix stated that some of the

requested documents were prepared in anticipation of litigation and/or are subject to attorney-client privilege, its responses further state it has produced all responsive documents and includes bates-label numbers for such production. (*See* DN 185-12, at p. 17).

The same is not true for Phoenix's response to RFP No. 54, which sought documents and communications between Phoenix and any current or potential customer, customer representative, end-user, manufacturer's representative or distributer of Phoenix in the territory concerning any Defendant or the subject matter of this case. (*Id.* at p. 20). Phoenix objected to the extent the request seeks confidential, proprietary, or privileged information or documents prepared in anticipation of litigation or attorney work product. (*Id.*). But Phoenix did not explain that it produced documents beyond this objection; instead, it additionally objected to the request as overbroad and unduly burdensome. (*Id.*). It seems Phoenix is conflating "confidential, proprietary, and privileged information" here. Documents subject to the attorney-client privilege between the client and attorney of record will be protected and need not be listed. However, Phoenix's confidential and proprietary information is covered by the parties' confidentiality agreement in the case, meaning Phoenix cannot object to their production on these grounds.

Phoenix, therefore, must produce the requested documents and information that are not subject to the attorney-client privilege or, if it has already produced such documents, must identify them by bates-label number. If Phoenix claims that any of this information is subject to attorney-client privilege beyond those between the client and the attorney of record, Phoenix must submit a privilege log that complies with the standards outlined in (III)(A)(3) above.

### 6. Phoenix's Redaction of Documents

Defendants claim that Phoenix has improperly redacted information about pricing and/or customer names in connection with its sales or potential sales of belt filter presses and related parts.

46

(DN 185, at p. 22). Defendants claim this information is relevant to Phoenix's damages based on lost sales and Defendants' mitigation-of-damages defense. (*Id.*). Phoenix claims this redacted pricing information is wholly irrelevant to the claims or defenses in this case for the reasons discussed in (IV)(C)(2). Disclosing the redacted information, Phoenix explains, would damage its present ability to conduct business in the territory. (DN 190, at pp. 22-23). Defendants reassert the relevance of the pricing information to their mitigation-of-damages defense: "if Phoenix is attempting to charge too much for its equipment or spare parts, the failure to make such sales could be Phoenix's fault, not CETCO's alleged misconduct." (DN 201, at pp. 21-22).

Defendants have not demonstrated this redacted information is relevant to their defenses or Phoenix's claims.[15] Under its unjust enrichment claim, Phoenix seeks to recover the benefits Defendants incurred from selling the products and services that it acquired by misappropriating Phoenix's trade secrets and confidential information. For a party to prevail on a theory of unjust enrichment in Kentucky, it must prove three elements: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Stansbury v. Hopkins Hardwoods, Inc.*, No. 4:15-CV-00016-JHM, 2017 WL 1362076, at * 8 (W.D. Ky. Apr. 11, 2017) (quoting *Furlong Dev. Co., LLC v. Georgetown-Scott Cnty. Planning & Zoning Comm'n*, 504 S.W.3d 34, 39-40 (Ky. 2016)). It is unclear how Phoenix's business activity in the territory postdating the distributor agreements would bear on Defendants' benefit from their alleged trade secret misappropriation. Phoenix could be prejudiced by revealing their current business negotiations in the territory, where it competes against Defendants.

It is further unclear how Defendants expected Phoenix to mitigate such damages since the

---

[15] The Court notes that Defendants do not cite any case law or other authority that supports the relevance of this information to its mitigation of damages defense.

unjust enrichment claim is based on the benefit Defendants incurred. And it seems this redacted information only involves transactions or communications postdating the effective period of the distributor agreements, making it irrelevant to Phoenix's breach-of-contract damages. For these reasons, the Court will not require Phoenix to produce unredacted copies of the documents at issue.

### 7. Phoenix's Claims of No Responsive Documents

Defendants produce a table of 19 RFPs to which Phoenix responded that it did not have any responsive documents and request that Phoenix explain why such wide-ranging categories of documents that would be expected to exist are not in its possession, custody, and control. (DN 185, at pp. 23-24). Phoenix contends that Defendants have not met their burden of producing evidence that permits a reasonable deduction that other documents exist. (DN 190, at pp. 23-24).

