**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:16-CV-00024-CHB**

**PHOENIX PROCESS**
**EQUIPMENT COMPANY**                                                                   **PLAINTIFF**

**VS.**

**CAPITAL EQUIPMENT &**
**TRADING CORPORATION, et al.**                                                         **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

Before the Court is Phoenix Process Equipment Corporation's ("Phoenix") Motion for Protective Order. (DN 245). Defendants Capital Equipment & Trading Corporation, et al. ("Defendants") have responded in opposition. (DN 252). Phoenix has replied. (DN 254). The District Judge referred Phoenix's Motion to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A). (DN 4; DN 117).

I. Background

The parties in this trade secret litigation have been fighting over the issues in Phoenix's Motion for Protective Order for several years. Put simply, Phoenix has repeatedly attempted to avoid disclosure of certain financial documents, trade secrets, and other allegedly proprietary information requested by Defendants and now seeks to designate these categories of documents as "Outside Counsel's Eyes Only."

Jumping back to April of 2018, the parties entered into a Confidentiality Agreement and Agreed Protective Order. (DN 183-1). The Agreement specifically covered documents produced in discovery and concluded with a provision of "Further Protection," stating: "[n]othing in this Confidentiality Agreement an Agreed Protective Order precludes any party from seeking and

obtaining from the Court a further protective order for any documents or information that the party believes may not be sufficiently protected by this or other protective orders." (*Id.* at PageID # 2788).

Almost two years after executing their Confidentiality Agreement, Phoenix and Defendants clashed over whether Phoenix should be required to produce financial documents relevant to its alleged damages and mitigation thereof. One category of these documents Defendants sought was "Phoenix's source financial records/information (not after the fact compilations made for the purpose of this lawsuit) regarding past sales for Phoenix by any of the Defendants, including documents regarding the cost of sales and costs of goods sold and selling, general and administrative expenses." (DN 185, at p. 18).

In an Opinion resolving dueling motions to compel filed by the parties, the Court determined "[i]f Phoenix has not produced these underlying financial records, including for transactions between Phoenix and its vendors, which are relevant here, it must do so." (DN 207, at PageID # 4136-38). In the same discovery Opinion, the Court addressed several categories of evidence Phoenix objected to as irrelevant. These included:

> (1) documents displaying information regarding belt filter presses sent to third parties and communications between third parties in which such material was transmitted; (2) copies of brochures, catalogues, videos, or other documents referring or relating to the design of Phoenix's belt filter presses and parts that were distributed or furnished to customers or potential customers at trade shows; (3) drawings, photos, and documents referenced on specific document pages produced by Phoenix that were in English and subsequently translated in Russian; and (4) confidentiality agreements between Phoenix and customers/potential customers at the time Phoenix sent such customers budgetary proposals for the potential sale of belt filter presses.

The Court determined "[h]ow Phoenix maintained the trade secrets and confidential information at issue in this case following Defendants' alleged misappropriation is relevant to Phoenix's unjust enrichment damages." (DN 207, at PageID # 4149). Explaining "[i]f other entities

2

or individuals also misused Phoenix's trade secrets, it could conceivably affect the benefit Defendants actually derived from their alleged misappropriation[,]" the Court indicated Phoenix must supplement its production "to the extent the categories identified above relate to Phoenix's maintaining of trade secrets at issue in this litigation." (*Id.*). On April 19, 2021, Phoenix filed a Notice of Compliance with the Court's March 18, 2021 Order, indicating it supplemented Bates labeled documents "Phoenix 3718 – Phoenix 3825" and supplemented and amended responses to Defendants' First Set of Requests for Production of Documents. (DN 216).

Despite Phoenix's purported compliance, Defendants filed a status report on July 27, 2021, conveying Phoenix had failed to produce the underlying financial records for its previously produced report on past sales. (DN 227, at PageID # 4255-56). Phoenix's own status report explained it produced all financial records in its possession relevant to Defendants' requests but redacted portions of the financial documents that are irrelevant to its past sales report. (DN 299, at p. 20). Eventually, after a telephonic conference, a Zoom hearing, and additional argument, the Court issued an Order on September 22, 2021, concluding:

