UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| PHOENIX PROCESS EQUIPMENT COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3:16-CV-024-CHB |
| v. | ) ) | **MEMORANDUM OPINION AND** |
| CAPITAL EQUIPMENT & TRADING CORPORATION, et al., | ) ) ) | **ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on a Motion to Exclude Testimony of Yuliy Rubinstein filed by Plaintiff Phoenix Process Equipment Company ("Phoenix"). [R. 261]. Defendants Capital Equipment and Trading Corporation, et al. ("Defendants") filed a Response. [R. 300]. Phoenix replied. [R. 322]. Fully briefed, this motion is ripe for review. For the reasons outlined below, the Court will grant in part and deny in part Phoenix's Motion.

## I.    BACKGROUND

Phoenix is a Kentucky-based company that designs, engineers, manufactures, and services machinery and equipment that recycles water and other materials used to wash coal. In 2009, Phoenix entered into a distribution agreement that granted Capital Equipment and Technology Corporation ("Technology Corp.") an exclusive territory to market and sell Phoenix's products. In 2012, Phoenix thought it was renewing its distribution agreement with Technology Corp. but, instead, entered into a new agreement with Capital Equipment and Trading Corporation ("Trading Corp."). Phoenix claims that at some point after entering into the 2012 agreement, it obtained information that Coralina Engineering, LLC ("Coralina") and Electrogorsk Metal Factory

("Elemet") were selling and distributing products very similar to Phoenix's in the region covered by its distribution agreement with Trading Corp.[1]

Based on this information, Phoenix initiated this lawsuit against Technology Corp., Trading Corp., Coralina, Elemet, and Alexander Chudnovets ("Mr. Chudnovets") in November of 2015.[2] *See* [R. 1–2]. Several of Phoenix's claims were previously dismissed by Judge McKinley. *See* [R. 57; R. 75]. Phoenix's remaining claims consist of breach of contract (Count I) and violation of the Kentucky Uniform Trade Secrets Act (KUTSA) (Count III). *See* [R. 40, pp. 8–10, ¶¶ 32–36, 41–45]. Phoenix further alleges that Trading Corp. and Coralina are "alter-ego" companies because the two companies share some of the same employees and offices, and because Mr. Chudnovets served as CEO of both companies while he was also on the board of directors at Trading Corp. and the sole member and director of Coralina. *Id*. at 4–6, ¶¶ 18–20, 25–28.

Discovery in this matter has been a contentious and fragmented process. Magistrate Judge Edwards and the former magistrate judge in this case have held numerous discovery dispute conferences. *See* [R. 97; R. 104; R. 150; R. 157; R. 164; R. 166; R. 180]. The matter currently before the Court concerns a dispute with expert testimony from Defendants' witness, Dr. Yully Rubinstein. Phoenix filed a Motion to Exclude, [R. 261], arguing that Dr. Rubinstein is not qualified to testify concerning certain matters because his opinions are either conclusory *ipse dixit*, unreliable, or do not "fit" the evidence. *Id*. at 12–16. On January 17, 2022, Defendants filed a Response, [R. 300]. Phoenix replied. [R. 322]. This matter is now ripe for review.

## II.   LEGAL STANDARD

---

[1] For a more comprehensive summary of the facts in this case, see Magistrate Judge Edwards' Opinion filed on March 19, 2019, [R. 127], or Chief Judge McKinley's Opinion filed on January 13, 2017, [R. 57].

[2] Because Technology Corp., Trading Corp., Coralina, and Alexander Chudnovets are represented by the same counsel, the Court will collectively refer to them as "Defendants" for purposes of this Motion unless it is necessary to distinguish between them.

"Admissibility in federal court, including the admissibility of expert testimony, is determined by federal standards even when a case . . . is tried in diversity." *Commins v. Genie Indus., Inc.*, No. 3:16-CV-00608-GNS-RSE, 2020 WL 1189937 (W.D. Ky. Mar. 12, 2020) (citation omitted). As a result, Federal Rule of Evidence 702, which governs the use of expert testimony, guides the Court's analysis. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under this rule, as amended, the trial judge is the gatekeeper, ensuring that expert testimony satisfies the requirements of reliability and relevance. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (recognizing "a gatekeeping role for the judge" under Rule 702).

