UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:16-CV-00024-CHB

PHOENIX PROCESS
EQUIPMENT COMPANY                                                                     PLAINTIFF

VS.

CAPITAL EQUIPMENT &
TRADING CORPORATION, et al.                                                          DEFENDANTS

### MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Phoenix Process Equipment Company's ("Phoenix") Motion to Exclude the Expert Testimony of Joshua Lynn. (DN 258). Defendants Capital Equipment & Trading Corporation, et al. ("Defendants") filed a Response. (DN 303). Phoenix filed a Reply. (DN 323). The District Judge has referred this Motion to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A). (DN 4; DN 117). For the following reasons, the Court will **grant in part and deny in part** Phoenix's Motion.

### I. Background

Phoenix is a Kentucky-based company that designs, engineers, manufactures, and services machinery and equipment that recycles water and other materials used to wash coal. In 2009, Phoenix entered into a distribution agreement that granted Capital Equipment and Technology Corporation ("Technology Corp.") an exclusive territory to market and sell Phoenix's products. In 2012, Phoenix thought it was renewing its distribution agreement with Technology Corp. but, instead, entered into a new agreement with Capital Equipment and Trading Corporation ("Trading Corp."). Phoenix claims that at some point after entering into the 2012 agreement, it obtained information that Coralina Engineering, LLC ("Coralina") and Electrogorsk Metal Factory

("Elemet") were selling and distributing products very similar to Phoenix's in the region covered by its distribution agreement with Trading Corp.[1]

Based on this information, Phoenix initiated this lawsuit against Technology Corp., Trading Corp., Coralina, Elemet, and Alexander Chudnovets ("Mr. Chudnovets") in November of 2015. (DN 1-2). Several of Phoenix's claims were previously dismissed by Judge McKinley. (DN 57; DN 75). Phoenix's remaining claims consist of breach of contract (Count I) and violation of the Kentucky Uniform Trade Secrets Act (KUTSA) (Count III). (DN 40, pp. 8–10, ¶¶ 32–36, 41–45). Phoenix further alleges that Trading Corp. and Coralina are "alter-ego" companies because the two companies share some of the same employees and offices, and because Mr. Chudnovets served as CEO of both companies while he was also on the board of directors at Trading Corp. and is the sole member and director of Coralina. (*Id*. at 4–6, ¶¶ 18–20, 25–28).

A. Defendants Enlist Joshua Lynn as a Rebuttal Expert for Phoenix's Damage Calculations

On March 30, 2020, Defendants designated two consultants from Whitley Penn, LLP, Walter Bratic and Joshua Lynn, as "testifying experts in this Lawsuit." (DN 301-1). That same day, Defendants submitted an expert report rebutting Phoenix's Damages Model that was co-signed by Mr. Bratic and Mr. Lynn.[2] (DN 260). Their expert report relied on information from Dr. Yuliy Rubinstein, Defendants' technical and relevant market expert, and Dmitry Prosnyakov, Coralina's Deputy Director of the Coal Department, to conclude: (1) Phoenix's damages report did not properly measure, formulate, or calculate Phoenix's claimed damages; (2) Phoenix's sales estimates for belt filter presses and spare parts are speculative and overstated relative to

---

[1] For a more comprehensive summary of the facts in this case, see Magistrate Judge Edwards' Opinion filed on March 19, 2019 (DN 127), or Chief Judge McKinley's Opinion filed on January 13, 2017 (DN 57).

[2] Phoenix's Damages Model was prepared by Phoenix's longtime President and CEO Gary Drake. Phoenix has designated Mr. Drake as both a fact and expert witness in this case. The District Judge has denied Defendants' Motion to Exclude Mr. Drake's expert testimony at trial, finding Mr. Drake had adequate personal knowledge of Phoenix's operations to present lay opinions as to lost profits. (DN 412, at PageID # 13476-77).

Defendants' actual reported sales of BFPs in the relevant territories; and (3) Phoenix's report did not address competition in the relevant market, Phoenix's but-for market share in the relevant market, Phoenix's manufacturing and marketing capacity, and Phoenix's incremental profit margin. (DN 260-2, at PageID # 6136-37). Based on these perceived deficiencies, Mr. Bratic and Mr. Lynn determined "Phoenix's damages calculation [was] not reliable and [did] not establish it suffered lost profits as a result of Defendants' alleged wrongful conduct." (*Id.* at PageID # 6137).