The Court first notes that several of these requests (*i.e.* RFP Nos. 113, 119) have previously been addressed elsewhere in the opinion.[16] Moving to the remainder of the disputed responses, it does not appear that Defendants have asserted more than cursory arguments regarding documents expected to be in Phoenix's possession to RFP Nos. 36, 77, 78, 113, 114, and 117. Supplementation is not necessary as to those responses.

Defendants claim Phoenix must have additional documents responsive to RFP No. 44 because although it claims it has no communications among employees or representatives concerning trade secrets or confidential information, Phoenix stated in interrogatory answers that its employees assisted in developing these trade secrets until 2016. (DN 201, at p. 22). There should be some documentation of developing these trade secrets, according to Defendants, because companies typically record and document such efforts. (*Id.*). While the Court earlier found that

---

[16] As to RFP No. 98, Phoenix claims it has supplemented its damages calculations since its initial responses were provided. Defendants have indicated in other portions of their motion to compel plans to seek exclusion of such supplemental damages report. (DN 201, at pp. 12-13). For now, the Court finds nothing further is necessary as to this Request.

Phoenix appropriately relied on commonsense, coupled with credible evidence, to demonstrate that more responsive documents existed, the same logic does not apply here. Defendants rely only on their belief that communications regarding the development of trade secrets should exist without producing any credible evidence. Phoenix will not be required to supplement its production.

As to RFP Nos. 48-57, seeking communications with third parties concerning the subject of the lawsuit, Defendants have carried their burden of demonstrating that more responsive documents exist. Phoenix references Mr. Drake's deposition testimony that all communications with third parties regarding this lawsuit occurred verbally and there are no written responsive documents. (DN 190, at p. 24). Defendants, however, submit an email demonstrating that Mr. Drake sent emails to third parties discussing the misappropriation allegations in this litigation. (DN 201, at p. 23 (citing DN 193-38)). This email creates a reasonable inference that other written communications to third parties concerning the subject of the lawsuit could exist. Phoenix is required to produce any responsive documents.

Finally, as to RFP Nos. 99, 105, 109, 110, and 119, Defendants request that Phoenix update its responses to reflect its production of responsive documents. (DN 201, at p. 3). The Court finds Defendants' request is reasonable and requires Phoenix to provide sworn verification that it has produced all responsive documents to these requests.

### 8. Phoenix's References to Second Amended Complaint

In Phoenix's initial responses to Trading Corp.'s First RFPs, it repeatedly stated that it was not producing responsive documents because its Second Amended Complaint "will not include a claim for violations of the Kentucky Uniform Trade Secrets Act." (*See*, *e.g.,* DN 185-12, at pp. 4-5). But after several rounds of motion practice, and the Court dismissing several of its other claims,

Phoenix continued with its KUTSA claim. (*See, e.g.,* DN 125; DN 131). Now, Defendants claim that Phoenix either must amend its responses to remove these improper statements or produce all documents responsive to those requests. (DN 185, at p. 25). Phoenix claims it has already supplemented its responses to indicate that it is not withholding any documents based upon its dated statements regarding its Second Amended Complaint. (DN 190, at p. 25).

The Court agrees with Defendants that Phoenix must formally amend and verify its responses to reflect the removal of any dated statements regarding its Second Amended Complaint. And to the extent that Phoenix claims is has already produced responsive documents, it must identify such documents by bates-label number. *See CUCS Unlimited,* 2019 WL 483313, at *7.

### 9. Documents Phoenix Used to Answer Interrogatories

Defendants take issue with Phoenix's claim that it has produced all documents used to answer Trading Corp.'s Interrogatories and requests Phoenix be ordered to produce all such documents or, if it still claims such documents have been produced, to provide responsive bates-label numbers. (DN 185, at p. 26). Phoenix confirms that it has produced all such documents in its various supplemental responses. (DN 190, at pp. 25-26). Phoenix must provide bates-label numbers for the documents it used to respond to Defendants' interrogatories. *See Neale*, 2020 WL 6948361, at *6.

### 10. Phoenix's Reference to Its Entire Production of Documents

Defendants claim that Phoenix fails to organize its production of documents or supplemental productions and instead has been "data dumping" large PDF files onto Defendants. (DN 185, at pp. 26-27). Specifically, Defendants oppose Phoenix's reference to documents bates-labeled 1-1179 in several of its responses. (*Id.*). Some of these files, Defendants assert, are incomplete or cut off in the middle of the document. (*Id.*). Defendants request that Phoenix be

ordered to organize its document production to correspond with the categories Defendants requested and indicate which documents are responsive to which requests. (*Id.*at p. 27).