> A party cannot unilaterally redact documents produced in discovery based upon a claim of irrelevance. *See, e.g., Am. Municipal Power, Inc v. Voith Hydro, Inc.*, No. 2:17-cv-708, 2020 WL 5014914, at *4 n.3 (S.D. Ohio Aug. 25, 2020) (collecting cases). And, regardless, the Court has already determined the underlying financial records are relevant to the claims in this case. Phoenix's arguments against relevance, accordingly, directly contravene the Court's Order. Moreover, the terms of the parties' confidentiality agreement in the litigation should cover any concern with the confidential nature of the underlying financial records. Phoenix, therefore, is ordered to comply with the Court's March 19, 2021 Order and provide unredacted copies of the underlying financial records previously produced and produce any additional underlying financial records, as outlined at DN 207, at pages 41-43 being withheld based on relevance.

(DN 236, at PageID # 4681-82).

Following the Court's Order, Phoenix produced close to 500 pages of documents (Phoenix Bates labeled 04558 – 05052) under an "Outside Counsel's Eyes Only" designation. (*See* DN 245-

3). Several days later, Phoenix filed the instant Motion for Protective Order, essentially requesting the Court ratify its designation of "Outside Counsel's Eyes Only" on its recent production. (DN 245). Phoenix maintains disclosure of the confidential, proprietary and trade secret information in these documents would cause serious injury. Asserting again that much of the information in the documents is not relevant to the claims and defenses of the lawsuit, Phoenix requests the Court enter a broader protective order than the one previously agreed to by the parties.

## II. Legal Standard

Under Federal Rule of Civil Procedure 26, trial courts have broad discretion to grant or deny protective orders. *Proctor & Gamble Co. v. Banker's Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specific way . . . ." Fed. R. Civ. P. 26(c)(1)(G). Good cause exists when the moving party "articulate[s] specific facts showing 'clearly defined and serious injury' resulting from the discovery sought . . . ." *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir. 2001) (quoting *Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987)). To overcome the basic policy in favor of broad discovery, the moving party has a heavy burden of demonstrating substantial justification for withholding information from the public. *See Proctor & Gamble*, 78 F.3d at 227; *Meyer Goldberg, Inc. of Lorain v. Fisher Foods, Inc.,* 823 F.3d 159, 162 (6th Cir. 1987) ("As a general proposition, pretrial discovery must take place in the public unless compelling reasons exist for denying public access to the proceedings.").

The "mere presence" of trade secrets does not entitle a disclosing party to a protective order. *Stout v. Remetronix, Inc.*, 298 F.R.D. 531, 534-35 (S.D. Ohio, 2014) (citation omitted); *see*

*also Acuity Brands Lighting, Inc. v. Bickley*, No. 5:13-CV-00366-DLB-REW, 2015 WL 12976102, at *4 (E.D. Ky. Sept. 4, 2015). Courts evaluate six factors in determining whether trade secrets or other confidential information needs protection:

> (1) the extent to which the information is known outside of [the] business;
>
> (2) the extent to which it is known by employees and others involved in [the] business;
>
> (3) the extent of measures taken . . . to guard the secrecy of the information;
>
> (4) the value of the information to [the business] to [its] competitors;
>
> (5) the amount of effort or money expended . . . in developing the information; and
>
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Vignes-Starr v. Lowe's Home Centers, LLC*, 544 F. Supp. 3d 774, 776 (W.D. Ky. 2021) (quoting *Williams v. Baptist Healthcare Sys.*, No. 3:16-CV-00236-CRS, 2018 WL 989546, at *2 (W.D. Ky. Feb. 20, 2018) (add'l citations omitted)).

An Attorneys' Eyes Only ("AEO") designation, which generally limits review of documents to the parties' attorneys and experts, is considered "the most restrictive (and thus least often justified) tier of discovery." *Specialty Auto Parts USA, Inc. v. Holley Performance Products, Inc.*, No. 1:17-CV-00147-JRW-LLK, 2020 WL 1914817, at *8 (W.D. Ky. Apr. 20, 2020) (quoting *Acuity Brands Lighting*, 2015 WL 12976102, at *4) (add'l citations omitted). To show an AEO designation is warranted in a "business context," the disclosing party must provide "specific demonstrations of fact, supported where possible by affidavits and concrete examples." *Id.* (quoting *Ohio Harness Horseman's Assoc., Inc. v. Northfield Park Assoc., LLC*, No. 5:16CV1780, 2016 WL 8608459, at *3 (N.D. Ohio Nov. 30, 2016) (quoting *Penn, LLC v. Prosper Bus. Dev. Corp.*, No. 2:10-cv-0993, 2012 WL 5948363, at *4 (S.D. Ohio Nov. 28, 2012))). Typically, AEO