The Sixth Circuit has found that, based on the language of Rule 702, an expert's opinion is admissible if it satisfies three requirements:

> First, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the testimony must be reliable. *Id.*

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

"Experts are permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as 'the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline.'" *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (quoting *Daubert*, 509 U.S. at 592). Accordingly, the Court's role is to examine "not the

3

qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Ultimately, "a witness is not a qualified expert simply because he self-identifies as such," and courts "take a liberal view of what knowledge, skill, experience, training, or education is sufficient to satisfy the requirement." *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208–09 (6th Cir. 2015).

Rule 702 also guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data," whether the testimony is the "product of reliable principles and methods," and whether the expert "has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. In addition, the Supreme Court has provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony, including: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94). "The test of reliability is 'flexible,' and the *Daubert* factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). The proponent of the testimony bears the burden of establishing its admissibility by a preponderance of proof. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

That being said, "[a]ny doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility." *In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 337 F. Supp.3d 728, 739 (S.D. Ohio 2015) (citations omitted); *see also Marmo v. Tyson Fresh*

4

*Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) ("Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility."). In other words, "rejection of expert testimony is the exception, rather than the rule, and [courts] will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (citation omitted).

## III.   ANLYSIS

### A.   Qualifications

In its Motion, Phoenix contests Dr. Rubinstein's qualifications to offer two opinions: (1) opinions "concerning the competitiveness of the Russian economic market for belt filter presses," and (2) opinions on "whether Phoenix's belt filter presses can be reverse engineered or are readily observable and readily known in the market." [R. 261, pp. 12–13].

### 1.   Reverse Engineering and Readily Observable and Readily Known in the Market

The Court believes Dr. Rubinstein is qualified to offer opinions on whether Phoenix's belt filter presses ("BFPs") "can be reserve engineered or are readily observable and readily known in the market." [R. 261, p. 13]. Dr. Rubinstein's extensive CV reflects that he possesses the knowledge, skill, experience, training, and education to speak on this subject.

Dr. Rubinstein has the pertinent educational and professional experience to proffer expert testimony in this case. He received a B.S. and M.S. in Metallurgical Engineering, a Ph.D. and a Doctor of Science degree in Mineral Processing. [R. 261–2, Ex. B, p. 2]. He was awarded membership in the Russian Academy of Mining Sciences, the highest distinction awarded to the top scientists in Russia. *Id.* Over a thirty-year period, he served as the Head of the Department of Mineral Processing and Director of Research and Development at the Institute of Solid Fossil Fuels Preparation in Russia. *Id.* In total, Dr. Rubinstein has over 50 years of experience in the mining

industry or in academic and governmental positions related to the mining industry. As demonstrated in his CV, and as explained by Defendants, Dr. Rubinstein's expertise in the coal industry "has resulted in Dr. Rubinstein reviewing technical documentation supplied by a number of BFP manufacturers; participating in the development of technical documentation and design of BFPs; visiting several coal beneficiation plants in Russia, Ukraine, and the CIS countries, where Dr. Rubinstein saw BFPs and processes firsthand, and previously visit[ed] a BFP manufacturer in Russia." [R. 300, p. 9].

Phoenix strategically emphasizes Dr. Rubinstein's statement that BFPs are not his interest. [R. 261, p. 13–14]. However, Phoenix takes Dr. Rubinstein's testimony out of context. The disputed testimony is as follows:

Q. Did you take any pictures of any of these mines and belt filter presses?

A. No, I have not take pictures of belt filter presses. That is not my interest. I not take picture, but look in equipment. As a rule when I visit factory I talk with director and with chief engineer and visit factory and look at equipment and ask him about showing me, maybe, manual operation, if I need him. But not picture.

[R. 263–1, Ex. A, p. 14, 51:20–52:3].

Contrary to Phoenix's argument, this testimony illustrates that Dr. Rubinstein is not responsible for the *photography* aspect of his inspection jobs. Notwithstanding, in its Reply, Phoenix highlights that Dr. Rubinstein admitted on a second occasion that BFPs were not his interest:

Q. Your publications are all about flotation and there aren't any of them about belt filter presses; are they, sir?

A. Look, I have 200 – 200 article publication for my life. 200. Can you imagine? And, of course – but I am sure I have not publication for belt filter presses. No, I haven't this one. But that is not complicated test, belt filter presses. It is a simple equipment. It is not important for me. As same Michelangelo not be to he can draw him.

6

Q. Reverse engineering a belt filter presses is not important to you? Is that what you just said?

A. I say, I not have publication in belt filter presses, period. I have publication in filtration process, but not in equipment.

Q. Well, you selected -- to use your words -- books and your major publications, and you certainly didn't select any publications on belt filter presses; did you, sir?