The next April, the parties began working to schedule expert depositions. In an email dated April 2, 2021, Defendants alerted Phoenix that "unless otherwise notified, Mr. Walter Bratic will be offered on behalf of Whitley Penn, LLP and not Mr. Joshua Lynn." (DN 324-1). But a few weeks later, Defendants informed Phoenix by telephone and by follow-up email that "Joshua Lynn would be presented as the witness on behalf of Whitley Penn." (DN 324-2). The impetus for this switch, Defendants explain, was that Phoenix only offered a limited number of dates for its own expert, Gary Drake's, deposition. Conflicts with Mr. Bratic's schedule prohibited him from attending Mr. Drake's deposition on any of Phoenix's suggested dates, necessitating Mr. Lynn's participation. (DN 301-3).

Mr. Lynn attended Mr. Drake's deposition on May 19, 2021. Immediately following Mr. Drake's deposition, Mr. Lynn prepared and submitted a supplemental expert report. (DN 301-2). Mr. Bratic did not sign this supplemental report. Mr. Lynn was eventually deposed on June 10, 2021. His deposition mostly consisted of questioning by Phoenix's counsel and limited direct questioning by Defendants' counsel. (*See* DN 260-1).

### B. Joshua Lynn's Resignation from Whitley Penn and Withdrawal as Expert

On November 5, 2021, Mr. Lynn voluntarily resigned from Whitley Penn. (DN 341-7; DN 341-8). Defendants were not notified of Mr. Lynn's resignation until November 30, 2021. (DN

341-9). After receiving this information, Defendants reached out to Mr. Lynn, attempting to engage him individually as an expert outside of his prior affiliation with Whitley Penn. (DN 343-3; DN 343-4). On December 8, 2021, Mr. Lynn communicated to Defendants his inability to continue serving as an expert individually or through Whitley Penn. (DN 343-4). Mr. Lynn did not provide a reason for his refusal. Whitley Penn has represented that Mr. Lynn was engaged as an expert in other proceedings at the time of his resignation and has likewise refused to continue serving as an expert in those cases. (DN 301-3, at ¶ 12).

While Defendants were dealing with Mr. Lynn's resignation, Phoenix filed the present Motion to Exclude Mr. Lynn's testimony. (DN 258). Defendants did not inform Phoenix of Mr. Lynn's resignation until January 6, 2022. (DN 301-4). In responding to Phoenix's Motion to Exclude Mr. Lynn, Defendants included a request to substitute Mr. Bratic for Mr. Lynn as their testifying damages expert in this Lawsuit. (DN 303, at PageID # 9613-15). After considering Defendants' unexplained delays in informing Phoenix of Mr. Lynn's resignation and the prejudice that Phoenix could face from substitution, the Court reached the following compromise:

> The Court will permit Mr. Lynn's deposition to be played at trial pursuant to Federal Rule of Civil Procedure 32(a). Mr. Bratic will be substituted as Defendants' live damages expert at trial. The playing of Mr. Lynn's deposition and Mr. Bratic's substitution, however, hinges on the assumption that at least some of Mr. Lynn's testimony survives Phoenix's pending motion to exclude.
>
> Defendants will not be permitted to use Mr. Bratic at trial to somehow avoid any deficiencies in Mr. Lynn's prior testimony. Mr. Bratic may not rectify or supplant Mr. Lynn's testimony. Instead, he will be limited to establishing the veracity and integrity of Mr. Lynn's original and supplemental expert reports and the conclusions therein and Mr. Lynn's previous testimony.

(DN 388, at PageID # 13005-06).

The Court must now resolve Phoenix's Motion to Exclude Mr. Lynn's Testimony. (DN 258).

## II. Legal Standard

"Admissibility in federal court, including the admissibility of expert testimony, is determined by federal standards even when a case . . . is tried in diversity." *Commins v. Genie Indus., Inc.*, No. 3:16–CV–00608–GNS–RSE, 2020 WL 1189937 (W.D. Ky. Mar. 12, 2020) (citation omitted). As a result, Federal Rule of Evidence 702, which governs the use of expert testimony, guides the Court's analysis. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under this Rule, the trial judge is the gatekeeper, ensuring that expert testimony satisfies the requirements of reliability and relevance. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (recognizing "a gatekeeping role for the judge" under Rule 702).