Phoenix alleges that documents 1-1179 were provided to Defendants in an organized fashion which would enable them to determine which documents were responsive to which requests. (DN 190, at pp. 26-27). According to Phoenix, Defendants have offered no support for its assertion that Phoenix did not produce its documents as they are kept in the ordinary course of business. (*Id.*).

Phoenix has not met its burden of demonstrating that it produced responsive documents as they are kept in the usual course of business under Rule 34. *See Cuttle*, 2012 WL 5990284, at *2. In fact, Phoenix improperly attempts to shift such burden to the Defendants. Phoenix does not identify where the documents were maintained, who maintained them, or whether the documents came from a single source or multiple sources and files. *Id.* Nor does Phoenix demonstrate that it has organized and labeled its production to correspond to the categories in Defendants' requests. Although Phoenix states that bates-labeled documents 1-1179 were provided to Defendants in an organized fashion, Defendants' reply demonstrates several examples of Phoenix's unorganized production. (DN 201, at pp. 25-26 (citing DN 201-2)). Phoenix's identification of a range of 1,179 bates-labeled documents does not comply with Phoenix's discovery obligations under Rule 34. Phoenix, accordingly, must identify by bates-label number which documents within this production correspond to each of Trading Corp.'s RFPs.[17]

### 11. Phoenix's Production of Unreadable or Incomplete Documents

Defendants next argue that Phoenix has produced several documents that are unreadable

---

[17] To the extent that Phoenix believes it should not be required to identify bates-label numbers because Defendants did not do so in their production, Phoenix did not argue in its motion to compel that Defendants did not produce documents in the usual course of business or that Defendants' production was unorganized or unsearchable.

or incomplete. (DN 185, at p. 27). They claim Phoenix has wholly failed to address these issues. (*Id.*). Phoenix explains that the documents at issue are the best copies that it possesses because they are emails or faxes that were stored only in paper copy. (DN 190, at p. 27). Defendants reply that Mr. Drake testified during his deposition that Phoenix has its records electronically stored despite prior representations that it only had hard copies of some records. (DN 201, at p. 27). Based on Mr. Drake's testimony, the Court will require Phoenix to provide a sworn verification that it has searched for and produced the most legible versions of the records at issue.

### 12. Phoenix's History of Not Producing Documents

Defendants allege that Phoenix failed to produce at least three documents critical to Phoenix's claims in the lawsuit until its witnesses were questioned about them during their depositions. (DN 185, at p. 28). Because of Phoenix's prior failures, Defendants request the Court order Phoenix to diligently review all of its records and compare them to what has been produced thus far and produce any outstanding responsive documents or provide a sworn verification that all such documents have been produced. (*Id.*). Phoenix explains that the three documents Defendants reference were acquired after the lawsuit began when it started investigating the extent to which Defendants misappropriated its trade secrets. (DN 190, at p. 28). Defendants reply that Phoenix's explanation is "patently false" because Phoenix's representatives testified that these documents were in Phoenix's possession in June of 2017 and Trading Corp. did not issue its first set of RFPs until April of 2018. (DN 201, at pp. 27-28). The Court agrees that based on this evidence, Phoenix should have produced the disputed documents prior to Mr. Fenzel and Mr. Drake's depositions. Phoenix shall therefore produce a sworn verification that it has produced all responsive documents to Trading Corp.'s first set of RFPs.

### C. Phoenix's Responses to Trading Corp.'s Second Requests for Production

### 1. Waiver of Objections

Phoenix missed its deadline for responding to Trading Corp.'s second set of RFPs by three days. (*See* DN 185-13). Defendants claim that because Phoenix has established a pattern of gratuitously disregarding deadlines in this case, all of its objections should be waived. (DN 185, at pp. 28-29). While the Court agrees that Phoenix has missed several deadlines in the course of this litigation, the Court again declines to deem waived all of Phoenix's objections based on their three-day delay and will instead evaluate Defendants' specific issues with Phoenix's objections.