designations are only permitted "when especially sensitive information is at issue or the information is to be provided to a competitor." *Ohio Harness*, 2016 WL 8608459, at *3 (quoting *Westbrook v. Charlie Sciara & Son Produce Co., Inc.*, No. 07-2657 Ma/P, 2008 WL 839745, at *4 (W.D. Tenn. Mar. 27, 2008)) (internal quotations omitted).

### III. Analysis

#### A.  Is Phoenix's Motion for Protective Order Procedurally Appropriate?

Defendants assert Phoenix should have objected to the Court's March 19, 2021 and September 22, 2021 Orders within fourteen days of their entry pursuant to Local Rule 72.2. (DN 252, at PageID # 5792-93). Because the Court has already considered, overruled, and rejected Phoenix's arguments, Defendants maintain the Court need not consider the merits of Phoenix's present Motion. (*Id.*). Phoenix's Reply highlights how Defendants have failed to cite any rule or case law requiring it to object to the Court's Orders rather than filing a separate motion for protective order. (DN 254, at PageID # 5962-63). Though frustrated that Phoenix's Motion for Protective Order essentially constitutes its third attempt at preventing disclosure of the contested categories of documents, the Court prefers resolution of this matter on the merits. Phoenix's allegations of likely concrete harm stemming from disclosure, especially its new arguments as to its "Outside Counsel's Eyes Only" designation, validates further evaluation.

#### B.  Has Phoenix Met the Requirements for Entry of a Protective Order Permitting Outside-Counsel's-Eyes-Only Designations?

Phoenix requests two categories of documents be subject to Outside-Counsel's-Eyes-Only ("OCEO") designations pursuant to a protective order. The first are the financial records Phoenix's CEO Gary Drake relied on while answering Defendants' interrogatories regarding the independent economic value of Phoenix's trade secrets. Phoenix originally produced redacted versions of these financial records, omitting information Mr. Drake did not use to answer Defendants' discovery

requests. The redacted information, Phoenix explains, includes sales and costs numbers associated with Phoenix's other markets (municipal markets, aggregates, industrial materials, etc.), sales numbers for spare parts on equipment other than belt filter presses, and operating expenses. Phoenix asserts the redacted information is not relevant to any claim or defense in this lawsuit.

The second category for which Phoenix claims protection is documents Phoenix sent to third parties relating to the sale of belt filter presses at issue in this litigation. Phoenix identifies over 400 pages of purchase orders, proposals, drawings, contracts, and operations and maintenance manuals associated with its sale of belt filter presses to customers around the world. These documents, Phoenix explains, contain an abundance of "confidential, proprietary, and trade secret information" bearing no relevance to the claims and defenses in this lawsuit. More specifically, Phoenix details customer identities, customer contact information, customer agent information, exact pricing used for equipment and services, drawings and other documents showing process and design information specific to each customer's project that would be damaging in Defendants' hands as a direct competitor.

i. Are the categories of documents in Phoenix's proposed protective order clearly defined?

Defendants oppose Phoenix's OCEO designations on several grounds. First, Defendants allege Phoenix's OBEC designation is overly broad in that Phoenix failed to limit this designation to specific categories of documents. (DN 252, at PageID # 5795). Relying on the Eastern District of Kentucky's decision in *Acuity Brands Lighting Inc. v. Bickley*, Defendants assert that Phoenix's designation of an entire production of documents as Attorneys' Eyes Only is "improper, plainly unwarranted and violated the implicit duty of good faith under Rule 26 . . . ." (*Id.* at PageID # 5796 (citing 2015 WL 12976102, at *2)). Defendants reference "sample pages" from Phoenix's

production they believe demonstrate the impropriety of Phoenix's extremely restrictive designations. (*Id.*).

The facts in *Acuity Brands Lighting* are readily distinguishable from the circumstances here. In that case the defendants produced approximately 90,000 pages of documents during discovery, all designated as Attorney's Eyes Only. *Acuity Brands Lighting,* 2015 WL 12976102, at *1. The court concluded the defendants "fundamentally misapprehended" the high standard of proper AEO designations by classifying 100% of their discovery as AEO. *Id.* at *2. Finding the defendants' indiscriminate, blanket designation to be improper, the court ordered the parties to cooperate to review and properly designate defendants' production. *Id.* at *3-4.