A. I repeat to you, I have not publication in belt filter presses. I have not this kind of publication. Q. And there is no publications on reverse engineering, either; are there, sir?

A. Of course I have not a publication on reverse engineering.

Q. Because you are not a mechanical engineer?

A. Not because. Because that is not interest for me. I have publication topic, which I have interest.

[R. 322, p. 2]. Dr. Rubinstein's "admission" does not prove he is unqualified. Even if belt filter presses are not the focus of his professional and academic work (or even his particular "interest"), such does not negate his extensive experience in the mining industry nor his work on and development of BFPs. Many experts are plenty knowledgeable about topics and research that do not necessarily align with their preferred subject matter. Further, as noted above and regardless of his actual interest in BFPs, Dr. Rubinstein's academic and professional experience in the mining industry, spanning over 50 years, *see* [R. 261–2, Ex. B], clearly provides "a foundation for a witness to answer a specific question." *Berry*, 25 F.3d at 1351. Thus, Dr. Rubinstein's extensive academic and work experience demonstrate that he is qualified to offer opinions on whether Phoenix's belt filter presses can be reverse engineered and whether they are readily observable and readily known in the market.

Next, Phoenix argues that though Dr. Rubinstein might be qualified to proffer an opinion on "ore processing and dressing focuse[d] on how to process and prepare mined ore for its ultimate end-use," he is not qualified to speak on BFPs. [R. 261, p. 13]. Phoenix simplifies this argument,

stressing that Dr. Rubinstein's expertise relates to the "front-end of the use of ore," not the back-end, where BFPs "are used … and are designed to assist in disposal of waste after processed and prepared ore has been separated from the waste." *Id.* Indeed, "[e]xpertise in the technology of fruit is not sufficient when analyzing the science of apples, and courts have excluded the testimony of engineers because their expertise was not particular to the science involved in the case." *Buck v. Ford Motor Co.*, 810 F. Supp.2d 815, 842 (N.D. Ohio 2011) (citation omitted). However, "[w]hether a proposed expert's experience is sufficient to qualify the expert to offer an opinion on a particular subject depends on the nature and extent of that experience." *U.S. v. Cunningham*, 679 F.3d 355, 379 (6th Cir. 2012).

Dr. Rubinstein is qualified to speak about this "back-end" process. First, it bears repeating, Dr. Rubinstein has over 50 years of experience in the mining industry. *See* [R. 261–2, Ex. B]. Phoenix seeks to minimize this experience by emphasizing the fact that Dr. Rubinstein is not an engineer. *See* [R. 261, pp. 13–14]. However, such argument seems to imply that only engineers can provide expert testimony on BFPs — an implication the Court rejects. Dr. Rubinstein's extensive, formal education in mineral processing and metallurgical engineering, coupled with his training and experience in mineral processing, which includes work at plants that use BFPs and develop pilot BFPs, demonstrate that he is qualified. [R. 300, p. 9]. Second, as testified, Dr. Rubinstein does have experience with BFPs:

> I tell you, I have experience with production belt filter presses in Progress in Berdychiv. Next, produce belt filter presses in my institute, pilot. Next we produce, manufacture design for belt filter presses. But, unfortunately, broken Soviet Union and we cannot produce — and we cannot produce this equipment. We stop this area. But in this case I familiar with pilot plant, which I have in my institute, and which manufacture drawing for belt presses … That is my experience about belt filter presses. And plus, maybe not less than 10, or maybe 12, coal — sample from coal, we check in our belt filter presses lab. In this case it is enough experience for them to understand how to organize and check the dewatering technology and what is better condition for belt filer presses.

[R. 263–1, Ex. A, p. 72, 284: 5–14, 18–24]. Third, Dr. Rubinstein testified that he has reversed engineered other machines in the mining industry, like the "Flotation" machine. *Id*. at 12, 41:4–13; *see also* [R. 300, p. 9]. Phoenix's Motion and the arguments espoused in its Reply essentially attempt to discount Dr. Rubinstein's experience by pointing to very nuanced and specific experiences that Dr. Rubinstein does not have with BFPs. However, this argumentative strategy has been rejected by courts in this district on multiple occasions. For example, in *Faughn v. Upright, Inc.*, the movants argued that the expert at issue was "not qualified to testify to the adequacy of the [aerial] lift's design without specialized experience with aerial lifts outside of his testimony in lawsuits and general experience in mechanical engineering." No. 5:03-CV-000237-TBR, 2007 WL 854259, at *2 (W.D. Ky. Mar. 15, 2007). The court, however, rejected this argument and denied the requested exclusion, explaining that "[t]he law does not require that [the expert] be the most qualified expert conceivable, only that he will 'assist the trier of fact in understanding and disposing of issues relevant to the case.'" *Id.* (citation omitted). The court in *Commins* took the exact same approach when rejecting the defendant's efforts to disqualify an expert "by pointing to very nuance[d] and specific experiences that [the expert did] not have with" the devices at issue. 2020 WL 1189937, at *4. For all the reason explained above, this Court has no reason to act differently here. Accordingly, Phoenix's argument that Dr. Rubenstein is not qualified to testify as to BFPs is rejected.