The Sixth Circuit has found, based on the language of Rule 702, an expert's opinion is admissible if it satisfies three requirements:

> First, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the testimony must be reliable. *Id.*

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

"Experts are permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as 'the expert's opinion [has] a reliable basis in the knowledge and

experience of the discipline.'" *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (quoting *Daubert*, 509 U.S. at 592). Accordingly, the Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Ultimately, "a witness is not a qualified expert simply because he self-identifies as such, [courts] take a liberal view of what knowledge, skill, experience, training, or education is sufficient to satisfy the requirement." *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208–09 (6th Cir. 2015).

Rule 702 also guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data," whether the testimony is the "product of reliable principles and methods," and whether the expert "has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. In addition, the Supreme Court has provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony, including: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94). "The test of reliability is 'flexible,' and the *Daubert* factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). The proponent of the testimony bears the burden of establishing its admissibility by a preponderance of proof. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

That being said, "[a]ny doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility." *In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*,

337 F. Supp.3d 728, 739 (S.D. Ohio 2015) (citations omitted); *see also Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) ("Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility."). In other words, "rejection of expert testimony is the exception, rather than the rule, and [courts] will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (citation omitted).

### III. Analysis

Phoenix seeks exclusion of Paragraphs 44-49, 50-51, 54-59, 64, 69, 73, and 76-89 of Mr. Lynn and Mr. Bratic's Expert Report (hereinafter "Mr. Lynn's Report"). These portions of Mr. Lynn's Report, Phoenix argues, rely on unvalidated hearsay; parrot opinions offered by other individuals or experts; do not rely on scientific methodology; and do not assist the trier of fact/lack sufficient evidentiary basis. Phoenix further challenges Mr. Lynn's involvement in preparing the Report, arguing his deposition testimony reflects he was entirely unfamiliar with portions of the Report and inappropriately used Russian documents to form his opinions.

A. Phoenix's Challenges to Mr. Lynn's Involvement with Preparing the Expert Report

During Mr. Lynn's deposition, Phoenix inquired as to his involvement in preparing the report he and Mr. Bratic signed. Mr. Lynn recalled his involvement in drafting the Report and recalled others from Whitley Penn assisting in drafting the Report. (DN 260-1, at PageID # 6075). He stated: "I don't recall the details of specifically my involvement versus Mr. Bratic's, of any given part of the report." (*Id.*). Shortly thereafter, Phoenix questioned how Mr. Lynn was able to rely on Russian documents attached to the Report when he doesn't speak Russian. (*Id.*). Mr. Lynn indicated he didn't recall attaching any Russian documents to his Report and that he could not understand any Russian documents he had reviewed in the case. (*Id.*).

7

In the "Background" section of its Motion to Exclude, Phoenix comments on Mr. Lynn's alleged lack of involvement with preparing the Report and reliance on Russian documents. Phoenix surmises Mr. Lynn was likely designated the testifying expert in this case once Defendants realized Mr. Bratic has been repeatedly excluded as an expert in other lawsuits in other courts. (DN 258, at PageID # 6011). Phoenix believes Mr. Lynn's supervision of the work done by other individuals on the report "was minimal at best and non-existent at worst." (*Id.* at PageID # 6012).

Phoenix cites no authority or precedent for the proposition that individuals within the same consulting firm as the signing expert cannot contribute to the expert's report. Perhaps more critically, Phoenix doesn't couch these accusations in terms of FRE 702 or the standard in *Daubert* for exclusion of expert evidence. Instead, Phoenix inserts these accusations by way of "Background" and makes no effort to later develop these claims as a true basis for exclusion in the "Argument" section. The same is true for Phoenix's accusations regarding Mr. Lynn's purported reliance on Russian documents. Exclusion will not be granted on this basis.