### 2. Phoenix's Use of Boilerplate Objections

In responding to Trading Corp.'s second set of RFPs, Phoenix repeatedly asserted boilerplate objections as to relevancy, undue burden, and proportionality. As the Court discussed in detail in evaluating Phoenix's motion to compel, boilerplate objections are highly frowned upon in this District. (*See supra* (III)(A)(2)). The Court earlier declined to deem waived Defendants' boilerplate objections and will do so again here because both parties have clearly failed to comply with their obligations during discovery.

Defendants outline several categories of information that Phoenix claims are irrelevant, including: (1) documents displaying information regarding belt filter presses sent to third parties and communications between third parties in which such material was transmitted; (2) copies of brochures, catalogues, videos, or other documents referring or relating to the design of Phoenix's belt filter presses and parts that were distributed or furnished to customers or potential customers at trade shows; (3) drawings, photos, and documents referenced on specific document pages produced by Phoenix that were in English and subsequently translated to Russian; and (4) confidentiality agreements between Phoenix and customers/potential customers at the time Phoenix sent such customers budgetary proposals for the potential sale of belt filter presses. (DN

185, at p. 30). Defendants claim these categories of documents are unquestionably relevant to Phoenix's misappropriation claims and to show whether Phoenix maintains the purported confidentiality of its alleged trade secrets. (*Id.* at p. 30).

Phoenix responds that this request falls outside of the "Relevant Period" and that it is not relevant how it maintained its confidential information after it was misappropriated by Defendants. (DN 190, at p. 28). Defendants, in reply, clarify that because Phoenix relied on a June 2017 report from Phoenix employee Matt Fenzel to support its claims, it doesn't matter that the discovery requested involves conduct that occurred after the distributor agreement ended. (DN 201, at p. 31). The Court agrees with Defendants. How Phoenix maintained the trade secrets and confidential information at issue in this case following Defendants' alleged misappropriation is relevant to Phoenix's unjust enrichment damages. If other entities or individuals also misused Phoenix's trade secrets, it could conceivably affect the benefit Defendants actually derived from their alleged misappropriation. To the extent the categories identified above relate to Phoenix's maintaining of the trade secrets at issue in this litigation, Phoenix must supplement its production.

Defendants also take issue with Phoenix's objection that Trading Corp. already has the responsive documents in its possession or that Trading Corp. is in the "same position" as Phoenix to access such documents. (DN 185, at pp. 31-32). Phoenix responds that it has produced all drawings, communications, and other requested information that was previously exchanged, regardless of whether Defendants had these documents in their possession. Phoenix's objection is improper. A party cannot avoid its discovery obligations by simply stating that the other side had possession of the requested documents preceding the litigation. If Phoenix is withholding any responsive documents on this basis, it is required to produce them to Defendants. If Phoenix maintains that all such documents have been produced, it must provide a sworn verification

reflecting that.

The Court also disagrees with Phoenix's assertions that producing responsive documents would "further delay the litigation." The parties' refusal to comply with their discovery obligations and to compromise with one another has continuously impeded progress in this case. Because this objection is unsound, Phoenix must produce any documents it is withholding on this basis and, if it now claims that all responsive documents have been produced, it must provide a sworn verification to that effect.

### 3. Phoenix's Reference to Previous Document Productions

In responding to Trading Corp.'s second set of RFPs, Phoenix referenced its "previously produced" responsive documents multiple times. Defendants take issue with Phoenix not sufficiently identifying the documents it allegedly previously produced. (DN 185, at pp. 33-34). Phoenix once more argues that Defendants have produced no evidence that it has not organized its document production. (DN 190, at p. 29). Phoenix explains that Defendants' second set of RFPs were largely duplicative of their prior requests and that Phoenix had already produced a significant portion of the requested documents. (*Id.*).

Based on the analysis in section (IV)(B)(10) above, the Court again finds Phoenix's broad reference to previously produced documents to be insufficient. It is Phoenix's burden, not Defendants', to demonstrate that responsive documents were produced as they are kept in the usual course of business or were organized and labeled to correspond to Defendants' RFPs as required by Rule 34. Phoenix did not meet this burden, and, contrary to Phoenix's assertions, Defendants produced evidence that Phoenix's production was neither organized nor labeled to correspond to Defendants' RFPs. (DN 201, at pp. 25-26 (citing DN 201-2)). Where Phoenix is relying on documents it previously produced, it must identify them by bates-label number.