Phoenix's designation of 400-500 documents as "Outside Counsel's Eyes Only," while still substantial, was only one portion of Phoenix's complete discovery production. Phoenix's production specifically responded to the Court's March 18, 2021 directive. Beyond this limited production, Phoenix produced countless other documents in discovery without such restrictive designations. Phoenix's limited designation is not comparable to the bad faith defendants in *Acuity Brands Lighting* exhibited by designating all documents produced during discovery as AEO.

Nor does the Court find Phoenix improperly failed to limit its OBEC designations to specific categories of documents. This District has rejected proposed protective orders where the categories are "so vague and broad that almost any document or piece of information could arguably fall within its ambit." *Holley*, 2020 WL 1914817, at *4 (discussing *Maker's Mark Distiller, Inc. v. Spalding Grp., Inc.*, No. 3:19-CV-00014-GNS-LLK, 2020 WL 201054, at *2-3 (W.D. Ky. Jan. 13, 2020)). Here, Phoenix and Defendants agree that Phoenix's production includes the following categories of documents:

(1) [U]nredacted copies of certain financial records relied upon in answering Defendants' Interrogatories requesting the independent economic value of Phoenix's trade secrets."

(2) "[O]ver 400 pages of purchase orders, proposals, drawings, contracts, and operations and maintenance manuals associated with the sale of belt filter presses . . . " and

(3) "[I]nformation and communications sent to third parties relating to all Phoenix's belt filter press sales . . . ."

Again, because Phoenix identified these limited categories of documents pursuant to the Court's directives, the Court finds they are sufficiently specific.

As for Defendants' claim that sample documents from Phoenix's production demonstrate an OCEO designation is not warranted, the Court is not persuaded. These sample documents include Phoenix's customer names, agent names, and contact information for customers, which Phoenix believes Defendants could use to target Phoenix customers and expand their directly competitive business outside of Defendants' Territory. Finding Phoenix has adequately identified the categories of information for which it seeks protection, the Court next determines whether good cause and likely concrete harm from disclosure exist for entry of a protective order.

> ii. Is Phoenix's proposed protective order supported by good cause?

Phoenix submits an Affidavit from its CEO Gary Drake addressing the six factors identified by this District in *Holley* and *Vignes-Starr* for evaluating whether trade secrets or other confidential information deserves protection. (DN 245-4). Defendants object to Drake's Affidavit as inadmissible evidence. Drake's Affidavit, Defendants aver, contains numerous "improper conclusory statements lacking a proper foundation, and legal conclusions . . . ." (DN 252, at PageID # 5806-07). In reply, Phoenix states Mr. Drake's affidavit includes facts within his personal knowledge of the money Phoenix spent developing trade secrets, financial data and information systems, and customer goodwill over the years. (DN 254, at PageID # 5960-61).

Upon review of Mr. Drake's affidavit, the Court finds all but one of the statements challenged by Defendants to be appropriate and admissible. The Court will not consider Mr. Drake's assertion that:

> Defendants have already taken the trade secrets and pricing information provided by Phoenix under a confidentiality agreement and misused it to assist Elemet to build copies of Phoenix machines and hold them in the marketplace as Phoenix equipment. This has significantly damaged Phoenix's ability to compete in the marketplace as evidenced by the significant reduction of Phoenix's sales of equipment and spare parts in the territory since 2014. Thus, Defendants have already sought to unfairly compete with Phoenix by misusing Phoenix's trade secrets and confidential pricing information.

(DN 245-4, at ¶ 12). Because Mr. Drake's statements essentially restate Phoenix's claims in this lawsuit, which have yet to be proven, reliance on these legal conclusions would be inappropriate.