## 2.  Competitiveness of the Russian Economic Market

With regard to Dr. Rubinstein's opinions concerning the competitiveness of the Russian economic market for BFPs, the Court believes Dr. Rubinstein is not qualified to provide such testimony. Admissible expert testimony relies on "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in

issue." Fed. R. Evid. 702(a). However, as Dr. Rubinstein admits, he is not an economist and fails to point to other experience that would otherwise qualify him to offer opinions in this area. *See* [R. 263–1, Ex. A, p. 53, 205:16–22]. He has no specialized knowledge in the field, but rather bases his economic opinions on the fact that he is a Russian citizen. *Id*. at 55, 214:22–215:8. Certainly, citizenship is not sufficient to produce expertise. Nor is citizenship a valid "reasoning or methodology underlying the testimony." *Daubert*, 509 U.S. at 592–93. Rather, Dr. Rubinstein's opinion mirrors "subjective belief or unsupported speculation," which is not enough. *Id*. at 590. Thus, Dr. Rubinstein is unqualified to offer an opinion on the competitiveness of the Russian economic market.

### B. Reliability – Conclusory *Ipse Dixit*

Phoenix offers a second reason as to why Dr. Rubinstein's testimony that "Phoenix's BFPs and its parts can be reserved engineered" should be excluded. [R. 261, p. 14]. Specifically, Phoenix argues that "[w]hile the *Daubert* analysis is a flexible one, that inquiry nevertheless requires an expert offering similar opinions either to have performed hands-on testing or to have extensive experience related to the machinery at issue." *Id*. According to Phoenix, Dr. Rubinstein has not met this standard, as he is "not qualified to opine about the engineering of belt filter presses" and "has merely offered his unverified word — his *ipse dixit* — that something is so." *Id*. at 16.

As mentioned, the Court's "gatekeeping inquiry must be 'tied to the facts of a particular case.'" *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591). However, the Court is not "required to admit expert testimony 'that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1997)). That said, "although 'nothing in either *Daubert*

10

or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert,' *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), a court must be sure not 'to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529. In general, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Phoenix believes *Johnson v. Manitowoc, Boom Trucks, Inc.,* 484 F.3d 426 (6th Cir. 2007) supports it position. *Johnson* is a products liability case where "expert testimony about the prudence of the decision to market" was essential to the plaintiff's case in chief. *Id*. at 429. The magistrate judge's opinion, which was adopted by the district court, excluded the expert's testimony because "he had entirely failed to test his theory" even though the expert "had drawn up a schematic for how . . . [the] interlocking outrigger system might be integrated into the" crane at issue. *Id*. at 430. The magistrate judge reasoned that "at least a modicum of empirical testing should have been performed." *Id*. at 431. On appeal, the Sixth Circuit upheld the district court's decision to adopt the magistrate judge's opinion, acknowledging the "'broad latitude' both in selecting appropriate reliability factors for a given case as well as in applying each of those factors to the case's facts." *Id*. at 436 (quoting *Kumho*, 526 U.S. at 152–53).

Notwithstanding *Johnson*, the Court does not believe Dr. Rubinstein's testimony should be excluded because it is "conclusory *ipse dixit*." First, as *Johnson* acknowledges, it is "not always . . . clear how an expert is to 'test' an expensive mechanical or electrical system[.]" *Id*. at 432. Second, and most importantly, Dr. Rubinstein's theory that Phoenix's BFPs can be reverse engineered does not have to be tested to be admissible. *See Davis Elecs. Co. v. Springer Capital,*