  A. Phoenix's Challenges to Mr. Lynn's Reliance on Dr. Rubinstein and Mr. Prosnyakov's Hearsay Statements (Paragraphs 44-49, 69, 77, 80, and 81)

In preparing his expert report, Mr. Lynn conducted interviews with Dr. Yuliy Rubinstein and Dmitry Prosnyakov. Dr. Rubinstein is Defendants' technical and relevant market expert.[3] Mr. Lynn interviewed Dr. Rubinstein by phone. During his deposition, Mr. Lynn could not recall whether anyone else was present for the telephone interview, whether Dr. Rubinstein was under oath, or whether he used a translator. (DN 260-1, at PageID # 6095). Mr. Lynn admitted he did

---

[3] In a separate Memorandum Opinion and Order, the District Judge granted in part and denied in part Phoenix's Motion to Exclude Dr. Rubinstein's expert testimony. (DN 413). Specifically, the Court found Dr. Rubinstein was not qualified to offer opinions "concerning the competitiveness of the Russian economic market for belt filter presses" because he is not an economist and points to no other experience qualifying him in this area. (*Id.* at PageID # 13486-87). The Court, however, declined to exclude Dr. Rubinstein's testimony on reverse engineering Phoenix's BFPs and whether Phoenix BFPs are readily observable and readily known in the market since he has over fifty years' experience in the mining industry, including designing BFPs, seeing BFPs and processes firsthand, and visiting BFP manufacturers in Russia. (*Id.* at PageID # 13483-86).

not research Dr. Rubinstein's expertise with belt filter presses and relied on Defense Counsel's representation that Dr. Rubinstein was a technical expert in the case. In Paragraphs 44-49 of his expert report, Mr. Lynn relies on Dr. Rubinstein's conclusions regarding Phoenix's trade secrets and whether its BFPs can be reverse engineered. (DN 260-2, at PageID # 6148-49).

Mr. Prosnyakov is Coralina's Deputy Director of the Coal Department. Mr. Lynn initially tried to interview Mr. Prosnyakov by phone but had difficulty understanding him. (DN 260-1, at PageID # 6099). Mr. Lynn then decided to switch to a written question/answer format. (*Id.*). Mr. Lynn's deposition testimony reflects he is unaware of whether Mr. Prosnyakov's written answers were given under oath or whether Mr. Prosnyakov typed the answers himself. (*Id.*). In Paragraphs 69, 77, 80, and 81 of his expert report, Mr. Lynn cited to Mr. Prosnyakov's representations regarding Coralina's involvement in the BFP marketplace and why Elemet BFPs, rather than Phoenix's, were preferred in Russia and CIS countries. (DN 260-2, at PageID # 6157, 6159-61).

Phoenix argues Mr. Lynn's reliance on Dr. Rubinstein and Mr. Prosnyakov's hearsay statements was improper because he made no effort to confirm their expertise or validate their opinions. Also inappropriate, Phoenix argues, is Mr. Lynn's parroting of Dr. Rubinstein and Mr. Prosnyakov's opinions without any independent analysis.

Federal Rule of Evidence 703 provides "an expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Experts may permissibly rely on otherwise inadmissible hearsay, including from other experts, to support their opinion, so long as "experts in the particular field would reasonably rely on those kinds of facts and data in forming an opinion on the subject." *Id.*; *see also Momeni-Kuric v. Metropolitan Property & Casualty Ins. Co.*, No. 3:18-cv-00197-RGJ, 2019 WL 3416677, at *10 (W.D. Ky. July 29, 2019) (citing *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728-29 (6th Cir. 1994)).

When an expert fails to verify the facts upon which they base their opinion, or relies solely on self-serving statements from a party, their opinion may be deemed unreliable. *See United States v. Tipton*, 269 F. App'x 551, 560 (6th Cir. 2008).

Trial courts also "must ensure that the expert witness is truly testifying as an expert and not merely serving as a conduit through which hearsay is brought before the jury." *United States v. Stone*, 222 F.R.D. 334, 341 (E.D. Tenn. 2004) (citing *United States v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987)). For an opinion to be helpful to the trier of fact, the expert witness must use his own experience. *Id.* An expert's reiteration of inadmissible hearsay is of no aid to the factfinder. *Id.* Stated otherwise, "the value the expert brings to the trial process is his ability to apply his expertise to facts and draw inferences from them." *Id.*

In *Deere & Co. v. FIMCO Inc.*, another judge in this District found where the expert "disclosed the individuals he interviewed, the dates on which he conducted the conversations, the questions asked, the interviewee's responses, and the opinions he formed as a result[,]" the court was satisfied that experts in his field would reasonably rely on that type of data in forming opinions. 239 F. Supp. 3d 964, 977-78 (W.D. Ky. 2017). The court distinguished *Deere & Co.* from *Potts v. Martin & Bayley, Inc.,* another case from this District. In *Potts*, the court found "the inadmissible hearsay statements of an unnamed consulting expert, where neither the date nor content of the conversation is disclosed, is not the type of information that is reasonably relied upon by experts in [the expert's] field." *Id.* (citing *Potts*, No. 4:08-CV-00015-JHM, 2011 WL 4703058, at *3 (W.D. Ky. Oct. 4, 2011)).