D. Phoenix's Responses to Trading Corp.'s Request for Admissions

Defendants lastly argue that Phoenix's responses to their Requests for Admissions (RFAs) did not comply with the Federal Rules. (DN 185, at pp. 34-35). Federal Rule of Civil Procedure 36 provides that a party may submit written requests to the other party to admit "the truth of any matters within the scope of Rule 26(b)(1) relating to: (A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents." Fed. R. Civ. P. 36(a)(1)(A)-(B). If the answering party does not admit a matter, its answer "must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." *Id.* (a)(4). Denials must fairly respond to the substance of the matter and if the answering party asserts lack of knowledge or information as its reason for failing to admit or deny, it must state "that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." *Id.*

Defendants claim several of Phoenix's denials are misleading and do not fairly respond to the substance of the matter. (DN 185, at p. 35). Specifically, Defendants point to Phoenix's denial that Mr. Chudnovets and Coralina were not expressly named parties to the distributor agreements at issue and explanation that they were, in essence, parties to such agreements due to Phoenix's alter-ego theory. (*Id.*). Defendants assert this answer is a legal contention, not appropriate in response to an RFA. (*Id.*). Phoenix responds that it denied the request because it was concerned with how Defendants would use such an admission given that the term "expressly" is not defined. (DN 190, at pp. 29-30).

The RFAs at issue asked Phoenix to admit that Mr. Chudnovets and Coralina were not expressly named as parties to any contract at issue in this litigation. (DN 185-14, at pp. 1-4). As to Mr. Chudnovets, Phoenix responded: "Deny. Chudnovets signed the 2009 Distributor Agreement

on behalf of CETCO Technology, and since Chudnovets is the alter ego of CETCO Technology and CETCO Trading, he is in his individual capacity bound by the terms of said Agreement, as well as the 2012 Distributor Agreement with CETCO Trading." (*Id.* at p. 2). Phoenix similarly denied the RFAs regarding Coralina, stating Coralina was the alter ego of CETCO Trading and CETCO Technology and was previously owned by CETCO Technology, making Coralina a party to and bound by the terms of the 2009 and 2012 distributor agreements. (*Id.* at p. 3).

Motions to compel are generally not the proper vehicle for proving the falsity of a party's response to a request for admission. *See Roden v. Floyd*, No. 2:16-cv-11208, 2019 WL 1098918, at *5 (E.D. Mich. Mar. 8, 2019). But the term "expressly" as used in Defendants' RFAs is not undefined or open to interpretation. In Merriam-Webster's dictionary, "expressly" is defined as "in an express manner" or "in definite and distinct terms." Merriam-Webster Online Dictionary (2020); https://www.merriam-webster.com/dictionary/expressly (derived from Merriam-Webster's Collegiate Dictionary 11th ed.). Defendants' RFAs, therefore, ask whether Mr. Chudnovets or Coralina were definitely and distinctly named in the 2009 and 2012 distributor agreements or any other contracts in the litigation. Phoenix's answers include inferences and legal arguments based on the allegations in its Complaint. Perplexingly, Phoenix's explanation that Mr. Chudnovets and Coralina were parties to the agreements because they are alter egos of Technology Corp. and Trading Corp. contradicts its denial that the parties were "expressly" named. Without determining the truthfulness of Phoenix's response, the Court will require Phoenix to amend its answers to RFA Nos. 1-11 using the dictionary definition of "expressly" as stated above.

Defendants also take issue with Phoenix's answer to RFA Nos. 15 and 16 that it could not admit or deny because it was unable to understand the requests. (DN 185, at p. 35). Phoenix's failure to state in detail why the matter could not be admitted or denied, Defendants assert, violates

Rule 36's requirements. (*Id.* at pp. 35-36). Phoenix did not respond to this argument. The Court agrees with Defendants that Phoenix's answers do not comply with Rule 36(a)(4)'s requirement that an answering party must state in detail why it cannot truthfully admit or deny a request. Phoenix merely stating that it "is not able to understand the Request" does not suffice. Accordingly, Phoenix must amend its answers to RFA Nos. 15 and 16 to provide a detailed statement as to why it cannot admit or deny these Requests.

## IV. SANCTIONS

Both parties request sanctions against the other side for the behavior discussed above. Phoenix requests its reasonable attorney's fees due to Defendants' intentional failure to comply with the Court's March 19, 2019 Order and repeated refusals to comply with Phoenix's relevant discovery requests. (DN 182, at pp. 53-54).  Defendants request attorney's fees for the reasonable expenses it incurred in making their motion to compel. (DN 185, at p. 36).