Having concluded the remainder of Mr. Drake's affidavit may be appropriately considered, the Court moves to the first factor - the extent to which the designated information is known outside of Phoenix's business. Mr. Drake testified Phoenix is a privately held company that does not publish the information it currently seeks to protect, including financial information, customer lists, contact information, pricing information, trade secrets, or proprietary design and process information relating to its belt filter press technology. (DN 245-4, at ¶ 4). And Mr. Drake noted all Phoenix employees are bound by confidentiality, non-disclosure, and non-competition agreements as a condition of their employment. (*Id.* at ¶ 10). Because the trade secrets, confidential information, and financial information is not widely, if at all, known outside of Phoenix, the first factor weighs in favor of protection. *See, Holley*, 2020 WL 1914817, at *5.

As to factor two, the extent to which the information is known by Phoenix's employees and others involved in the business, Mr. Drake testified Phoenix limits employee access to information and, as noted above, all employees are bound by confidentiality, non-disclosure, and

non-competition agreements as a condition of their employment. (*Id.* at ¶ 10). As to the specific categories of documents, Mr. Drake explains:

- "Phoenix's internal financial statements are only disclosed to Phoenix's President/CEO, Chief Financial Officer, General Manager/Senior Vice-President of Sales and Marketing, Phoenix's three shareholders, and Phoenix's certified public accountant. Information on internal product sales and market metrics . . . are only disclosed to the President/CEO, CFO, GM/Sr. VP of Sales and Marketing." (*Id.* at ¶ 6-7).

- "Phoenix's confidential customer and sales information, sales contracts and purchase orders, and pricing information are only disclosed to Phoenix staff to the degree necessary to perform their jobs. For example, Phoenix's engineers would not typically have access to financial or pricing information, while employees working in financial, or marketing departments would not have access to Phoenix's trade secrets relating to its belt filter press technology or engineering design information." (*Id.* at ¶ 8).

This testimony clearly demonstrates access to the disputed information is limited, even among its employees, which weighs in Phoenix's favor.

The information from factor two instructs the analysis for factor three. It is clear from Mr. Drake's above testimony that Phoenix takes significant measures to keep its information secure. He elaborates that documents relating to trade secrets and confidential business and financial information are stored on its computer network, which is password protected and requires individual logins by each employee. (*Id.* at ¶ 9). The network, Mr. Drake explains, cannot be accessed remotely by VPN and can only be accessed from Phoenix's offices. (*Id.* at ¶ 10). As for third parties in receipt of trade secret and proprietary information, Mr. Drake says Phoenix requires they "agree to maintain the confidentiality of the information and agree not to disclose that information to third parties." (*Id.* at ¶ 11).

Defendants respond that before filing Mr. Drake's affidavit, Phoenix had never disclosed its alleged computer network and computer system purportedly restricting employees and others from accessing certain records. (DN 252, at PageID # 5797). Mr. Drake's assertions, Defendants emphasize, are contradicted by earlier testimony from Phoenix's office manager, Betty Roberts-

11

Fox, indicating every department has its own policies, that she had no knowledge of a written or verbal policy for handling confidential or proprietary documents, and that she did not know any policies or procedures for restricting employees' access to confidential information or for sharing such information with those not employed at Phoenix. (*Id.*). Defendants further rely on testimony from Matt Fenzel, Phoenix's International Sales Manager, that he could not recall policies relating to Phoenix's employees' access to confidential or proprietary material or for sharing such material with outside sales representatives. (*Id.* at PageID # 5797-98). If Phoenix truly had internal procedures for restricting access to these records, Defendants suggest Phoenix's Office Manager and International Sales Manager would have confirmed their existence. (*Id.* at PageID # 5798).

Phoenix submits Defendants' finding only four documents not containing a confidentiality provision of approximately 500 produced supports the great effort Phoenix exerts to protect its confidential and trade secret information. (DN 254, at PageID # 5968). Phoenix also represents it relies on "multiple forms and layers of protection," so that if a confidentially provision is not in a transmittal document, other documents contain limited use language or other prohibitions regarding the misuse of confidential information. (*Id.* at PageID # 5968-69). Though admitting Mr. Drake's affidavit does not establish "policies and procedures" for protecting the disputed information, Phoenix distinguishes that his description of the concrete and actual steps Phoenix engages for protection suffices. (*Id.*).