*LLC*, 558 F. Supp.3d 443, 449 (W.D. Ky. 2021) ("[E]xpert testimony can be reliable without the expert performing tests to support his or her theory."); *Clay v. Ford Motor Co.*, 215 F.3d 663, 668 (6th Cir. 2000) (stating that "the district court in its discretion, could have decided that [the expert's] failure to test his theories went to the weight of this testimony . . . not to its admissibility"). Stated differently:

> The motion to exclude [the expert's] testimony relies on the implicit premise that no expert can testify without having conducted testing. Neither *Daubert* nor its Sixth Circuit progeny support such a premise. I[n] fact, the foundations for the respective experts' opinions in the three cases discussed above are very similar to [the expert's]: they all observed the physical evidence and applied their scientific and engineering knowledge to reach certain conclusions. When this occurs, the proffered testimony is admissible. *Jacobs v. Tricam Indus.*, 816 F. Supp.2d 487, 493 (E.D. Mich. 2011) ("Furthermore, testing is not required in every case, particularly where, as here, the expert conducted an examination of the physical evidence.").

*Crouch v. John Jewell Aircraft, Inc.*, No. 3:07–CV–638-DJH, 2016 WL 157464, at *4 (W.D. Ky. Jan. 12, 2016).

Here, it is clear that experience and knowledge establish a foundation of reliability. Moreover, even though Dr. Rubinstein has not tested his theory, his testimony is the product of observations and the application of scientific and engineering knowledge to said observations. *See id*. As the Defendants note:

> Dr. Rubinstein's reverse engineering opinions are the product of a thorough review of Phoenix's BFP designs, drawings, procedures, and manuals paired with Dr. Rubinstein's knowledge and observations complied [sic] over his 60 years in the mining industry, including but not limited to Dr. Rubinstein's experience reviewing technical documentation supplied by a number of BFP manufacturers; participating in the development of technical documentation and design of BFPs; visiting several coal beneficiation plants in Russia, Ukraine, and the CIS countries, where Dr. Rubinstein saw BFPs and processes firsthand; previously visiting a BFP manufacturer in Russia; and successfully reverse engineer a different machine for the mining industry.

[R. 300, pp. 12–13; R. 263–1, Ex. A, pp. 12–19, 41:8–11, 51:9–52:3; 64:24–66:17, 67:11–70:9]. As a result, the Court finds that Dr. Rubinstein's testimony is not conclusory *ipse dixit*, but rather expert testimony that "will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a).

Lastly, Phoenix argues more generally that Dr. Rubinstein's testimony is unreliable. [R. 261, p. 16]. In *Kumho*, the Supreme Court recognized that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." 526 U.S. at 150. Reliability, therefore, is not determined exclusively by a checklist or test. Instead, the Court, when determining if Dr. Rubinstein's testimony is reliable, must determine whether the offered opinions are "supported by appropriate validation — *i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. In other words, "[t]he concept of 'reliability' implies that an expert's opinion must be based on something 'more than subjective belief or unsupported speculation.'" *Navarro v. P&G*, 501 F. Supp.3d 482, 489 (S.D. Ohio 2020) (quoting *Daubert*, 509 U.S. at 590); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529–30 ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say unsupported speculation."). Nevertheless, "[w]here the reliability of the evidence is in dispute, it is more appropriate for a judge to admit the evidence than to keep it from the fact-finder because '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours & Co.*, 90 F. Supp.3d 746, 752 (S.D. Ohio 2015) (quoting *Daubert*, 509 U.S. at 596).

13

The Court believes Dr. Rubinstein's testimony is sufficiently reliable. Dr. Rubinstein bases his analysis on his "knowledge, education, training and experience." [R. 261–3, Ex. C, p. 4]; *see generally* [R. 261–3, Ex. C]. Dr. Rubinstein has "well over 50 years of experience in the mining industry or in academic and governmental positions related to the mining industry." [R. 261–3, Ex. C, p. 3]. His opinions are a product of his educational background, his "knowledge of coal sludge filtration/dewatering" and "[his] personal experience in various BFPs in operation in Russia and neighboring countries . . . [.]" *Id.* at 11. Further, as established above, the fact that Dr. Rubinstein's opinions on reverse engineering Phoenix's BFPs have not been tested does not defeat their admissibility or reliability. *See Davis Elecs. Co. v. Springer Cap., LLC*, 558 F. Supp. 3d 443, 450 (W.D. Ky. 2021). Dr. Rubenstein highlights the standards, like the GOST State standards of Russia, used when drafting his analysis and provides a detailed analysis for how he reached his conclusion. [R. 261–3, Ex. C, pp. 10–16]. Consequently, the Court finds Dr. Rubinstein's testimony to be sufficiently reliable. *See Ferris v. Tennessee Log Homes, Inc.*, No. 4:06–CV–35–M, 2009 WL 1506724, at *10 (W.D. Ky. May 27, 2009) (quoting *Zerega Ave. Realty Corp. v. Hanover Ins. Co.*, No. 04 CIV. 9651(KNF), 2006 WL 1343643 (S.D.N.Y. May 17, 2006)) ("Drawing upon one's education background and practical experience is a reliable methodology through which to develop opinions and reach conclusions about scientific, technical, or other areas of specialized knowledge.").