Mr. Lynn's circumstances are more akin to those in *Deere & Co.* Mr. Lynn disclosed the names and roles of the individuals he interviewed – Dr. Rubinstein, the Defendants' technical expert, and Mr. Prosnyakov, Coralina's Deputy Director of the Coal Department. Mr. Lynn

produced his notes from interviewing Dr. Rubinstein, and the questions/answers from Mr. Prosnyakov's interview were memorialized in writing. While Mr. Lynn could have independently assessed Dr. Rubinstein's and Mr. Prosnyakov's qualifications and expertise before relying on their statements and opinions, these were not unknown individuals with questionable experience. Quite the opposite, Dr. Rubinstein, as Defendants' technical expert, prepared a separate expert report and was deposed as part of this litigation.[4] And Mr. Prosnyakov is a management level employee at Defendant Coralina.

Phoenix makes much of the fact that Dr. Rubinstein and Mr. Prosnyakov were not under oath when providing information to Mr. Lynn. But FRE 703 institutes no such requirement. The Rule only requires the hearsay relied upon to be the kind of facts and data an expert in a particular field would reasonably rely on in forming an opinion on the subject. Fed. R. Evid. 703. Mr. Lynn has at least fourteen years of expertise in "financial, economic, and accounting analyses, including lost profits, lost wages, reasonable royalties, business valuation, intellectual property licensing, disgorgement/unjust enrichment, tracing, fraud investigation, regressions, cost of capital, and pre- and post-judgment interest." (DN 260-2, at PageID # 6191). Defendants enlisted Mr. Lynn to review, evaluate, and rebut Phoenix's claimed damages as a result of Defendants' alleged wrongful conduct. To accurately evaluate Phoenix's damages model, Mr. Lynn reasonably relied on Dr. Rubinstein and Mr. Prosnyakov's information, as is common practice for financial and economic experts who usually have no experience in the underlying subject matter of the litigation. The Court is satisfied with Mr. Lynn's reliance on information from these two sources.

---

[4] Mr. Lynn's Report relies on information he obtained while interviewing Dr. Rubinstein but appears to be limited to Dr. Rubinstein's expertise regarding BFPs and their ability to be reverse engineered. Because the Court has already found Dr. Rubinstein to be amply qualified to testify on these matters, Mr. Lynn's reliance on this information was appropriate.

11

Contrary to Phoenix's assertions, Mr. Lynn did not merely parrot information gleaned from Dr. Rubinstein and Mr. Prosnyakov. Mr. Lynn instead used their information and opinions to form his own opinions regarding Phoenix's claimed damages. Specifically, Mr. Lynn used Dr. Rubinstein's statements regarding BFPs and their ability to be reproduced or reverse-engineered to conclude that Phoenix's trade secrets have little to no economic value. Mr. Lynn also used Dr. Rubinstein's opinions to conclude Phoenix's lost profits calculations do not measure the economic value of its alleged trade secrets and do not causally connect Phoenix's lost profits to its trade secret claims. (*See* DN 260-2, at ¶¶ 44-49).

Nor did Mr. Lynn merely take Mr. Prosnyakov's statements and proffer them as his own. Mr. Lynn used Mr. Prosnyakov's information relating to Coralina's involvement in the BFP marketplace to find deficiencies in Phoenix's claimed damages. For instance, Mr. Lynn concluded Phoenix's claimed lost sales were overstated. Mr. Lynn also explained Phoenix's damages calculations did not consider several market factors contributing to its downturn in sales and did not provide analysis of market competitors in the Territory, changes in the bidding process for Coralina and other companies selling Phoenix equipment, or the global downturn in the coal industry. (*Id.* at ¶¶ 69-70; 76-78, 80-83).

Because Mr. Lynn applied his experience as a financial, economic, and accounting expert to Dr. Rubinstein and Mr. Prosnyakov's information to rebut Phoenix's damages model, the Court finds these portions of his opinion are admissible under FRE 703 and *Daubert*. Critically, a finding of admissibility of expert testimony is the beginning, not the end of the process. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. If Phoenix finds Mr. Lynn's reliance on the hearsay of Dr. Rubinstein and Mr.

Prosnyakov to be unpersuasive, it should make this case to the ultimate fact finder, the jury.

### B. Phoenix's Challenges to Mr. Lynn's Methodology

In a subsection of his report titled "Phoenix's BFP Sales Estimates Were Not Consistent with Actual BFP Sales," Mr. Lynn opined Phoenix's lost sales estimate of 27-49 BFPs was unreliable. (DN 260-2, at PageID # 6151-53). Mr. Lynn determined that even if Phoenix is successful on its breach of contract claims, the actual sales data produced in the lawsuit shows Phoenix could only recover for 9-25 BFPs sold in the Territory during the relevant period. (*Id.*). During his deposition, Mr. Lynn admitted awareness of Coralina's representations that it no longer possesses certain records regarding sales and purchases of BFPs. (DN 260-1, at PageID # 6089).

Phoenix argues Mr. Lynn cherry-picked the smallest known number of sales on which to base his opinions to minimize the damages from Defendants' wrongful conduct. (DN 258, at PageID # 6024-25). According to Phoenix, Mr. Lynn disregarded significant other evidence of sales (information on Elemet's, Coralina's, and Trading Corp.'s websites, emails, and information Phoenix obtained during site visits) in favor of adopting Coralina's admittedly incomplete representation of BFP sales. (*Id.*). Mr. Lynn's failure to consider this relevant evidence and admitted reliance on incomplete data, Phoenix offers, renders his methodology unreliable.

Defendants submit three reasons why Mr. Lynn's reliance on Coralina's sales representations were appropriate. First, Defendants note Phoenix's failure to attach any of the alleged "other evidence of sales" with its Motion to Exclude Mr. Lynn and believes the referenced evidence should not be considered. Next, Defendants emphasize that the credibility and accuracy of Mr. Lynn's opinions do not affect the admissibility of the testimony but, rather, affect the weight of the testimony, a determination for the jury. Finally, Defendants indicate expert testimony based on allegedly erroneous facts should be permitted so long as some support exists for those facts in

the record. Even though the number of BFPs sold is disputed among the parties, Defendants reason that Mr. Lynn's opinions about the accuracy of Phoenix's lost sales estimates are supported by a Coralina document reflecting Elemet sold 25 BFPs to Coralina and then subsequently sold them to third-party end users.

Defendants' position is persuasive. Certainly, a factual dispute exists regarding the number of BFP sales between Elemet and the Defendants and between other BFP producers or distributors and the Defendants. Though Coralina produced a spreadsheet listing 25 BFP transactions involving Elemet, the parties have debated the existence of documents reflecting these sales and additional sales throughout discovery. Most recently, the Court granted spoliation sanctions against Defendant Coralina for its negligent destruction of relevant technical documents and communications from their transactions with Elemet. (DN 391, at PageID # 13053). To remedy this spoliation, a permissive adverse inference instruction will be provided to the jury at trial as follows:

> The jury will be instructed that it may presume that technical documents and communications related to Coralina's transactions with Elemet were in Coralina's control and that Coralina had a duty to preserve such evidence.
>
> The jury may presume that Coralina breached that duty by allowing these technical documents and communications to be destroyed.
>
> The jury may presume that the information contained in these technical documents and communications would have supported Phoenix's breach of contract and KUTSA claims and would have been adverse to Coralina's defenses.

(*Id.* at PageID # 13069; DN 396, at PageID # 13110).

This is all to say that while Phoenix may have legitimate concerns about the accuracy of Mr. Lynn's figures and his reliance on Coralina's sales spreadsheet, the Court need not decide these factual disputes at this juncture. The issue will be placed in the jury's hands at trial, and Phoenix will be able to challenge Mr. Lynn's damage calculations then. *See Daubert*, 509 U.S. at

14

596. The fact that Mr. Lynn relied on Coralina's spreadsheet in forming his conclusions does not render his methodology unsound or unreliable.

### C. Phoenix's Challenges to Specific Conclusions by Mr. Lynn

Phoenix identifies three specific statements from Mr. Lynn's Report it believes lack evidentiary basis and will not assist the trier of fact. First is Mr. Lynn's determination that Phoenix's profit margin is fundamentally flawed and that its profit margins are reduced by "but-for" incremental costs. (DN 258, at PageID # 6026). Mr. Lynn's Report states Phoenix did not apply an incremental profit margin against its alleged but-for sales of BFP Parts and instead applied its gross profit margin to its but-for sales of BFP Parts. (DN 260-2, at PageID # 6158-59). Because Phoenix did not provide complete financial records, Mr. Lynn indicated he was "unable to determine whether Phoenix incurred any additional but-for incremental costs" and Phoenix's alleged profit margin for sales of BFP Parts from its damages report is unreliable. (*Id.*).

To support Mr. Lynn's conclusions having no evidentiary basis, Phoenix relies on Mr. Lynn's deposition testimony that "there could be costs" that would reduce Phoenix's profit margins. Phoenix also magnifies Mr. Lynn's testimony that he thinks "it is within a reasonable degree of certainty that there could be additional costs that have not been accounted for." (DN 260-1, at PageID # 6096-97). Because Mr. Lynn was unable to offer any such costs and only purports to be reasonably certain that such costs could exist, Phoenix maintains Mr. Lynn's speculative and obstructive conclusions would not assist the jury.

Defendants reason any fault for Mr. Lynn not having sufficient facts regarding profit margins lies with Phoenix since it has refused to produce underlying financial documents relevant to the profit-margin analysis. (DN 303, at PageID # 9612-13). Defendants further explain Phoenix

has designated is financial documents as "Outside Counsel's Eyes Only," meaning Defendants' experts, including Mr. Lynn, had no opportunity to review and consider the information. (*Id.*).

The issue of whether Phoenix should disclose all underlying financial records was recently resolved by the Court when the undersigned granted in part Phoenix's Motion for Protective Order. (DN 407 at PageID # 13426-27). The undersigned found "Outside Counsel's Eyes Only" designations were appropriate for the disputed financial documents because they bore little to no relevancy to the claims and defenses in the litigation. (*Id.*). The relevance was "so minimal," it could not possibly outweigh the concrete harm Phoenix would face if disclosure was ordered. (*Id.* at n. 2). Under this ruling, neither Defendants' experts nor their in-house counsel would have access to such information. (*Id.*).

Bearing this in mind, the evidentiary basis for Mr. Lynn's statements regarding Phoenix's profit margin is limited because Mr. Lynn did not have access (and still does not have access) to certain financial documents. Mr. Lynn's conclusions in this section are explicitly based on his perceived deficiencies in Phoenix's profit margin and his inability to verify the accuracy or reliability of such profit margin. Based on the information provided by Phoenix to Mr. Lynn, sufficient evidentiary basis for his conclusions exists to overcome Phoenix's admissibility challenge. Paragraph 64 of Mr. Lynn's report will not be excluded.

Phoenix's challenges to the vagueness of Mr. Lynn's deposition testimony regarding potential costs for reducing Phoenix's profit margin, however, bear merit. While neither FRE 703 nor *Daubert* requires an expert's conclusion be stated in irrefutable terms to be admissible, Mr. Lynn's deposition testimony would only serve to confuse the jury. Mr. Lynn presents the idea that "it is within a reasonable degree of certainty that there could be additional costs that have not been accounted for." But Mr. Lynn could not identify any specific costs that would reduce Phoenix's

gross profit margin and stated: "I do not have a calculation of those costs." (DN 260-1, at PageID # 6096-97). Without any elaboration on these costs and the direct effect such costs would have on Phoenix's profit margin calculations, this testimony lacks sufficient evidentiary basis. For these reasons, the Court excludes Mr. Lynn's deposition testimony from Page 108, Line 9 through Page 109, Line 6. (*Id.*). Mr. Bratic will not be permitted to testify to these excluded statements at trial.

Phoenix next takes issue with Mr. Lynn's assumption that BFPs have a ten-year useful economic life. (DN 258, at PageID # 6027). Mr. Lynn's report cites no support for this statement, and he testified during his deposition that he didn't know where he obtained such figure. (*Id.*). Defendants did not address this argument in their Response.

Mr. Lynn's Report states Mr. Drake's report "assumed, with no basis, an infinite useful economic life for Phoenix BFPs." (DN 260-2, at PageID # 6158). Several sentences later, Mr. Lynn noted: "It is our understanding that the useful economic life of Phoenix BFPs was approximately 10 years in a coal beneficiation application in Russia." (*Id.*). Mr. Lynn concluded, based on the ten-year useful economic life, that Phoenix's estimated lost sales of BFP parts was unreliable. (*Id.*). When pressed during his deposition about the ten-year figure, Mr. Lynn admitted he did not recall where he obtained it. (DN 260-1, at PageID # 6094-95). Mr. Lynn also testified to his belief that Phoenix separately stated there may be a twenty-year service life for BFPs. (*Id.*).

Phoenix is correct; Mr. Lynn provides no evidentiary basis for his conclusion that BFPs have a ten-year useful life. Mr. Lynn's experience and expertise as a financial, economic, and accounting consultant in no way qualifies him to make unsupported conclusions regarding the useful life of a belt-filter press. And because Mr. Lynn presents no evidentiary basis for this statement, his conclusion that Phoenix's estimated lost sales of BFP parts is unreliable likewise lacks an evidentiary basis. Without any support for these statements from the record, Mr. Lynn's

analysis at Paragraph 73 will not assist the trier of fact. The Court, therefore, excludes Paragraph 73 of Mr. Lynn's report and the related testimony from his deposition. At trial, Mr. Bratic may not testify as to the useful life of a BFP or how the life span affects Phoenix's alleged damages.

Lastly, Phoenix challenges Mr. Lynn's opinion that Phoenix's damages are unreliable because it did not consider other market factors, including a Value Added Tax (VAT) of 18% assessed against any United States-made BFP being imported for sale in Russia or CIS countries. (DN 258, at PageID # 6027). Phoenix finds this opinion is speculative based on Mr. Lynn's deposition testimony that he did not know whether "any of the goods at issue in this case were subject to the VAT." (*Id.* (citing DN 260-1, at PageID # 6098)). Defendants again failed to address this argument in their Response.

Upon further review, Mr. Lynn's only mention of the Russian VAT in his report is in Paragraph 77, Footnote 150:

> As shown in Exhibit 9, Coralina purchased Elemet BFPs at prices ranging from approximately $126,000 to $137,000 per BFP from January 2010 through September 2014.[150]
>
> [FN 150 See Exhibit 9. The BFP prices shown [sic] Exhibit 9 and discussed in this paragraph do not include Russian Value Added Tax ("VAT"). Generally, all goods sold in Russia, whether produced domestically or imported, are subject to an 18% VAT. See https://www.investinregions.ru/en/investor/useful/nalogovaya-sistema/value_added_taxes/.]

(DN 260-2, at PageID # 6159-60). Phoenix has mischaracterized Mr. Lynn's opinion. Nowhere in Mr. Lynn's expert report does he state Phoenix's damages are unreliable because they failed to consider the Russian VAT. Notably, Mr. Lynn did not list the VAT as one of the market factors in Paragraph 76 that Phoenix allegedly failed to consider as contributing to Defendants' transactions with Elemet. (*Id.*). Nor does Mr. Lynn distinguish between the Russian VAT's applicability to Phoenix machines versus Russian-manufactured machines. Mr. Lynn simply noted the existence

of the Russian VAT in a footnote and provided general background information about the VAT and its application.

Though the usefulness of this footnote is somewhat questionable, the Court does not find it lacks evidentiary support. Mr. Lynn is qualified to provide information regarding foreign taxes and included a link to the "Investment Platform of Russian Regions" website in support. The Court finds no basis for excluding either Footnote 150 or Mr. Lynn's brief deposition testimony regarding VATs. As explained in the Court's prior Order permitting Mr. Bratic be substituted for Mr. Lynn at trial, however, Mr. Bratic "may not rectify or supplant Mr. Lynn's testimony" and is "limited to establishing the veracity of Mr. Lynn's expert reports and testimony. (DN 388, at PageID # 13006).

## IV. Conclusion

**IT IS THEREFORE ORDERED** that Phoenix's Motion to Exclude Mr. Lynn's Testimony (DN 258) is:

(1) **GRANTED IN PART** in that Paragraph 73 of Mr. Lynn's Report and Page 108, Line 9 - Page 109, Line 6 of Mr. Lynn's deposition testimony are **EXCLUDED;** and

(2) **DENIED IN PART** as to the remainder of Mr. Lynn's Report and deposition testimony.

Copies:     Counsel of Record

19