When a motion to compel is granted, the Court must require the party whose conduct necessitated the motion, the attorney advising that conduct, or both, "to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37 (a)(5)(A). The Rule excepts payment of such expenses from this mandatory provision if "the opposing party's nondisclosure, response, or objection was substantially justified" or "other circumstances make an award of expenses unjust." *Id.* (a)(5)(A)(ii)-(iii). When a motion to compel is granted in part and denied in part, the Court may, after giving the parties an opportunity to be heard, apportion the reasonable expenses for the motion. *Id.* (a)(5)(C).

In this drawn-out litigation, an award of expenses to either party is neither just nor practical. Both sides are at fault in failing to comply with their discovery obligations and unreasonably delaying the discovery period. Their multiplicity of motion papers was necessitated only by a

mutual failure to cooperate. Moreover, the competing motions to compel are replete with hypocritical arguments To name a few: both sides responded to discovery requests using impermissible boilerplate objections, then objected to the other side doing so (DN 182, at p. 43; DN 185, at pp. 29-30); both sides have missed or ignored deadlines but objected to the other side doing so (DN 182, at pp. 43-44; DN 185, at pp. 28-29); both sides waited until responding to a motion to compel to assert substantive objections, but objected to the other side doing so (DN 199, at p. 16; DN 201, at p. 20); and both sides have objected to appropriate time periods for discovery requests, while objecting to the other side doing so (DN 182, at p. 42; DN 185, at p. 30-32).

Were the Court to award expenses based on the deficiencies from both sides discussed in this Opinion, the sanctions imposed would tend to cancel each other out and would not be an effective deterrent for future dilatory behavior in this litigation. Imposing sanctions would likely encourage non-compliance, heighten tensions between the parties, and further stall the litigation. *See, e.g., Hahn Acquisition Corp., v. Hahn,* 137 F. Supp. 2d 895, 900 (E.D. Mich. Mar. 29, 2001) (declining to impose sanctions despite both sides' "hyperactive litigiousness" warranting sanctions). In declining to award fees, however, the Court is not condoning the parties' combative behavior. There is a difference between zealously representing the interests of one's client and wholly refusing to cooperate with opposing counsel.

The Court will give the parties thirty days to comply with the directives of this Opinion and provide opposing counsel with outstanding discovery. The Court trusts the parties will rise above their past behavior and work agreeably to ensure the Court's directives are met. Because discovery ended months ago, the Court warns the parties that it will not entertain further motion practice on these issues or further extensions. The case has been stalled in discovery for too long and must move toward resolution. Either side's failure to comply will result in sanctions.

<u>V. ORDER</u>

**IT IS THEREFORE ORDERED** as follows:

(1) Phoenix's Motion to Compel (DN 182) is **GRANTED IN PART and DENIED IN PART** as outlined in Section III. Unless otherwise specified in the Opinion, Defendants will have **thirty (30) days** to conduct additional searches, produce additional discovery, provide sworn verifications, and update their privilege log.

    a.  Phoenix's Request to Extend its Rebuttal Expert Deadline is **DENIED.**

    b.  Phoenix's Request for Attorney's Fees is **DENIED.**

(2) Defendants' Motion to Compel (DN 185) is **GRANTED IN PART AND DENIED IN PART** as outlined in Section IV. Unless otherwise specified in the Opinion, Phoenix will have **thirty (30) days** to conduct additional searches, produce additional discovery, provide sworn verifications, identify documents previously produced by bates-label number, supplement its responses to disputed RFAs, and, if necessary, provide a privilege log.

    a.  Defendants' Request for Attorney's Fees is **DENIED.**

(3) All Motions to Exceed Page Limitations (DN 184; DN 192; DN 195; DN 198; DN 200) are **GRANTED.**

(4) All Motions to Seal Exhibits (DN 181; DN 183; DN 191; DN 202) are **GRANTED.**

(5) The Court will hold a telephonic conference on **April 2, 2021, at 10:00 AM**. The parties shall participate using the following dial-in information: 1-888-808-6929, Access Code: 2887606.

March 18, 2021

Regina S. Edwards, Magistrate Judge
United States District Court

Copies:       Counsel of Record

60