While it is somewhat questionable that neither Phoenix's Office Manager nor International Sales Manager previously articulated information regarding Phoenix's computer network or policies for distributing confidential/proprietary information to third parties, this discrepancy does not render Mr. Drake's testimony false or unsupported. In the deposition excerpts provided by Defendants, Mr. Fenzel and Ms. Roberts-Fox did not testify that no policies or procedures for

accessing confidential/proprietary information existed, but rather that they were not aware of them or could not recall them. (*See* DN 252-12, at PageID # 5843-44; DN 252-13, at PageID # 5853). And the fact that nearly every document in Phoenix's disputed production included some form of confidentiality provision supports Mr. Drake's testimony regarding distribution of confidential/proprietary information to third parties. Though more neutral than the previous two factors, the third factor still counsels slightly in Phoenix's favor.

Fourth, the Court considers the value of the information to Phoenix and to its competitors. Mr. Drake testified if Phoenix's competitors, here Defendants, had access to its customer information and needs, Defendants could target those customers, knowing prices from past dealings with Phoenix, and unfairly compete with Phoenix on price. (DN 245-4, at ¶ 12). If Phoenix were to provide information Phoenix provided to third parties, including sales, marketing, design, and process information, Mr. Drake testified Defendants could also unfairly compete with Phoenix in other markets. (*Id.*). Mr. Drake also emphasized the additional insight these documents would provide to Defendants as to Phoenix's products, processes, applications, evaluations, and technology. (*Id.*).

Defendants maintain Phoenix's allegations of harm are vague, conclusory, and insufficient to satisfy Phoenix's heightened burden. (DN 252, at PageID # 5802-03). Defendants further contend Phoenix has already produced financial records similar to those it seeks to restrict here during the litigation. (*Id.* at PageID # 5801-02). Likewise, Defendants cite to excerpts from manuals and general arrangements drawings, allegedly identical to those designated as OCEO, that Phoenix earlier produced without any confidential designation. (*Id.*).

*Holley* is instructive in evaluating this factor. There, the court found the defendant's CEO's affidavit "demonstrates that the documents and information sought to be protected are confidential

13

in nature and [] specifically addresses how a competitor could use the different categories of documents and information to create a competitive advantage over [defendant]." 2020 WL 1914817, at *7. The alleged harm, the court continued, was not attenuated because "a direct competitor would receive the information and documents at issue and that disclosure would likely hurt the [disclosing party]." *Id.* Both in *Holley* and *AWP, Inc. v. Safe Zone Services, LLC,* courts in this District have reasoned that once a party gains access to its competitors' sensitive financial information or trade secrets, it cannot unlearn such information and it would be naïve to believe the information "would not, to some degree, inform the party's own business decisions whether intentional or not." *Id.* at *9; *AWP*, No. 3:19-CV-00734-CRS-CHL, 2021 WL 2654121, at *4 (W.D. Ky. June 28, 2021).

Mr. Drake's Affidavit specifically addresses how Defendants could use the different categories of documents and information to create a competitive advantage over Phoenix – Defendants would likely target Phoenix's customers, identify market gaps, move into markets outside of their Territory, and tailor their pricing to undercut Phoenix. Phoenix's allegations of harm are not vague, conclusory, or attenuated. Like in *Holley* and *AWP,* this Court cannot see how Defendants' future business decisions would not be impacted by receipt of the disputed information here. And disclosure of trade secrets and financial figures not relevant to this litigation would be extremely prejudicial to Phoenix. Factor four, accordingly, weighs in favor of protection.

As for the fifth factor, the amount of money Phoenix expended in developing the information it seeks to protect, Mr. Drake estimates Phoenix has spent over five million dollars developing the trade secrets at issue in the litigation. (DN 245-4, at ¶ 13). Mr. Drake indicated Phoenix spends "a significant amount of money each year" developing relationships with new and existing customers. (*Id.*). This includes goodwill, advertising, trade shows, visits to potential and

14

existing customers. (*Id.*). Money is also spent on contracts with sales representatives to market Phoenix products and investing to develop financial and data information systems for tracking, improving, and supporting its business. (*Id.*). These efforts, Mr. Drake explains, have developed Phoenix's reputation as an experienced provider for over thirty-six years. (*Id.*). Based on these representations, Phoenix has expended a significant amount on the information it seeks to protect, which favors Phoenix's position.

The sixth factor requires evaluation of the ease or difficulty with which the information could be properly acquired or duplicated by others. As discussed in considering factors one, two, and three, Mr. Drake's Affidavit demonstrates the efforts Phoenix has taken to conceal, secure, and protect its confidential and proprietary information. Accordingly, it would be difficult for others to acquire or duplicate such information. This final factor supports protection.

Because each factor weighs in Phoenix's favor, it has established good cause for entry of a protective order as to the three categories of documents produced.

    iii. Has Phoenix met the heightened standard for OCEO designations?

The remaining inquiry, then, is whether Phoenix has proven the heightened requirement for OCEO designations. Courts utilize a balancing test under these circumstances, weighing "the needs of the party seeking the information against the potential harm resulting from disclosure." *Holley*, 2020 WL 1914817, at *9 (quoting *Nash-Finch Co. & Super Food Servs., Inc. v. Casey's Foods, Inc.*, 6:15-cv-00086-GVT, 2016 WL 737903, at *2 (E.D. Ky. Feb. 23, 2016)) (add'l citation omitted).

Defendants take issue with Phoenix's OCEO designations because this would limit review and evaluation of the disputed records to only Defendants' counsel of record in the case. Such designation is even more restrictive than the AEO designations in *Holley* and other cases, which

15

permits review of documents to the parties' attorneys and experts. (DN 252, at PageID # 5793). Defendants claim its experts should also be permitted to review the disputed documents to prepare proper defenses to counter Phoenix's trade secret claims and requested monetary damages in the lawsuit. (*Id.* at PageID # 5794). Phoenix's OCEO designation, according to Defendants, does not strike the right balance between Defendants' right to the evidence and Phoenix's alleged need for protection. (*Id.* at PageID # 5794-95). Defendants maintain the parties' existing Agreed Confidentiality and Protective Order offers sufficient protection.

While recognizing the extreme restriction in OCEO designations, Phoenix argues it is appropriate and necessary here because none of the disputed information is relevant to the claims and defenses in this case. (DN 254, at PageID # 5964). Phoenix explains the trade secrets and proprietary information at issue relate only to Phoenix's dealings outside of Defendants' Territory and, while similar documents were produced in discovery, they are not identical. As for the financial documents, Phoenix reiterates their irrelevance and explains the previously redacted information related only to Phoenix's other categories of business and markets. None of this information, Phoenix concludes, could assist Defendants in challenging Phoenix's lost profits and profit margins in its coal equipment business. (*Id.* at PageID # 5964-65). Phoenix also explains an AEO designation will not offer adequate protection here because of Defendants' inconsistencies in identifying in-house counsel. (DN 245, at PageID # 5449). Specifically, Phoenix cites to Defendants' identifying Maxim Luchachev as Coralina's executive manager initially but later identifying him as an attorney.[1] (*Id.*).

On balance, the Court finds the potential harm to Phoenix outweighs Defendants' need for the information, which warrants Phoenix's OCEO designation. The Court agrees with Phoenix that

---

[1] Defendants' Response did not challenge Phoenix's representations regarding Maxim Luchachev's roles at Coralina.

the disputed documents bear little to no relevancy to the claims and defenses in the litigation and, accordingly, Defendants' experts do not need access.[2] The same goes for Defendants' in-house attorneys that have been inconsistently identified. Because the Court finds Phoenix has made these designations in good faith as to three limited categories of documents, the Court find an additional protective order is necessary. Phoenix's Proposed Protective Order (DN 245-6), however, is deficient. This proposed protective order does not identify the three categories of documents for which protection is warranted and does not include any type of sealing provision. Phoenix, therefore, will have seven days to refile an appropriate proposed protective order.

## ORDER

For the foregoing reasons, **IT IS THEREFORE ORDERED** that Phoenix's Motion for Protective Order (DN 245) is **GRANTED in part.** Phoenix has **seven (7) days** to file an appropriate proposed protective order for the Court's consideration and entry.

Regina S. Edwards, Magistrate Judge
United States District Court

August 15, 2022

Copies:     Counsel of Record

---

[2] Though the Court has previously indicated the disputed documents were relevant to the litigation, the Court finds upon further review any relevance is so minimal it cannot possibly outweigh the concrete harm Phoenix faces if disclosure is ordered. The Court's earlier rulings indicated that documents relating to Phoenix's worldwide belt filter press sales were relevant so Defendants could assess the steps Phoenix took to protect its confidential information and whether other third-parties could have also misused Phoenix's confidential information and trade secrets. Defense counsel can, and appears to already have, assessed the production for confidentiality provisions even under an OCEO designation.