### C.  Relevance – Fit Test

Finally, Phoenix takes aim at Dr. Rubinstein's testimony by arguing it does not "fit" the evidence. [R. 261, pp. 16–17]. "In terms of relevancy, the trial court should consider 'whether that reasoning and methodology properly can be applied to the facts at issue.'" *Asad v. Cont'l Airlines, Inc.*, 314 F. Supp.2d 726, 732 (N.D. Ohio 2004) (quoting *Kumho*, 526 U.S. at 150). The "trial court

14

must ensure that the proposed expert testimony is relevant to the task at hand and that there is a proper fit between the inquiry in the case and the testimony." *Id*. "[E]xpert testimony that does not relate to any issue in the case is not relevant and therefore not helpful." *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993). Thus, the issue is whether Dr. Rubinstein's testimony relates to any issue in the case.

First, Phoenix argues that Dr. Rubinstein's opinions that "Phoenix's belt filter press and accompanying processes have no independent economic value do not fit the evidence in this case." [R. 261, p. 17]. However, such opinion is clearly relevant to Phoenix's trade secret claims, where Phoenix seeks to "recover from the Defendants 'both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.'" [R. 40, p. 10, ¶ 44].

Second, Phoenix argues Dr. Rubinstein's opinion that "Phoenix's process is readily observable and widely known and is similar to that of most other BFP manufacturers" fails the fit test. [R. 261, p. 18 (internal quotation marks omitted)]. In support of its argument, Phoenix asserts that: Dr. Rubinstein failed to review and consider necessary evidence required to reach his position; Dr. Rubinstein failed to compare Phoenix's drawing that it provided to Technology Corp. to the drawings of Coralina; and "Rubinstein also failed to compare . . . many of the manuals and documents provided by Phoenix to the Defendants." *Id*. at 18–19. The Court, however, is not convinced by Phoenix's argument. Phoenix seeks to attack the weight of the evidence. However, that is not appropriate at this stage of the litigation. Rather, "comparing two pieces of evidence and determining which is more credible should be left for the finder of fact and should not be considered when ruling on Rule 702 admissibility." *Jahn Equine Servs., PSC*, 233 F.3d 382, 391 (6th Cir. 2000). Accordingly, the Court will maintain its gatekeeper role and not "supplant the

adversary system or the role of the jury." *L.S. v. Scarano*, No. 2:10-CV-51, 2011 WL 4948099, at *3 (S.D. Ohio Oct. 18, 2011). Phoenix may attack admissible evidence at a later time via "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[.]" *Daubert*, 509 U.S. at 596. Dr. Rubinstein's testimony relates to Phoenix's process, techniques, and BFPs. Thus, the Court finds that Dr. Rubinstein's testimony would be helpful to the trier of fact, is relevant, and is admissible under Rule 702.

## IV.    CONCLUSION

The Court believes Dr. Rubinstein possesses the "scientific, technical, or other specialized knowledge" to offer an opinion on Phoenix's BFPs and whether they can be reversed engineered. FED. R. EVID. 702. However, the Court does not believe Dr. Rubinstein is qualified to provide an opinion on the competitiveness of the Russian economy simply because he is a citizen of Russia. Finally, the Court believes that Dr. Rubinstein's opinion is reliable and fits the evidence. Accordingly, **IT IS HEREBY ORDERED** as follows:

1. Plaintiff's Motion to Exclude Testimony of Yuliy Rubinstein **[R. 261]** is **GRANTED in part** and **DENIED in part**.

    a. The Motion is **GRANTED** to the extent it seeks to exclude Dr. Rubinstein's testimony on the competitiveness of the Russian economic market.

    b. The Motion is **DENIED** to the extent it seeks to exclude Dr. Rubinstein's testimony on reverse engineering Phoenix's BFPs and whether Phoenix BFPs are readily observable and readily known in the market.

This the 30th day of August, 2022.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY