UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

PHOENIX PROCESS EQUIPMENT
COMPANY,                                     )
                                             )        Civil Action No. 3:16-CV-024-CHB
          Plaintiff,                         )
                                             )
v.                                           )        **MEMORANDUM OPINION AND**
                                             )        **ORDER**
CAPITAL EQUIPMENT & TRADING                  )
CORPORATION, et al.,                         )
                                             )
          Defendants.                        )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Before the Court are Motions for Partial Summary Judgment filed by Plaintiff Phoenix

Process Equipment Company ("Phoenix"), [R. 264; R. 267], as well as the Motion for Summary

Judgment or to Dismiss for Misjoinder, [R. 271], and Motions for Partial Summary Judgment, [R.

276; R. 278], filed by Defendants Capital Equipment & Trading Corporation ("Trading Corp."),

Coralina Engineering, LLC ("Coralina"), and Alexander Chudnovets (collectively, "Defendants").

Defendants have responded to Phoenix's Motions [R. 295; R. 395],[1] and Phoenix has replied, [R.

320; R. 321]. Likewise, Phoenix has responded to Defendants' Motions, [R. 287; R. 288; R. 290],

and Defendants have replied, [R. 325; R. 328; R. 330]. These matters are ripe for consideration.

For the reasons set forth below, the Court will grant Defendants' Motion for Summary Judgment

or to Dismiss for Misjoinder, [R. 271], and will deny Defendants' remaining motions and

Phoenix's motions.

**I.   BACKGROUND**

---

[1] Defendants' original response [R. 305] exceeded the twenty-five-page limit outlined in Local Rule 7.1(d) without good cause, and the Court ordered them to file a new response that comported with the Rule. *See* [R. 393]. Defendants did so. The Court therefore addresses only their amended response [R. 395] in this Order.

Phoenix is a Kentucky-based company that designs, engineers, manufactures, and services machinery and equipment that recycles water and other materials used to wash coal. [R. 40, ¶ 10]. Phoenix has had its products distributed in Russia, Ukraine, and other eastern European nations since 1997 by an assortment of different companies that all have used some variation of the trade name "CETCO." *Id.* at ¶ 11. In 2009, Phoenix entered into a Distributor Agreement that granted Capital Equipment and Technology Corporation ("Technology Corp."), a Delaware corporation, an exclusive territory to market and sell Phoenix's products for at least three years. *Id.* at ¶¶ 11, 12–14. This Distributor Agreement was signed on Technology Corp.'s behalf by its CEO, Defendant Alexander Chudnovets, who also owned ninety percent of the company's stock. Chudnovets signed the agreement after meeting with employees of Phoenix at its facilities in Kentucky and Indiana. *Id.* at ¶¶ 12–14.

In October 2011, Technology Corp. was dissolved under the laws of Delaware. *See* [R. 1-3, Ex. B (Certificate of Dissolution)]. Phoenix claims it was never notified of Technology Corp.'s dissolution. [R. 57, p. 2]. In 2012, Phoenix thought it was renewing its Distributor Agreement with Technology Corp. *Id.* However, unbeknownst to Phoenix, it actually entered into a new agreement with Trading Corp., a Texas corporation. *Id.* Although Chudnovets served as CEO and on the board of directors of Trading Corp., the 2012 agreement was signed by Maria Roberson,[2] the president of Trading Corp. *Id.* The 2009 and 2012 Distributor Agreements are nearly identical, and each contain two pertinent clauses. *See generally* [R. 50-2 (2009 Distributor Agreement)]; [R. 50-7 (2012 Distributor Agreement)]. The "exclusivity clause" reads as follows:

> Neither Company [Phoenix] nor Distributor [CETCO] shall directly or indirectly enter into similar Agreements in the Territory for the design, development, manufacture, marketing, or sale of Equipment within the Territory and neither party

---

[2] Defendants claim that although the agreement bears Roberson's signature, it was actually "stamped" by a Coralina Engineering employee by the name of Vadim Novak. [R. 295, p. 5].

will design, develop, manufacture, market, or sell Equipment in the Territory directly or indirectly competitive with the other party.

[R. 50-2, p. 2; R. 50-7, p. 2]. The "confidentiality clause" reads as follows:

All price information and quotations regarding Equipment, customer lists, and customer names which now or hereafter are in Distributor's [CETCO's] possession, and all engineering data and other technical data furnished by the Company [Phoenix] to Distributor [CETCO], will be deemed to have been furnished in confidence and for use by Distributor [CETCO] only in connection with this Agreement. All such data and information referenced above will remain the property of Company [Phoenix] and, upon the expiration or termination of this Agreement, Distributor [CETCO] will dispose of all known copies of such information as directed by the Company [Phoenix].

[R. 50-2, p. 6; R. 50-7, pp. 5–6].

Phoenix claims that at some point after entering into the 2012 agreement, it obtained information that Coralina and Electrogorsk Metal Factory ("Elemet") were selling and distributing products very similar to Phoenix's in the region covered by its 2012 Distributor Agreement with Trading Corp. [R. 57, p. 3]. Based on this information, Phoenix initiated this lawsuit against Technology Corp., Trading Corp., Coralina, Elemet, and Chudnovets in Jefferson County Circuit Court in November of 2015. *See* [R. 1-2, Ex. A (Complaint)]. Defendants timely removed the action to this Court. [R. 1]. Several of Phoenix's claims were previously dismissed by Judge Joseph McKinley. *See* [R. 57; R. 75]. Phoenix's remaining claims are for breach of contract (Count I) and violation of the Kentucky Uniform Trade Secrets Act, KRS 365.880, *et seq.* ("KUTSA") (Count III). *See* [R. 40, pp. 8–10, ¶¶ 32–36, 41–45]. Phoenix further alleges that Trading Corp. and Coralina are "alter ego" companies because the two share some of the same employees and offices, and because Chudnovets served as CEO of both companies while he was also on the board of directors at Trading Corp. and the sole member and director of Coralina. *Id.* at 4–6, ¶¶ 18–20, 25–28.

After a lengthy and contentious discovery process, the parties submitted cross motions for summary judgment. Defendants also submitted an independent motion for summary judgment or to dismiss for misjoinder. Fully briefed, these motions are ripe for disposition.

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. That burden may be satisfied by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

Once the moving party satisfies this burden, the non-moving party must then produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material

fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.* In fact, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." FED. R. CIV. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted). The same standards apply when parties file cross-motions for summary judgment, *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (citing *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)), and cross-motions do not require the Court to grant summary judgment for one side or the other. *Walters v. Gill Indus., Inc.*, No. CV 5:21-069-DCR, 2022 WL 507656, at *4 (E.D. Ky. Feb. 18, 2022). Rather, "the Court evaluates each party's motion on its own merits, drawing all reasonable inferences against the party whose motion is under consideration." *Id.*

## III. ANALYSIS

Through two motions for partial relief, Phoenix seeks summary judgment on both of its remaining claims against Defendants: breach of contract, *see* [R. 264], and violations of KUTSA,

*see* [R. 267]. Defendants likewise seek summary judgment on each of Phoenix's remaining claims, *see* [R. 278; R. 276], and offer a third argument for summary judgment or dismissal based on misjoinder of Technology Corp., *see* [R. 271].

## A. DEFENDANTS' OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

The Court will first address the Objections [R. 306; R. 307; R. 318; R. 319] lodged by Defendants concerning the evidence Phoenix relies on in its own summary judgment motions and in its responses to Defendants' summary judgment motions. Relying on Rule 56, Defendants suggest many of Phoenix's exhibits would not be admissible at trial and, therefore, cannot be considered at the summary judgment stage. [R. 307, p. 1–2]. Defendants' objections are not well taken, however, for several reasons. Chiefly among them is the fact that, rather than include them in their responses to Phoenix's summary judgment motions and in their replies to Phoenix's responses, Defendants again attempt to circumvent Local Rule 7.1's page limit by filing four separate, lengthy objections. The Advisory Committee Notes to FRCP 56(c) explain:

> Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. *There is no need to make a separate motion to strike*. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

FED. R. CIV. P. comm. notes. 2010 amend. ¶ 12 (emphasis added).

While stand-alone objections are not precluded under the Rules, the timing and form of Defendants' objections have, in essence, produced additional briefing on the underlying summary judgment motions. Defendants filed their objections to Phoenix's summary judgment motions on January 18, 2022, the day after responding to Phoenix's motion for summary judgment on its breach of contract claims and the same day they responded to Phoenix's motion for summary

judgment on its KUTSA claim. They objected to Phoenix's responses to Defendants' own summary judgment motions on February 7, 2022 and February 8, 2022, simultaneously with their reply briefs. Simply put, Defendants could have addressed their objections to admissibility in their response and reply briefs, but instead used them as an opportunity to further argue their positions on summary judgment. Had Phoenix presented new evidence or raised a new argument in a *reply*, leaving Defendants with no opportunity to respond, Defendants' stand-alone objections would have been appropriate. *See Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 481–82 (6th Cir. 2003) ("When new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated . . . [i]t is only logical that the purposes of notice and opportunity to respond extend Rule 56(c) to [such a] situation . . . and require a district court to allow the nonmoving party an opportunity to respond.") (citation omitted). Defendants were afforded adequate opportunities to respond to Phoenix's arguments. Yet through their lengthy, stand-alone objections, Defendants essentially ask the Court to consider a combined one hundred additional pages of briefing on the motions for summary judgment. The Court declines to do so.

Moreover, Magistrate Judge Edwards has addressed many of Defendants' objections in her Report and Recommendation on Spoilation Sanctions, including sustaining those related to certain unauthenticated translated website screenshots, [R. 391, pp. 26–29], overruling those related to a 2016 "CETCO Group" brochure, *id.* at 16, and overruling those claiming Gary Drake's Affidavit was "conclusory" and constituted hearsay, *id.* at 29. Neither party filed objections to Magistrate Judge Edwards' Report and Recommendation, and this Court adopted it in full. *See* [R. 396]. To the extent Defendants' objections to Phoenix's exhibits are duplicative of those previously ruled on by Magistrate Judge Edwards, the Court deems them moot. In addition, the Court will not entertain any of Defendants' objections to "assertions" or "misstatements" made by Phoenix. *See,*

*e.g.*, [R. 307, pp. 5–6, 7, 8, 11]. Defendants urge the Court to strike various statements made by Phoenix because they "assume[] facts not admitted in evidence." *Id.* In doing so, without any case law to support their position, Defendants essentially ask the Court to disregard portions of Phoenix's *argument*, rather than the evidence it relies on. Defendants' position is wholly without merit. To the extent the Court relies on any evidence at issue in Defendants' remaining objections, notwithstanding its prior admonishment regarding their stand-alone form, the Court will address them in its rulings below.

### B. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON OR DISMISSAL OF ALL CLAIMS AGAINST TECHNOLOGY CORP.

The Court turns now to Defendants' Motion for Summary Judgment or to Dismiss for Misjoinder of Technology Corp., [R. 271]. Defendants suggest the Court should dispose of all Phoenix's claims against Technology Corp. because, as a dissolved corporation, it lacks capacity to be sued under Delaware law. *See id.* Phoenix responds that Technology Corp.'s reliance on the Delaware dissolution statutes is misplaced because: (1) it waived its capacity argument by failing to assert it as an affirmative defense; (2) it failed to follow the proper procedures outlined in the Delaware dissolution statutes; and (3) Chudnovets and agents of the Defendant-entities are estopped from relying on the statute because they purposefully concealed and misrepresented Technology Corp.'s legal status. [R. 288, pp. 1–2].

A corporation's capacity to sue or be sued is governed by the law under which it was organized. FED. R. CIV. P. 17(b)(2). This rule applies to both active and dissolved corporations. *Okla. Nat. Gas Co. v. Oklahoma*, 273 U.S. 257, 260 (1927) (noting capacity of dissolved corporation is governed by state of incorporation). Technology Corp. was organized and incorporated under the laws of Delaware. *See* [R. 270-3]. Under Delaware law, the relevant statutes read as follows:

All corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct, bodies corporate for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets, but not for the purpose of continuing the business for which the corporation was organized. With respect to any action, suit or proceeding begun by or against the corporation either prior to or within 3 years after the date of its expiration or dissolution, the action shall not abate by reason of the dissolution of the corporation; the corporation shall, solely for the purpose of such action, suit or proceeding, be continued as a body corporate beyond the 3-year period and until any judgments, orders or decrees therein shall be fully executed, without the necessity for any special direction to that effect by the Court of Chancery.

Del. Code Ann. tit. 8, § 278 (West).

When any corporation organized under this chapter shall be dissolved in any manner whatever, the Court of Chancery, on application of any creditor, stockholder or director of the corporation, or any other person who shows good cause therefor, at any time, may either appoint 1 or more of the directors of the corporation to be trustees, or appoint 1 or more persons to be receivers, of and for the corporation, to take charge of the corporation's property, and to collect the debts and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation, or otherwise, all such suits as may be necessary or proper for the purposes aforesaid, and to appoint an agent or agents under them, and to do all other acts which might be done by the corporation, if in being, that may be necessary for the final settlement of the unfinished business of the corporation. The powers of the trustees or receivers may be continued as long as the Court of Chancery shall think necessary for the purposes aforesaid.

Del. Code Ann. tit. 8, § 279 (West).

A party denying capacity of the legal existence of an organized association "must do so by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge." FED. R. CIV. P. 9(a)(2). "In raising the defense of capacity, defendant bears the burden of showing by 'specific negative averment [and] supporting particulars' that it is not an entity capable of being sued." *Pension Benefit Guar. Corp. v. Staples Cont. & Com., Inc.*, No. 1:13-CV-898, 2014 WL 1045995, at *2 (S.D. Ohio Mar. 14, 2014) (citing FED. R. CIV. P. 9(a)). Phoenix

claims Technology Corp. waived its capacity argument since it "never filed a responsive pleading in this case, let alone raised by specific negative averment any lack of capacity to be sued or its lack of legal existence." [R. 288, p. 5]. Indeed, Technology Corp. has never participated in this lawsuit, and Phoenix has not filed a motion demanding that Technology Corp. file an answer. Defendants suggest this supports their position that Technology Corp. lacks capacity, since it indicates the dissolved corporation has had no means to defend itself in this suit. *See* [R. 271, p. 2].

The Court need not delve further into whether Technology Corp. waived this argument because, in any case, Phoenix was on clear notice that Technology Corp. lacked capacity at the outset of this suit. In its Answer, Trading Corp. stated it "admits that Capital Equipment & Technology Corporation was a Delaware corporation that dissolved in October 2011." [R. 7, p. 1]. Defendants also attached Technology Corp.'s Certificate of Dissolution to their Notice of Removal. *See* [R. 1-3, Ex. B (Certificate of Dissolution)]. In its first Motion to Dismiss, Trading Corp. again noted that "Technology, a non-existent entity, has not appeared in this action and does not have the power to do so." [R. 46-1, p. 2]. Phoenix acknowledges Trading Corp.'s admission but argues this was not a "specific denial that [Technology Corp.] lacked capacity to be sued or did not legally exist." [R. 288, p. 5, n.12]. The Court disagrees. Trading Corp.'s affirmation at the outset of this case that Technology Corp. was dissolved in 2011, accompanied by the Certificate of Dissolution, served as a "specific negative averment" with "supporting particulars" that Technology Corp. was not an active entity capable of being sued. *Pension Benefit*, 2014 WL 1045995 at *2.

Although the Court finds that Phoenix had notice of Technology Corp.'s dissolved status, it must still address Defendants' second argument—that Technology Corp.'s capacity argument

*could not have been* waived—because it bears on whether Phoenix's claims against Technology Corp. should be dismissed with or without prejudice. Defendants argue that Technology Corp.'s legal status presents a substantive capacity issue (as opposed to procedural capacity), which is not an affirmative defense and allows for Technology Corp.'s dismissal at any time. [R. 325, p. 2]. To arrive at this conclusion, Defendants reason that Delaware's dissolution statutes function as statutes of repose that extinguished Phoenix's claims against Technology Corp. after the three-year period during which a plaintiff may, as a matter of right, sue a dissolved corporation without petitioning the Delaware Court of Chancery. *Id.*

The Parties' arguments potentially implicate a two-step analysis to determine if the capacity argument is waivable. First, the Court must determine whether Delaware's dissolution statutes, Del. Code Ann. tit. 8, §§ 278, 279, are statutes of repose. If so, the Court must then determine whether the statute of repose is an affirmative defense for the purposes of Federal Rule of Civil Procedure 8(c). *See Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895, 901 (6th Cir. 2002) (explaining state law is used to determine whether a statute of repose is governed by Federal Rule of Civil Procedure 8(c) or 12(b)(6)). Here, the Court need not reach the second inquiry because it is clear Delaware's dissolution statutes do not function as statutes of repose.

The Delaware Supreme Court has explicitly held that Delaware's dissolution statutes, Del. Code Ann. tit. 8, §§ 278, 279, "do not extinguish [a] corporation's liability to third parties." *In re Krafft-Murphy Co., Inc.*, 82 A.3d 696, 705 (Del. 2013). Specifically, the court explained:

> Nothing in § 278 operates as a statute of limitations that would bar claims *or extinguish a dissolved corporation's liability to third parties*. It is the case—and our courts have frequently held—that as a body corporate a dissolved corporation ceases to exist and is not amenable to suit after the expiration of § 278's three year period. From that it does not follow, however, that § 278 extinguishes the corporation's underlying liability to third parties. To the contrary, § 279 enables a dissolved corporation to (through a receiver) "sue and be sued" after the expiration of the § 278 three year period. That is, § 279 establishes that the expiration of §

> 278's three year period does not extinguish the dissolved corporation's underlying
> liability.

*Id.* (emphasis added). Consequently, the Court finds that Delaware's dissolution statutes are not, and were not intended to be, statutes of repose or limitation. Defendants concede this point by acknowledging that the Delaware Court of Chancery may revive a dissolved corporation after expiration of the statutory winding-up period when the corporation has undisposed assets (although Defendants claim Technology Corp. has none). *See* [R. 271, p. 7]; *see also Hancock Shoppes, LLC v. Retained Subsidiary One, LLC*, No. 2:17–CV–364–FTM–99CM, 2018 WL 11322731, at *2 (M.D. Fla. May 15, 2018) (quoting *Weyerhaeuser Co. v. Edward Hines Lumbar Co.*, No. 91–C–623, 1991 WL 169385, at *6 (N.D. Ill. Aug. 28, 1991)) ("After the 278's three-year period ends, the corporation has no power … to defend suits. Thus, 'a hopeful plaintiff must apply to the Court of Chancery for the appointment of a receiver who would then defend suits on behalf of the corporation.'"). This cuts against Defendants' argument that Technology Corp. lacks "substantive" capacity to be sued after the three-year winding up period, since they clearly agree that a dissolved corporation may be revived by the Delaware Court of Chancery when "certain circumstances permit." [R. 271, p. 5]. Therefore, the Court disagrees with Defendants that Phoenix's claims were extinguished by virtue of the dissolution statutes and Technology Corp.'s capacity was a "substantive" issue that could not have been waived.

Phoenix's next argument, that Technology Corp.'s capacity argument fails because it did not follow the dissolution statutes' directives in Sections 280–282, is similarly unavailing. Sections 280–281(b) outline planning procedures whereby a corporation may give notice of its dissolution and require persons with claims against it to present them, and further provide for how the corporation should pay any existing claims and distribute any remaining assets to shareholders. *See* Del. Code Ann. tit. 8, §§ 280–281(b). Sections 281(c) and 282 provide a "safe harbor" from

liability for directors and shareholders of corporations that have complied with § 281(a) or (b). *See id.* at §§ 281(c), 282. But these provisions are permissive,[3] merely offering "directors of dissolved corporations two alternate pathways to discharge their fiduciary duties to existing and future claimants, while also enabling the corporation to make distributions during its corporate winding-up activities." *Krafft-Murphy*, 82 A.3d at 705. To be sure, "[c]ompliance with either §§ 280–281(a) or § 281(b) shields directors and shareholders of the dissolved corporation from post-dissolution liability to third party claimants." *Id.* at 706. It does not follow that non-compliance with these provisions would render the corporation's dissolution imperfect or otherwise impact its capacity to be sued. *See Krafft-Murphy*, 82 A.3d at 707 ("These provisions concern only the liability of directors and shareholders—not the liability of the dissolved corporation."). Simply put, Technology Corp.'s compliance with these sections, which could only have shielded officers and shareholders from *liability*, has no bearing on whether the company has *capacity* to defend this suit. As the Court just found, because the dissolution statutes are not statutes of repose that extinguish stale claims, Technology Corp.'s present lack of capacity does not mean its future potential liability has been eliminated.

Lastly on this point, Phoenix's position that Defendants should be equitably estopped from asserting that Technology Corp. lacks capacity is unpersuasive. Phoenix relies on *Ross v. Venezuelan-Am. Independent Oil Producers Association*, where the U.S. District Court for the District of Delaware held a dissolved corporation liable for attorneys' fees incurred in a post-

---

[3] Section 280 specifically provides:

> After a corporation has been dissolved in accordance with the procedures set forth in this chapter, the corporation or any successor entity *may* give notice of the dissolution, requiring all persons having a claim against the corporation other than a claim against the corporation in a pending action, suit or proceeding to which the corporation is a party to present their claims against the corporation in accordance with such notice.

Del. Code Ann. tit. 8, § 280(a)(1) (emphasis added).

dissolution tax liability action. 230 F. Supp. 701, 704 (D. Del. 1964). In *Ross*, the attorney-plaintiffs found success even though they sued the dissolved corporation more than three years after its dissolution. *Id.* at 703. *Ross* is, however, distinguishable from this case for several reasons. First, and most importantly, the attorney-plaintiffs in *Ross* agreed to take on the underlying tax case to contest the corporation's federal income tax deficiency assessment, which resulted in a substantial penalty for the corporation and ultimately caused its involuntary dissolution when its charter was voided. *Id.* at 702. In other words, the attorneys undertook to represent the corporation, and the corporation agreed to hire the attorneys, for the specific purpose of reducing the substantial tax liability the dissolved corporation owed. The court reasoned, therefore, that it would be inequitable for the dissolved corporation, which hired the attorneys knowing it had few remaining assets post-dissolution with which to pay the attorneys, to avoid payment after enjoying the benefit of their services (i.e., what ended up being a penalty reduction of nearly seven hundred thousand dollars). *Id.* at 702, 704. In addition, the plaintiff-attorneys and the dissolved corporation entered into their representation agreement knowing the corporation was dissolved but did so within three years of its dissolution and for the specific "purpose of . . . defending . . . proceedings by or against [the corporation], and to enable it to gradually settle and close its business" as contemplated by Delaware's dissolution statutes. *Id.* at 702. Lastly, the court specifically noted that the amount owed for the plaintiff-attorneys was pursuant to a valid employment contract and "for an uncontested sum certain." *Id.* at 704.

None of those essential facts is present in this case. Here, the Court once again reiterates that Technology Corp.'s potential liability to Phoenix was not *extinguished* by the passage of time since its dissolution in 2011. However, Phoenix has known from the outset of this lawsuit that Technology Corp. was dissolved as of 2011, and yet six years into litigation has failed to petition

the Court of Chancery for a receiver or body corporate. While Phoenix claims the Defendants "actively concealed [Technology Corp's] dissolution" from it, [R. 288, p. 13], Trading Corp. informed Phoenix, and the public at large, of Technology Corp's dissolution when it filed its Answer and appended its Certificate of Dissolution to the Notice of Removal in this case. This alone counsels against any equitable considerations regarding whether to dismiss its claims against Technology Corp. at this time. Delaware law is clear, and the Court cannot find that any equitable considerations should apply here to supersede the dissolution statutes' requirement that a receiver or body corporate be appointed to act on Technology Corp.'s behalf.

In sum, under Delaware law, without appointment of a receiver or body corporate, Technology Corp. lacks capacity to sue or be sued. Further, Defendants asserted "by specific negative averment" that Technology Corp. was dissolved as of 2011 and not amenable to suit, and therefore provided Phoenix ample notice of Technology Corp.'s incapacity. *Pension Benefit*, 2014 WL 1045995 at *2. For these reasons, the Court will grant Defendants' Motion to Dismiss Phoenix's claims against Technology Corp. [R. 271]. However, since the Delaware dissolution statutes do not operate as statutes of repose that would extinguish Technology Corp.'s liability after a statutorily-defined period, Phoenix's claims against Technology Corp. shall be dismissed without prejudice to allow Phoenix to petition the Delaware Court of Chancery for a body corporate and refile its complaint as to Technology Corp. if it so chooses.[4]

### C. SUMMARY JUDGMENT ON PHOENIX'S BREACH OF CONTRACT CLAIMS (COUNT I)

The Court turns next to the parties' cross-motions for summary judgment on Phoenix's breach of contract claims. [R. 264; R. 278]. For its part, Phoenix argues it has conclusively

---

[4] Because the Court will dismiss Phoenix's claims against Technology Corp. without prejudice, it will not address any of Phoenix's arguments related to Technology Corp. further in this Order.

established these claims by demonstrating (1) the existence of a valid contract with Trading Corp., (2) actions admittedly taken by Trading Corp. in breach of the contract, and (3) clear damages. [R. 264, pp. 16–19]. Defendants collectively responded in opposition. [R. 295]. In a separate motion, Defendants Chudnovets and Coralina moved for summary judgment on Phoenix's breach of contract claims, first citing a complete lack of evidence they were parties to or bound by any contract with Phoenix and also submitting that Phoenix's alter ego theory fails. [R. 278, pp. 29–40]. Chudnovets and Coralina additionally seek summary judgment on all Phoenix's claims against them based on lack of personal jurisdiction. *Id.* at 8–28.

### 1.   Personal Jurisdiction over Defendants Chudnovets and Coralina

A federal court sitting in diversity may exercise jurisdiction over a defendant only if a court in the forum state could do so. *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997) (citation omitted). The Court therefore begins by reassessing whether it may exercise personal jurisdiction over Chudnovets and Coralina. The Defendants previously raised this issue in a motion to dismiss for lack of personal jurisdiction, which was denied by Judge McKinley. *See* [R. 57; R. 75]. But, as Defendants note, at that early stage of litigation, Phoenix needed only to make a prima facie showing that personal jurisdiction was proper. *See MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 899 (6th Cir. 2017) (citing *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 893 (6th Cir. 2002)) ("In our review of a plaintiff's prima facie case, we consider pleadings and affidavits 'in a light most favorable to the plaintiff,' without weighing 'the controverting assertions of the party seeking dismissal.' . . . If the plaintiff makes a prima facie showing, . . . the defendant's avenues to contest personal jurisdiction are not foreclosed here— 'the defendant can continue to contest personal jurisdiction by requesting an evidentiary hearing or moving for summary judgment should the evidence suggest 'a material variance from the facts'

as presented by plaintiffs."). At this stage, the burden on Phoenix is higher. *See Kerns v. Caterpillar, Inc.*, 583 F. Supp. 2d 885, 891 n.1 (M.D. Tenn. 2008) (citing FED. R. CIV. P. 12(d)) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

Phoenix argues this Court has personal jurisdiction over Chudnovets and Coralina because they purposely availed themselves of Kentucky through their business relationship with Phoenix. [R. 287, p. 2]. This requires the court to consider "(1) whether the law of the state in which the district court sits authorizes jurisdiction, and (2) whether the exercise of jurisdiction comports with the Due Process Clause." *Brunner v. Hampson*, 441 F.3d 457, 463 (6th Cir. 2006).

As to the first requirement, the Kentucky Supreme Court has found that the statute requires a two-prong showing before a court can exercise personal jurisdiction over a nonresident. *Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 57 (Ky. 2011). First, the Court must find that a nonresident's conduct or activities fall within one of nine enumerated subsections in KRS 454.210. Second, the Court must determine if the plaintiff's claims arise from the defendant's actions. This requires a showing of "a reasonable and direct nexus between the wrongful acts alleged in the complaint and the statutory predicate for long-arm jurisdiction[.]" *Id.* at 59.

The Court finds that Chudnovets' activities in the state implicate KRS 454.210(2)(a)(1), as they constitute "transacting any business in this Commonwealth." Chudnovets traveled to Kentucky in April of 2009 to attend a trade show for the coal industry and, on the same trip, visited Phoenix's headquarters in Louisville where he and Vadim Novak pitched a PowerPoint presentation about Technology Corp. and other CETCO-branded companies. [R. 50-3, ¶ 6]. During this trip, Chudnovets also negotiated a renewal of the 2006 Distributor Agreement that was soon

to expire and proposed other possible joint ventures between Phoenix and Technology Corp. that did not come to fruition. *Id.* at ¶ 8. The Court finds that these activities constitute "transacting business in the Commonwealth," as Chudnovets was soliciting current and future business for a company that, at the time, he was a ninety-percent owner, while being physically present in the state. *See Philmo, Inc. v. Checker Food Holding Co.*, No. 1:15-cv-00098-JHM, 2016 WL 1092862, at *2–3 (W.D. Ky. Mar. 21, 2016) (compiling cases interpreting the phrase "transacting any business in the Commonwealth").

The Court further finds that the second requirement—whether the plaintiff's claims arise from the defendant's actions in the forum state—has been met, as Phoenix's claims against Chudnovets arise from the business he transacted while in the Kentucky. Judge McKinley reached the same conclusion at an earlier stage of this case:

> Phoenix asserts that Chudnovets, acting as an agent of the CETCO-branded companies and Elemet, as well as on his own behalf, used the access to Phoenix's trade secrets that was granted as a result of the Distributor Agreement to misappropriate those trade secrets and sell "knock-off" products based on that confidential information, while making fraudulent statements in the process. (Pl.'s First Am. Compl. [DN 40] ¶¶ 32–51.) The CETCO-branded companies, Elemet, and Chudnovets would not have had access to those trade secrets from May 2009 to July 2012, a period in which Phoenix alleges the conspiracy to misappropriate began, if not for Chudnovet's activities in Kentucky negotiating the Distributor Agreement. Therefore, the claims arose from Chudnovets's activities in the state, and the requirements of the long-arm statute are met.

[R. 57, p. 6, ¶ 1]. Although Phoenix's fraud claim has been dismissed, the Court knows of no other changed circumstance that would alter the Court's finding that Phoenix's live claims arose from Chudnovets's activities within Kentucky. The Court therefore finds that Kentucky authorizes jurisdiction over Chudnovets.

The Court must next determine whether the exercise of personal jurisdiction conforms with due process. "The relevant inquiry is whether the facts of the case demonstrate that the nonresident

defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991) (citations omitted). The Sixth Circuit has identified three criteria for determining whether specific in personam jurisdiction may be exercised. *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. *Id.* Second, the cause of action must arise from the defendant's activities there. *Id.* Third, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *Id.* The Sixth Circuit considers purposeful availment "essential" to a finding of personal jurisdiction. *Intera Corp. v. Henderson*, 428 F.3d 605, 616 (6th Cir. 2005) (citation omitted). This requirement "serves to protect a defendant from being haled into a jurisdiction by virtue of 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.* (citations omitted). Finally,

> where an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice; i.e., whether [the agent] purposely availed [himself] of the forum and the reasonably foreseeable consequences of that availment.

*Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 698 (6th Cir. 2000) (citations omitted).

As the Court just concluded above, Chudnovets purposefully availed himself to the benefit of conducting business in Kentucky. The record illustrates that he has been physically present in the state at least three times, where he attended a coal trade show and solicited business. He personally negotiated the 2009 Distributor Agreement with Phoenix while in Kentucky at a time when he personally owned ninety percent of Technology Corp., the company for which he was

negotiating. He further engaged in discussions with Phoenix about an expanded partnership with the company, which never came to fruition, and he directed at least one email to a representative at Phoenix in Kentucky. *See* [R 50-11, p. 2]. Although Chudnovets only visited Kentucky to solicit business on behalf of his companies, and his physical presence in the state was sporadic, on balance, the Court finds that Chudnovets has purposefully availed himself to the protections of the state of Kentucky to establish personal jurisdiction over him. As Judge McKinley previously held, "Chudnovets' contacts with Kentucky are not 'random' or 'fortuitous,' and while the attenuation factor is close, they are not so attenuated so as to upset 'notions of fair play and substantial justice.'" [R. 57, p. 8].

The remaining due process requirements have likewise been met. Kentucky's long-arm statute already requires a finding that the claims arise from the defendant's contacts with the state, just as the Due Process Clause does, and the Court has already established that Phoenix's claims arise from the business Chudnovets transacted while in Kentucky. And "where, as here, the first two criterion are met, 'an inference of reasonableness arises' and 'only the unusual case will not meet this third criteria.'" *Air Prods. and Controls, Inc. v. Safetech Intern., Inc.*, 503 F.3d 544, 554 (6th Cir. 2007) (quoting *Theunissen*, 935 F.2d at 1461). Under the third prong, courts consider the following factors: "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy." *Id.* at 554–55 (citation omitted).

Here, while Chudnovets is a resident of Russia, defending himself in this litigation does not unreasonably burden him. Chudnovets previously served as CEO of Technology Corp., a Delaware corporation, and of Trading Corp., a Texas corporation. He speaks fluent English and has demonstrated an ability and willingness to travel to the United States. And while some of the

actions at issue in this case took place in Russia, the fact remains that allowing a foreign forum to exercise jurisdiction would not lead to a more efficient outcome. The parties have been litigating this case in Kentucky for more than six years, and it has now reached the summary judgment stage. It would be wholly inefficient (and illogical) to adjudicate this case in any other forum. The Court therefore finds that it may exercise personal jurisdiction over Chudnovets.

Just as with Chudnovets, the Court finds it can properly exercise personal jurisdiction over Coralina. First, Coralina has met the requirement of "transacting any business in this Commonwealth" under KRS 454.210(2)(a)(1). Chudnovets, the sole member of Coralina, stated in his affidavit that Novak is an employee of Coralina. [R. 48-1, ¶ 28]. Novak accompanied Chudnovets on his visit to Kentucky in 2009 to negotiate the Distributor Agreement between Technology Corp. and Phoenix to deliver the same PowerPoint discussed above. [R. 50-15]. While Coralina was not a party to the Distributor Agreement, by Chudnovets' own admission, Coralina "facilitate[s] [Trading Corporation's] purchases and resales of products manufactured by Phoenix." [R. 48-1, ¶ 24]. In addition, Novak was in Kentucky in 2012 and brought a purchase order for equipment to Phoenix while in the state. [R. 50-5, p. 2]. Further, Novak served as the primary point of contact with Phoenix and communicated extensively with Phoenix via email [R. 50-5], including those communications surrounding execution of the 2012 Distributor Agreement. *See* [R. 50-6]. Therefore, the Court finds that Coralina transacted business in Kentucky by having an agent, Vadim Novak, participate in negotiations for the Distributor Agreement between Technology Corp. and Phoenix, physically deliver purchase orders while in the state, and communicate extensively regarding the 2012 Distributor Agreement between Trading Corporation and Phoenix.

Additionally, Phoenix's claims against Coralina arise from Coralina's contacts with the state. As with Chudnovets, Phoenix claims that Coralina misappropriated trade secrets, which could not have occurred but for the Distributor Agreements that gave Coralina and the other defendants access to those trade secrets, and Coralina's agent played an active role in negotiating and delivering both the 2009 and 2012 agreements. Therefore, the claims against Coralina arise from its contacts with Kentucky, and the requirements of the long-arm statute have been met.

Finally, Coralina would suffer no due process violation by being subject to personal jurisdiction in Kentucky. Coralina has purposefully availed itself to the protections of the state of Kentucky so that exercising specific in personam personal jurisdiction is appropriate, as it has at least twice, in 2009 and 2012, sent an agent to Kentucky to negotiate contracts, deliver purchase orders, and solicit business. Further, Coralina agents remained in regular contact with Phoenix in Kentucky via email, and those emails were directed at maintaining the business relationships between Phoenix, Trading Corp., and Coralina. As with Chudnovets, Coralina's contacts with Kentucky were not "random" or "fortuitous," they were made for financial interests. Thus, the purposeful availment requirement has been met. *See Air Prods. and Controls*, 503 F.3d at 551 (noting that a "continuing business relationship" is a strong factor indicating purposeful availment).

In sum, Coralina's claims arise from its contacts with Kentucky, and the Court finds that it remains reasonable to exercise personal jurisdiction over Coralina. Although Coralina is a Russian limited liability corporation, as Judge McKinley noted previously, its sole member is already a party to this suit, diminishing any additional burden that may result from requiring a foreign defendant to defend itself in Kentucky. The Court, therefore, may exercise personal jurisdiction over Coralina. The Court finds no "material variance from the facts" as Phoenix presented them at

the early stages of litigation that would change the Court's personal jurisdiction analysis. *MAG IAS Holdings*, 854 F.3d at 899. Accordingly, the Court will not dismiss any of Phoenix's claims on the basis that it lacks personal jurisdiction over Chudnovets or Coralina.

### 2. Phoenix's Breach of Contract Claims

This suit is before the Court on the basis of diversity jurisdiction. *See* [R. 1, p. 1, ¶ 1]. As a result, the Court must apply the substantive law of Kentucky. *See Shaffer v. CSX Transp., Inc.*, 462 F. App'x 597, 599 (6th Cir. 2012) (citing *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006)) ("Diversity jurisdiction requires a federal court to apply the substantive law of the state in which it sits."). The parties do not dispute this. *See* [R. 264, p. 18; R. 295, p. 3]. In addition, the 2009 and 2012 Distributor Agreements state that they shall be interpreted under the laws of Kentucky. *See* [R. 50–2, Ex. 1, p. 5 (2009 Distributor Agreement); R. 50–7, Ex. 6, p. 5 (2012 Distributor Agreement)]; *see also Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738–39 (6th Cir.1999) ("A contractual choice of law provision will be binding[.]"); Restatement (Second) of Conflict of Laws § 187(2) (1988) (providing that choice of law provisions in a contract are generally binding). Under Kentucky law, to prove breach of contract, Phoenix must establish (1) the existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach. *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009).

Chudnovets and Coralina suggest they cannot be liable for breach of contract because neither contracted directly with Phoenix. [R. 295, p. 3]. Trading Corp., however, contends that even though it is a named party to the 2012 Distributor Agreement, *see* [R. 50–7, Ex. 6, p. 2], the contract is invalid because the individual who executed it on Trading Corp.'s behalf, Vadim Novak, lacked authority to do so. *Id.* at 4. The Court addresses each argument in turn.

With regard to Chudnovets and Coralina's argument, the Court agrees that they may not be directly liable for breach of the 2012 Distributor Agreement. Neither was a party to the contract, *see* [R. 50–7, Ex. 6], and, in general, a party cannot breach a contract it is not a party to. *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 595 (Ky. 2012) (recognizing the "general rule that only parties to a contract may enforce or be bound by its provisions"). Instead, Chudnovets and Coralina may be liable for breach of the 2012 Distributor Agreement under an alter ego theory.

The Court turns first to the contract dispute between Phoenix and Trading Corp.

### a. Contract Existence

Defendants argue Vadim Novak lacked actual, implied, or apparent authority to bind Trading Corp. and that the 2012 Distributor Agreement is therefore invalid. [R. 295, pp. 4–6 (citing [R. 291-1, Ex 1 (Trading Corp.'s November 2019 Amended Discovery Responses), p. 15]; [R. 291-3, Ex. 3 (Deposition of Maria (Roberson) Gordon), pp. 10–13])]. An agent has actual authority to take any action "designated or implied in the principal's manifestations to the agent" as well as those "necessary and incidental to achieving the principal's objectives[.]" *Ping*, 376 S.W.3d at 592 (quoting Restatement (Third) of Agency § 2.02 (2006)). Implied authority is actual authority not expressly granted but "circumstantially proven by the principal's actions which the principal actually intended the agent to possess and includes such powers as are practically necessary to carry out the duties actually delegated." *Mill St. Church of Christ v. Hogan*, 785 S.W.2d 263, 267 (Ky. Ct. App. 1990) (citation omitted).

Apparent authority, on the other hand, can bind the principal to a transaction even where the agent was not actually authorized to enter into it. In other words, "[a]n agent is said to have apparent authority to enter transactions on his or her principal's behalf with a third party when the principal has manifested to the third party that the agent is so authorized, and the third party

reasonably relies on that manifestation." *Ping*, 376 S.W.3d at 594; *see also* Restatement (Third) of Agency § 2.03 (2006) ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.").

Here, Defendants offer that although Maria Roberson's signature appears on the 2012 Distributor Agreement, Novak used her "signature stamp" to execute the agreement without permission. [R. 295, pp. 5–6 (citing [R. 291-1, Ex. 1 (Trading Corp.'s November 2019 Amended Discovery Responses), p. 15]; [R. 291-3, Ex. 3 (Deposition of Maria (Roberson) Gordon), pp. 10–13])]. But the facts and circumstances demonstrate that, if Novak lacked actual authority (which itself is doubtful),[5] he had apparent authority to bind Trading Corp., and Phoenix was reasonable in accepting the agreement as authentic. In other words, even if the Court were to overlook the total lack of support for Defendants' assertion that Novak went rogue and executed the 2012 Distributor Agreement without explicit permission to do so, the parties' dealings conclusively establish that he had apparent authority to act on Trading Corp.'s behalf.

Kentucky courts make three inquiries to determine whether an agent has apparent authority: (1) whether the principal manifested that the agent had authority, (2) whether the third-party reasonably believed the agent had authority based on the manifestations, and (3) whether the third-party's belief was directly traceable to the principal's manifestations. *Mark D. Dean, P.S.C. v. Commonwealth Bank & Tr. Co.*, 434 S.W.3d 489, 500 (Ky. 2014). Here, each of the elements

---

[5] Novak serves in a managerial role at Coralina and has been involved with the CETCO companies since at least 2009. This fact alone—that Novak to this day remains employed by Coralina despite his alleged unauthorized entry into a contract that implicated his employer in a lawsuit—casts doubt on Defendants' claims that Novak was acting without authority. Further, and notably, Novak copied Chudnovets on an internal email regarding execution of the 2012 Distributor Agreement, *see* [R. 320, p. 2], casting greater doubt on Defendants' claims that his actions were unauthorized.

of apparent authority is present. First, Chudnovets, who at the time was a ninety-percent owner of Technology Corp., manifested that Novak had authority to act as the company's liaison when he brought Novak to Kentucky to negotiate the 2009 Distributor Agreement and pitch other business ideas to Phoenix. From that point, Novak served as Phoenix's primary point of contact throughout its dealings with Technology Corp., and later Trading Corp, holding himself out to Phoenix as an employee of "CETCO." Phoenix was certainly reasonable to accept Novak as its contact person after Chudnovets' personal introduction of Novak during their visit to Kentucky, and the second element is therefore met. As Trading Corp.'s point-person for Phoenix, Novak had apparent authority to act *in the specific manner* he did – sending a signed agreement that Phoenix had no reason to suspect was forged. Phoenix's belief that Novak acted with authority when he emailed the signed agreement was directly traceable to Chudnovets' manifestations in 2009 and his continued assent to Novak serving as a contact person for Phoenix throughout years of business dealings thereafter.

While agency is a question of fact "to be determined from the circumstances and the conduct of the parties," *Concrete Materials Corp. v. Bank of Danville & Tr. Co.*, 938 S.W.2d 254, 259–60 (Ky. 1997), summary judgment may still be appropriate on such a claim where no reasonable juror could find that an agent lacked authority to bind the principal. Thus, for all the reasons just stated, the Court finds that even drawing all reasonable inferences in Defendants' favor and accepting as true their position that Novak stamped Roberson's signature without express authorization, no reasonable juror could find that Phoenix was unreasonable in believing Roberson's signature on the 2012 Distributor Agreement was genuine and that Novak's representations were accurate. As a result, the Court finds that Novak had apparent authority to

bind Trading Corp. to the 2012 Distributor Agreement and, therefore, Phoenix has conclusively established that a contract existed between it and Trading Corp.

### b. Breach of Contract

Defendants offer that "because there is a genuine issue of material fact on whether Trading Corp. was a party to the 2012 Distributor Agreement, there is a genuine issue of material fact whether [] the exclusivity terms were binding on Trading Corp. and as such, Phoenix did not establish as a matter of law that Trading Corp. breached the 2012 Distributor Agreement through any sales in the Territory during the Relevant Period." [R. 295, pp. 6–7]. For the reasons stated above, the Court disagrees. No reasonable juror could find that Trading Corp. was not a party to the 2012 Distributor Agreement, and Phoenix has met its burden of conclusively proving the existence of a contract.

While arguing Trading Corp. could not have breached the 2012 Distributor Agreement because it was not validly entered into, Defendants concede that Trading Corp. bought and sold belt filter presses and "spare parts" from Elemet, a Phoenix competitor within the territory governed by the 2012 Distributor Agreement, in 2013 and 2014. [R. 295, pp. 6–7]. As Phoenix notes, Defendants submitted spreadsheets[6] detailing purchases and sales between Coralina, Trading Corp., a Ukranian company called DTEK, and other end users. *See* [R. 264, p. 19]; [R.

---

[6] Defendants object to the following "statement" made by Phoenix in its response to Defendants' motion for summary judgment on the KUTSA claim:

> Defendants have also represented to customers that Elemet-produced belt filter presses were "Phoenix" belt filter presses in contracts and on their websites. Defendants have produced a spreadsheet showing that they sold at least 25 Elemet-manufactured belt filter presses into the market beginning in 2010. These all appear to be direct copies of Phoenix belt filter presses that were marketed and held out to the public as Phoenix-made machines.

[R. 329, p. 12]. Defendants claim this statement "mischaracterize[s] or misstate[s] the evidence," but they do not claim the spreadsheet Phoenix references is itself inadmissible. *See id.* As previously stated, the Court will not entertain Defendants' arguments that any *assertions* or *arguments* made by Phoenix should be stricken, as opposed to the evidence in support of those assertions. Accordingly, the Court finds no admissibility issues related to the spreadsheet.

266-1, Ex. 9 (Confidential Spreadsheet), p. 2]. Thus, even drawing all reasonable inferences in Defendants' favor, the Court concludes that no reasonable juror could find that Trading Corp. did not breach the plain language of the exclusivity provision of the 2012 Distributor Agreement, *see* [R. 50-7, p. 2 (2012 Distributor Agreement)], based on their own admissions.

Although Phoenix has conclusively established a breach of the exclusivity provision of the 2012 Distributor Agreement, it has not proven a similar breach of the confidentiality provision as a matter of law. Phoenix suggests "Defendants violated the confidentiality provisions in the Agreements by using Phoenix's trade secrets to build copies of Phoenix belt filter presses at the Elemet facility and sell those in violation of the Distributor Agreement." [R. 264, p. 17 (citing generally [R. 266-1, Ex. 9 (Confidential Spreadsheet)]]. Phoenix further argues that Defendants' use of "trade secret and confidential[] information Phoenix provided with the understanding that it was covered by these distributor agreements, . . . to build the Elemet-manufactured copies of Phoenix machines . . . is a clear violation of the confidentiality provisions." *Id.* at 19. Phoenix's claims for breach of the confidentiality provision hinge in part on its KUTSA claims which, as will be discussed further below, the Court cannot grant summary judgment on. For this reason, the Court likewise cannot find that Phoenix conclusively established a breach of the confidentiality provision of the 2012 Distributor Agreement.

### c. Damages

Notwithstanding Phoenix's success in proving the first two elements of its breach of contract claims related to the exclusivity provision, where both parties' arguments for summary judgment fail is the damages element. Phoenix offers that it "has outlined its damages extensively in Mr. Drake's damages calculations . . . [and] all that is required for Phoenix to prevail on its summary judgment motion is to prove it was damaged at all, not the specific dollar value of its

damages." [R. 320, p. 11 (citing generally R. 248 (Phoenix's Amended and Supplemental Itemization of Damages)]. That may be, but the Court disagrees that Phoenix has conclusively proven it suffered damages through Drake's attestation. To be sure, Phoenix has made a sufficient showing of damages to *survive* summary judgment, but it is not entitled to judgment in its favor simply because it has presented some evidence to support its claim of damages. *See Green Leaf Nursery, Inc. v. Kmart Corp.*, 485 F. Supp.2d 815, 819 (E.D. Mich. 2007) ("After having reviewed the record, the Court finds that Plaintiff has produced sufficient evidence to show that it has suffered damages . . . [.] Accordingly, Plaintiff has a genuine issue of material fact proper for trial."). Rather, its damages evidence must prevent a reasonable fact finder from finding for Defendants after all inferences are drawn in their favor.

In ruling on Defendants' Motion to Exclude the Testimony of Gary Drake, the Court found that Drake has adequate personal knowledge of Phoenix's operations to present lay opinions on lost profits and provide a damages assessment despite Defendants' concerns about the accuracy of the figures he presented. [R. 412, pp. 16–17]. The Court reasoned that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993), and declined to assess the credibility of Drake's testimony or resolve the parties' factual disputes surrounding it, a job reserved for the finder of fact. *Id.*

At the summary judgment stage, the Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Sims v. Memphis Processors, Inc.*, 926 F.2d 524, 526 (6th Cir. 1991). Because Phoenix's damages evidence consists only of Drake's calculations, the Court again concludes that the reliability of his testimony must be determined by

the jury at trial. Because Phoenix has not presented any other conclusive proof of damages that would prevent a reasonable jury from finding in favor of Defendants, summary judgment for Phoenix would be improper. In the same way, because it is clear Phoenix can produce some evidence concerning potential damages, there is still a dispute of material fact between the parties, rendering summary judgment for Defendants improper.

### 3. Phoenix's Alter ego Theory

The Court turns next to whether Phoenix's alter ego theory implicates Coralina, Chudnovets, and/or Technology Corp.[7] Defendants argue that Phoenix cannot show that they perpetuated any actual fraud, an essential element of Phoenix's alter ego theory. [R. 278, p. 31].[8]

The parties agree that federal courts sitting in diversity apply the choice of law rules of the forum state. *See* [R. 264, p. 20; R. 295, p. 10]. Kentucky applies the law of the state of incorporation to alter ego issues, but the parties disagree as to whether Phoenix's alter ego claims should be assessed under Texas law, where Trading Corp. is incorporated, or Delaware law, where Technology Corp. was incorporated.[9] Phoenix suggests both Delaware and Texas standards should apply (the former to Technology Corp. and the latter to Trading Corp.), [R. 264, p. 21], while Defendants suggest one standard should apply for the sake of "simplicity," [R. 278, p. 30]. The

---

[7] Because the Court has already found that it may exercise personal jurisdiction over Chudnovets and Coralina, it will not address their argument regarding insufficient proof to establish personal jurisdiction through veil piercing under Texas law.

[8] The Court will briefly address Defendants' argument that Phoenix did not sufficient plead its alter ego theory related to Chudnovets. *See* [R. 278, p. 4]. "Pleadings are intended to give adverse parties notice of each party's claims and defenses, as well as notice of the relief sought." *Richard Nugent & CAO, Inc. v. Est. of Ellickson*, 543 S.W.3d 243, 264 (Tex. App. 2018) (citation omitted). A pleading will suffice if it "gives fair and adequate notice of the facts upon which the pleader bases his claim." *Id.* (quoting *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982). Alter ego must be specifically pleaded or it is waived, unless tried by consent." *Id.* (citation omitted). In its Amended Complaint, Phoenix alleges "CETCO and Coralina are 'alter ego' companies, operating as one and the same entities. The Defendant, Chudnovets is the chief executive officer, director and a shareholder of both companies, and they share some of the same employees and offices. Chudnovets is the sole member and director of Coralina." [R. 40, p. 4]. This was sufficient to put Chudnovets on notice that he was implicated in Phoenix's alter ego theory.

[9] The parties appeared at one point to agree that both Delaware and Texas standards would apply, *see* [R. 264, p. 21]; [R. 295, pp. 10–11], which Magistrate Judge Edwards acknowledged in her Report and Recommendation on spoliation sanctions. *See* [R. 391, p. 30]. Defendants have since changed their position.

Court agrees with Defendants that Texas's alter ego standard applies here. However, the Court does not arrive at that conclusion for simplicity's sake. Importantly, since Phoenix argues that Technology Corp. and Trading Corp. are themselves one and the same, *see generally* [R. 264, p. 3–4], their potential alter ego liability cannot logically be assessed using different standards. At its core, Phoenix's alter ego theory is that Trading Corp., Technology Corp., Coralina, and Chudnovets are all liable to it for Trading Corp.'s breach of the 2012 Distributor Agreement because of the Chudnovets-led "shell game" played by these companies. *Id.* Because Trading Corp., a Texas corporation, is the only Defendant with potential direct liability for breach of contract, and the inquiry is whether the remaining Defendants may be implicated too, the alter ego standards of Texas apply. Moreover, because the Court will dismiss Phoenix's claims against Technology Corp. without prejudice, it will not consider Technology Corp.'s potential alter ego liability at this time. This eliminates the possibility that Delaware's alter ego standard is applicable to the Court's inquiry.

Under Texas law, alter ego liability involves two considerations: "(1) the relationship between the entities, and (2) whether the entities' use of limited liability was illegitimate." *U.S. KingKing, LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 213 (Tex. App. 2018) (citation omitted). "To pierce the corporate veil and impose liability under an alter ego theory, the plaintiff must demonstrate (1) that the entity on which it seeks to impose liability is the alter ego of the debtor, and (2) that the corporate fiction was used for an illegitimate purpose, that is, to perpetrate an actual fraud on the plaintiff for the defendant's direct personal benefit." *Id.* (citations omitted). However, "[e]vidence that a company was used as an alter ego does not, by itself create an issue regarding whether it was used to commit an actual fraud on the plaintiff for the defendant's personal benefit." *Metroplex Mailing Servs., LLC v. RR Donnelley & Sons Co.*, 410 S.W.3d 889, 896–97

(Tex. App. 2013). Rather, "[a]lter ego is determined from the 'total dealings' of the corporation and the individual owner," including (1) the degree to which corporate and individual property is kept separate, (2) the amount of financial interest, ownership, and control the individual maintains over the corporation, and (3) whether the corporation has been used for personal purposes. *KingKing*, 555 S.W.3d at 213.

In making its alter ego argument, Phoenix focuses almost exclusively on the relationship between the Defendants. Phoenix submits that "Chudnovets is the sole member and 100% owner of Defendant Coralina and has been its CEO since its founding in 2004," that "Chudnovets served as the CEO of CETCO Technology from 1994 until it was surreptitiously dissolved in 2011 [and] owned 90% of the stock in CETCO Technology," and that "Chudnovets was a director, Chairman of the Board, and President of CETCO Trading, and his involvement with CETCO Trading ended in 2015." [R. 264, p. 3 (citing [R. 243-2, Ex. 2 (Alexander Chudnovets' Second Amended Discovery Responses), pp. 6–7])]. Phoenix also points out that business cards Chudnovets provided to Phoenix listed the same business address for CETCO Technology, CETCO Trading, and Coralina. *Id.* at p. 4 (citing [R. 264-4, Ex. 3 (CETCO Business Cards), pp. 2–3]). Phoenix further offers that at various points all Defendants used the trade name and/or logo "CETCO." Lastly, Phoenix notes that Technology Corp.'s Moscow Office was located at the same address that Coralina has identified as its own. *Id.* (citing [R. 243-10, Ex. 10 (Coralina's Second Amended Discovery Responses), p. 11]).

Defendants staunchly defend their separateness, alleging that "Coralina, Trading Corp. and Technology Corp. are/were separate and independent legal entities" and "no parent-subsidiary relationship or common ownership exists" between them. [R. 278, p. 32 (citing [R. 48-1, Ex. 1 (Affidavit of Alexander Chudnovets), pp. 7–8]) (hereinafter ("Chudnovets Affidavit")]. In support,

Defendants offer the sworn Affidavit of Alexander Chudnovets, who attests that he is the sole member of Coralina, and that Coralina owns no shares in Trading Corp. *Id.* (citing Chudnovets Affidavit, R. 48-1, p. 9). The Affidavit further provides that "none of Coralina, Technology Corp. or Trading Corp. caused the incorporation or organization of the other" and that all corporate entities were "in good standing" under the laws of the state and/or country of their incorporation at all relevant periods. Chudnovets Affidavit, R. 48-1, p. 11. Importantly, the Defendants note that Coralina, Trading Corp., and Technology Corp. "did not have identical boards of directors or officers," and during the relevant times, "Chudnovets managed Coralina as its sole member and chief executive officer, . . . [and] Trading Corp. was managed by Maria Gordon (formerly Roberson) as president, who was not affiliated with Coralina, and by a separate board of directors of which Chudnovets was but one member." [R. 278, p. 33 (citing Chudnovets Affidavit, R. 48-1, pp. 9–10)]. In addition, Defendants point to Chudnovets' declaration that "Coralina and Trading Corp. did not set policies for each other," and the companies "could and did engage in business and transactions without the involvement of the others." *Id.* (citing Chudnovets Affidavit, R. 48-1, p. 9). Finally, Defendants contend that Technology Corp. "was not the predecessor entity of either Coralina or Trading Corp." *Id.* (citing Chudnovets Affidavit, R. 48-1, p. 8).

In their arguments against finding alter ego liability, Defendants also focus heavily on the fact that Phoenix cannot prove fraud under Texas law. They note that "Phoenix does not even have live claims for fraud against any of them in this Lawsuit as shown by this Court's prior dismissal of Phoenix's claims for fraud and fraud in the inducement[.]" [R. 278, p. 31]. In doing so, Defendants falsely equate "actual fraud" with the tort of fraud. Texas courts have distinguished between the two, finding that "in the context of piercing the corporate veil, actual fraud is not equivalent to the tort of fraud." *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App. 2010). A

distinct legal concept, actual fraud involves "dishonesty of purpose or intent to deceive." *Id.* (quoting *Castleberry v. Branscum*, 721 S.W.2d 270, 273 (Tex. 1986)).

Phoenix argues it has sufficiently shown that Chudnovets and the Defendant-entities committed an actual fraud. Phoenix submits that Chudnovets "made the decision to dissolve [Technology Corp.] during the pendency of a contract with Phoenix, and intentionally hid from Phoenix the fact that Technology had dissolved," "never returned Phoenix's confidential and trade secret information as required under the contract, and instead, used his CETCO Group of companies to misappropriate Phoenix's trade secrets and sell competing belt filter presses, holding them out as Phoenix products." [R. 287, p. 20 (citing [R. 243-2, Ex.2 (Alexander Chudnovets' Second Amended Discovery Responses), p. 10])]. Then, Phoenix continues, "[i]n the meantime, Chudnovets' Coralina employees held themselves out as 'CETCO' and led Phoenix to believe that the parties were operating under the 2009 Agreement." *Id.* (citing generally [R. 264-15, Ex. 14 (Correspondence and Documents Regarding 2009 Distributor Agreement)]). Phoenix submits that, because Chudnovets and agents of Coralina "intentionally misled Phoenix into believing the contract still existed, a reasonable jury could conclude that actual fraud occurred and it would be unjust not to hold Chudnovets and Coralina, who used Technology as a shell corporation to misappropriate Phoenix's trade secrets perpetuate a breach of contract on Phoenix, liable under the alter ego theory." *Id.*

Having assessed the Parties' positions and evidence in support, the Court finds that each can narrowly survive summary judgment but neither can prevail. To be sure, Phoenix has submitted sufficient evidence to allow a reasonable juror to find that any or all of the Defendants are alter egos of one another. This evidence is not, however, sufficient to preclude a finding that the Defendants were separate and distinct after drawing all reasonable inferences in their favor.

Likewise, determining whether Chudnovets and the Defendant-entities committed an actual fraud against Phoenix requires weighing conflicting evidence and factual issues, a job reserved for the fact finder.[10]

Accordingly, the Court finds that there is a genuine issue of material fact with respect to Phoenix's breach of contract claim related to Defendants' alleged breach of the confidentiality provision and damages, and granting summary judgment on those claims would be inappropriate. The Court likewise finds that a genuine issue of material fact exists as to Phoenix's theory of alter ego liability between Trading Corp., Chudnovets, and Coralina. Therefore, the Court will deny both Phoenix's Motion for Partial Summary Judgment on its breach of contract claims (Count I) [R. 264] and Defendants' Motion for Partial Summary Judgment on the same claims [R. 278].

### D.  SUMMARY JUDGMENT ON PHOENIX'S TRADE SECRETS CLAIMS (COUNT III)

The parties have also submitted competing summary judgment motions on Phoenix's KUTSA claims. [*See* R. 267; R. 276]. Phoenix suggests it has demonstrated all elements to prevail on its KUTSA claim and that no reasonable jury could find otherwise. [R. 267, p. 13]. Defendants suggest they are entitled to summary judgment on Phoenix's KUTSA claim because Phoenix has had "every opportunity to develop" the claim but failed to do so. [R. 276, p. 4].

To prevail on a KUTSA claim, a plaintiff must present evidence that: (1) the information it seeks to protect qualifies as a trade secret; and (2) the defendant misappropriated the protected information. *BDT Prods., Inc. v. Lexmark Intern., Inc.*, 274 F. Supp. 2d 880 (E.D. Ky. 2003), *aff'd* 124 F. Appx. 329; KRS § 365.880. Under Kentucky law, a trade secret is defined as:

Information, including a formula, pattern, compilation, program, data, design, method, technique, or process that:

---

[10] Much of the conflicting evidence of fraud is the same or similar to that of misappropriation under KUTSA, *see infra* Section D(3), and the Court further finds that summary judgment is precluded for the same reasons stated therein.

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

KRS § 365.880(4). Whether information is considered a trade secret is a question of fact. *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 671 (E.D. Ky. 2009). When applying the elements of KRS § 365.880, "no one factor is determinative." *Id.*; *see also KCH Servs. v. Vanaire, Inc*., No. 05-777-C, 2008 U.S. Dist. LEXIS 73059, at *6 (W.D. Ky. Sept. 23, 2008) (quoting *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 795 (W.D. Ky. 2001)) (In any analysis of this sort, no one factor is determinative. Every circumstance must be considered on the merits.").

Misappropriation occurs where a trade secret is obtained "by a person who knows or has reason to know that the trade secret was acquired by improper means" or where a trade secret is disclosed or used "without express or implied consent" by a person who:

1. Used improper means to acquire knowledge of the trade secret; or
2. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
   a. Derived from or through a person who had utilized improper means to acquire it;
   b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
   c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
3. Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

KRS § 365.880(2).

### 1. KUTSA's Statute of Limitations

Defendants argue Phoenix's KUTSA claims must fail because it was not brought within the statute's three-year limitations period. [R. 276, p. 23]. They suggest Phoenix was alerted to "potential misappropriation and other allegations" in 2009, when Gary Drake "heard rumors 'that

- 36 -

CETCO was trying to do business with one of Phoenix's competitors and that they were actively seeking to build [] belt press equipment in Russia." *Id.* at 24. Phoenix offers that the first time it received information that "would have alerted it that Defendants were misappropriating its trade secrets" was in 2015, when Drake was informed at a trade association meeting that CETCO was building "knock-offs" of another company's equipment and that "Phoenix should look into whether a similar issue [was] occurring in its relationship with CETCO." [R. 290, p. 24]. Phoenix promptly began investigating the potential misappropriation and brought this lawsuit two months later.

KUTSA provides that "[a]n action for misappropriation must be brought within three (3) years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." KRS § 365.890. It therefore "delays the commencement of the limitation period until an aggrieved person discovers or reasonably should have discovered the existence of misappropriation." *Amalgamated Industries Ltd v. Tressa, Inc.*, 69 Fed. App'x. 255, 261 (6th Cir. 2003) (quoting Ky. Unif. Trade Secrets Act, com. to § 6, p. 462). "If objectively reasonable notice of misappropriation exists, three years is sufficient time to vindicate one's legal rights." *Id.*

While Phoenix may have been aware of "rumors" as early as 2009 that Technology Corp. may have breached an earlier distributor agreement, was seeking to do business with Phoenix's competitors, and was even seeking to develop their own belt press equipment to compete with Phoenix, *see* [R. 276, p. 24]; [R. 274-1, Ex. 1 (Deposition of Gary Drake) pp. 7–9 (hereinafter "Drake Deposition")], these rumors alone would not necessarily alert Phoenix that its trade secrets were potentially being misappropriated. Even if Phoenix's investigation ultimately revealed alleged misappropriation beginning in 2009 or 2010, this does not mean Phoenix was or should have been aware of such misappropriation that early. To be sure, the "reasonable discovery" rule

requires that the holder of a trade secret "conduct a timely and reasonable investigation after learning of possible misappropriation." *Adcor Indus., Inc. v. Bevcorp, LLC*, 252 F. App'x 55, 62 (6th Cir. 2007). The jury, and not this Court, must decide whether Phoenix had "objectively reasonable notice" of "possible" misappropriation sufficient to toll the statute of limitations more than three years before this action was commenced. Even drawing all reasonable inferences in Defendants' favor, there is a genuine issue of material fact as to whether Phoenix's KUTSA claim is timely.

### 2. Phoenix's Alleged Trade Secrets

#### a. Qualification as Protectable Information

Phoenix contends its trade secrets consist of "its coal refuse dewatering process, supporting process development, selection, and optimization techniques and methodologies; its belt filter press device design; and the written documentation Phoenix created to memorialize or assist with those designs and processes." [R. 267, p. 2]. Defendants generally allege that Phoenix's supposed trade secrets are overinclusive and vague. [R. 276, p. 4]. In its supplemental interrogatory responses tendered to Defendants on July 25, 2019, Phoenix further clarified its trade secrets as follows:

1. Detailed Phoenix AutoCad DWG belt filter press design drawings and component information;
2. Slurry and material characterization and testing procedures and techniques as detailed in the Phoenix laboratory work instructions;
3. Belt Filter Press laboratory bench scale simulation procedures and modeling as detailed in Phoenix laboratory work instructions;
4. Phoenix dewatering chemical selection and application techniques as detailed in Phoenix laboratory work instructions;
5. Phoenix field sampling procedures and techniques as detailed in Phoenix laboratory work instructions;
6. Phoenix belt filter press sizing procedures as detailed in Phoenix laboratory work instructions;

7. Phoenix belt filter press application and process engineering data and techniques and operations and metrics of the equipment as detailed in Phoenix's engineering training manuals and other documents;

8. Phoenix belt filter press manufacturing information and specifications dealing with their capabilities, including but not limited to estimated labor hours and steel weights required for producing Phoenix belt filter presses; and

9. Phoenix belt filter press process and optimization techniques.

*Id.* (citing [R. 185-7, pp. 4–5]).

Trade secret protection will not apply where information is generally known in an industry, is public knowledge, or consists of ideas that are well-known or easily ascertainable. *Catalyst & Chem. Servs., Inc. v. Global Support*, 350 F. Supp. 2d 1, 9 (D.D.C. 2004), *aff'd* 173 F. App'x 825 (Fed. Cir. 2006) ("[I]t is widely accepted that a trade secret can exist in a combination of characteristics, each of which, by itself, is in the public domain."); *Arco Indus. Corp. v. Chemical Corp.*, 633 F.2d 435, 442 (6th Cir. 1980) (holding that under Michigan law a new combination of known steps or processes can be entitled to trade secret protection). While Phoenix acknowledges this, it argues that its trade secrets involve a "unified process, design, or operation made up of characteristics or components in the public domain [but] used in unique combination to afford a competitive advantage." [R. 267, pp. 14–15]. Phoenix points to the "substantial time, money and effort" it spent developing its belt filter press design and "trade secret process and technology" to support its position that they are unique, valuable, and not readily ascertainable. *Id.* at pp. 16–17 (citing [R. 267-6, Ex. 5 (Phoenix April 19, 2021 Interrogatory Responses)]).[11]

Defendants argue that "an item is not a trade secret under KUTSA simply because it may qualify as confidential under an agreement" and because one party has labeled it as such. [R. 395, p. 6]. To support their position that Phoenix's processes, techniques, drawings, and components are not trade secrets, Defendants rely on the opinions of their expert, Dr. Yuliy Rubinstein. *See id.*

---

[11] The Court acknowledges Defendants' objection to its consideration of Phoenix's interrogatories, [R. 306, p. 29], and addresses the objection in its analysis below.

at 8–9, 15. Dr. Rubinstein opined that (1) Phoenix's belt filter press "and related parts and components[] can be reverse engineered," (2) Phoenix's general arrangement CAD drawings provided in .dwg format are the type routinely provided to end-users and do not contain trade secrets, (2) and Phoenix's belt filter press "process is readily observable and widely known in the Russian coal bifurcation industry." [R. 261-3, Ex. A (Expert Report of Yuliy Rubinstein) p. 4] (hereinafter "Rubinstein Report"). In ruling on Phoenix's motion to exclude Dr. Rubinstein's testimony, the Court determined that it could not compare competing, admissible evidence to determine which is more credible, as to do so would "supplant the adversary system or the role of the jury." [R. 414, pp. 15–16 (quoting *L.S. v. Scarano*, No. 2:10-CV-51, 2011 WL 4948099, at *3 (S.D. Ohio Oct. 18, 2011))]. As evidenced by their briefing, and supporting contradictory evidence cited by the parties, a material issue of fact related to the characterization of Phoenix's alleged trade secrets exists. Therefore, it would be inappropriate for the Court to resolve that factual issue.

### b.  Independent Economic Value

To show independent economic value, "the secret information must afford the owner a competitive advantage by having value to the owner and potential competitors." *Daimler-Chrysler Servs. N. Am., LLC v. Summit Nat., Inc.*, 289 F. App'x 916, 922 (6th Cir. 2008).

As with the parties' general arguments regarding whether Phoenix's information can qualify as a trade secret, their positions here largely rely on competing opinions this Court has already found admissible. Again, Defendants rely on the findings of Dr. Rubinstein, who suggests Phoenix's "material characterization methods," "bench and pilot scale simulation methods or equivalents," "equipment selection methods," "standard work instructions," "Handbook and Training Manual" and "International Sales Manual" hold "no independent commercial value and would not provide anyone in the Russian coal beneficiation industry or a manufacturer or seller of

BFPs any kind of competitive or economic advantage in the design, manufacture or sale of a BFP." [Rubinstein Report, R. 261-1, pp. 4–5, 15–18]. By introducing contradictory testimony by Dr. Rubinstein, Defendants seek to discredit that of Gary Drake. [R. 395, pp. 9–10].

On the other hand, Phoenix asserts that its "belt filter press design" has independent economic value based on the investment Phoenix made to develop it and based on the value it provides to Phoenix's business operations. [R. 267, p. 17]. For support, Phoenix largely relies on the findings of Gary Drake, the company's president and CEO, who Phoenix argues has knowledge about the relative secrecy of Phoenix's technology, its financial investment to develop that technology, and the business's return on its investment from the technology's relative value. *See id.* at 3–6, 19. Specifically, Phoenix provides that Drake estimated the labor costs to develop Phoenix's alleged trade secrets "over the last 36 years" was, at minimum, "$5.0 million." [R. 267-6, Ex. 5 (Phoenix April 19, 2021 Interrogatory Responses)]. Drake also performed a "current Independent Economic Value analysis" and determined Phoenix's trade secrets are valued at approximately $12,668,949. *Id.* at 7–11. While Defendants object to these figures as "unverified and inadmissible hearsay" and dispute the reliability of Drake's opinions generally, [R. 306, p. 29]; *see also* [R. 273 (Defendants' Motion to Exclude the Proposed Expert Testimony of Gary Drake)], the Court already determined that Drake has adequate personal knowledge of Phoenix's operations and finances to provide both lay and expert opinions when it ruled on Defendants' motion to exclude Drake's testimony. *See* [R. 412, pp. 14–17]. The Court, therefore, will once again overrule Defendants' objections as to the *reliability* of Drake's findings, and will not opine on their accuracy.[12] As with Dr. Rubinstein's opinions on the characterization of Phoenix's alleged

---

[12] Defendants also object to these interrogatory responses as "unverified" and inadmissible hearsay because they were prepared by counsel and not a representative of Phoenix. [R. 306, p. 29]. But as Phoenix notes, its April 2021 discovery responses were supplements to those originally provided by Drake on behalf of Phoenix. [R. 318, p. 14]. In any case, the Federal Rules specifically contemplate that "interrogatory answers" are among the evidence admissible to support

trade secrets, the Court cannot "supplant the . . . role of the jury" by either accepting as true or rejecting Drake's testimony. *Scarano*, 2011 WL 4948099 at *3. It is clear the parties dispute the independent economic value, if any, of Phoenix's alleged trade secrets, and each offers sufficient evidence to create a genuine material fact that must be decided by a factfinder.

### c.  Ascertainability by Proper Means

Where a design or process is readily ascertainable by proper means, it cannot qualify for trade secret protection. According to Phoenix, "there is no evidence that another person could obtain [its] belt filter press designs or processes through proper means." *Id.* at 17. Phoenix discredits Defendants' expert, Dr. Rubinstein, arguing he "admits that the *processes* involved in coal tailing dewatering cannot be reverse engineered." [R. 267, p. 17 (citing [R. 269-5 (Deposition of Yuliy Rubenstein), pp. 3, 4] (emphasis added). Defendants argue that Phoenix's processes are readily known and used in the Russian market and that its belt filter presses can be reverse engineered without use of Phoenix's confidential information. [R. 395, p. 14]. Dr. Rubinstein opined that Phoenix's belt filter presses "and related parts" can be reverse engineered without Phoenix's designs. [Rubinstein Report, R. 261-3, p. 4]. He provided that, in general, "the process and principles of BFP operation and its technological scheme of dewatering is essentially identical from manufacturer to manufacturer, the machines are available to disassemble, the processes, components and functional schemes of the BFP are readily apparent and the parts and components are available to scan and measure," and, consequently, "from a combination of those observations, measurements . . . , manufacturing and assembly drawings can be easily and readily-created." *Id.*

Relying on Dr. Rubinstein's expert report and testimony, Defendants argue the information comprising Phoenix's alleged trade secrets is commonly known and publicly available. [R. 395,

---

a party's assertion "that a fact cannot be or is genuinely disputed." FED. R. CIV. P. 56(c)(1)(A).  The Court therefore overrules Defendants' objection

p. 15]. In its reply, however, Phoenix distinguishes between a .dwg drawing and a .pdf version, which is the only type offered to end users. [R. 321, pp. 4–6]. Phoenix explains:

> Mr. Drake has testified that the .dwg drawings were not furnished to end users and that end users were only furnished .pdf copies of these drawings. Contrary to Defendants' assertion, Mr. Drake testified that the .dwg drawing is very different from a .pdf version and with the dimensional and component information contained in the electronic version, a person could create their own subassembly drawings. Mr. Drake further testified that Phoenix provided CETCO more detailed information on subassemblies at their request and also provided Vadim Novak with additional information that, combined with the additional trade secret design and process information Phoenix gave to Defendants, would have allowed Defendants to duplicate Phoenix's machine, process and technology, and business model.

*Id.* (citing [R. 321-1 (Excerpted Drake Deposition), pp. 3–4]).[13]

Defendants reference Judge McKinley's order denying their motion to dismiss Phoenix's KUTSA claim, in which he opined that there "is a fine line between the confidential design of the belt press and the belt press itself, and discovery may reveal that the design of the belt press was ascertainable without misappropriation of any trade secret." [R. 395, p. 14, n.75 (citing [R. 57, p. 18])]. While Judge McKinley did provide that this dispute would be best dealt with at the summary judgment stage "and not earlier," neither party has conclusively established their position to prevail on this issue as a matter of law. Most glaringly, Defendants' expert's findings leave room for a reasonable juror to infer that Phoenix's confidential information is required to reverse engineer the belt filter presses. Dr. Rubinstein's cryptic explanations that "there is not *much* difference in substantial design features in BFPs of various manufacturers" and that "Phoenix's BFPs operate *similarly* to those of its competitors," [Rubinstein Report, R. 261-3, p. 8] (emphasis added), but not the exact same way, further blurs the "fine line" Judge McKinley described. In other words,

---

[13] Defendants object generally to assertions "regarding what Phoenix 'provided' to Defendants," claiming they are conclusory and unsupported. [R. 306, pp. 10, 11]. They also suggest Phoenix "misstate[s] the evidence" in its reference to Drake's deposition testimony. *Id.* at pp. 5–6. Defendants do not provide an independent basis for why Drake's deposition testimony on these issues is inadmissible; they simply contest Phoenix's use and description of the evidence. Once again, the Court declines to entertain Defendants' critiques of Phoenix's arguments or "assertions."

even if the Court were to accept Dr. Rubinstein's findings as true, a reasonable juror could still find that the differences, however minor, in Phoenix's designs and techniques must be known and implemented in order to reverse engineer its belt filter presses, even if the remaining aspects of the equipment are readily available, or a reasonable juror could simply choose to believe Drake's opinions on the matter over Dr. Rubinstein's. As above, the credibility of each party's opinion witnesses and the evaluation of conflicting evidence will determine this issue, an assessment reserved for the fact finder.

### d. Phoenix's Steps to Protect its Trade Secrets

Under KUTSA, efforts to maintain the secrecy of a trade secret need only be "reasonable under the circumstances." KRS 365.880(4). Courts assessing the nearly identical Uniform Trade Secrets Act (UTSA) have determined that "reasonable efforts does not mean 'all conceivable efforts'" or "[h]eroic measures." *John Bean Techs. Corp. v. B GSE Grp., LLC*, No. 1:17-CV-142-RJS-DAO, 2020 WL 4698984, 1298, n. 133, 134 (D. Utah Aug. 13, 2020) (counting cases). Indeed, "an owner is not required to maintain absolute secrecy to retain trade secret protection." *Catalyst & Chem. Servs., Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 10 (D.D.C. 2004).

Phoenix offers that it took "more than reasonable efforts" to protect its trade secrets. [R. 267, p. 19]. Phoenix points to the Affidavit of Gary Drake, who attests that Phoenix "does not publish or publicly share its detailed financial information, . . . pricing information, trade secrets, or proprietary design and process information[,]" that it "limits employee access to information" to a "'need to know' basis," and that the company stores information related to its alleged trade secrets "on its computer network or in secure document filing systems" that are password protected. *Id.* at 19–20 (citing [R. 267-17, Ex. 12 (Affidavit of Gary Drake), pp. 1, 3–4]).[14]

---

[14] Defendants object to this portion of Drake's Affidavit, arguing "it is contradicted" by other record evidence. [R. 306, pp. 30–31]. The presentation of contradictory but otherwise admissible evidence is precisely what creates genuine

Defendants argue Phoenix failed to take reasonable steps to protect its alleged trade secrets by disclosing them to parties with no obligation of confidentiality, including Coralina. [R. 276, p. 14–15]. Defendants point to other third-party sales representatives, namely Conn-Weld, that Phoenix admits to supplying with confidential information and/or trade secrets without entering into a confidentiality agreement. *Id.* at p. 15 (citing [R. 239 (Plaintiff's Compliance with September 22, 2021 Court Order), pp. 2–3].

During his deposition, Phoenix's Matt Fenzel testified that only "sales and marketing literature," a "sales training manual" and "Phoenix proposals" were disclosed to Conn-Weld. [R. 290-6, Ex. F (Deposition of Matt Fenzel), p. 4] (hereinafter "Fenzel Deposition"). Phoenix maintains that Conn-Weld "was never provided IOM Manuals, Phoenix's Engineering handbook, the Phoenix International Sales Manual provided to Defendants, or any other process or technological information that Phoenix claims is a trade secret in this case." [R. 290, p. 18 (citing [Fenzel Deposition, R. 290-6, pp. 3–4])]. Defendants point to no evidence that Phoenix disclosed any trade secrets to Conn-Weld. Rather, they simply rely on the fact that Phoenix did not require Conn-Weld to sign a confidentiality agreement before doing business of any kind with it. This alone does not definitively prove that Phoenix failed to adequately protect its alleged trade secrets.

Defendants also claim Phoenix's disclosure of protected information to Coralina, which owed no duty of confidentiality to Phoenix, extinguished any property right of its trade secrets. [R. 276, p. 15]. Phoenix maintains that it did so based only on Coralina employees' misrepresentations that they were Trading Corp. employees subject to the confidentiality provision. [R. 290, p. 19]. Phoenix's reasonableness in believing the Coralina employees were actually employed by Trading

issues of material fact to preclude summary judgment. Without an independent basis to challenge this portion of Drake's Affidavit, the Court will not strike it simply because Defendants can present evidence that may contradict it. To do so would require the Court to weigh the competing evidence and determine which to accept as true.

Corp. and under a duty to protect its confidentiality is a material fact at the center of Phoenix's KUTSA claims.  Assessing Phoenix's reasonableness is a job for the ultimate factfinder, not this Court.

Drawing all reasonable inferences in Defendants' favor, a reasonable juror could nevertheless find that Phoenix acted reasonably in its attempts to protect its alleged trade secrets. In the same way, drawing all reasonable inferences in Phoenix's favor, a reasonable juror could find that Phoenix extinguished its trade secret claims by disclosing confidential information to third parties with no obligation to protect it. The conflicting evidence on this point presents a question for the jury.

### 3.  Defendants' Alleged Misappropriation

The Court likewise finds summary judgment inappropriate for either party as to the second prong of the KUTSA claim—whether the defendant misappropriated the protected information. Defendants suggest there is insufficient evidence that they misappropriated Phoenix's trade secrets, [R. 276, p. 19], claiming that Gary Drake's deposition testimony, which Phoenix relies on in its misappropriation allegations, "merely points to photos of Elemet's alleged knock off BFPs and offers general claims about [them] having purportedly similar parts and configurations to Phoenix's BFPs," which, "at most amounts to evidence about similar superficial features [] insufficient to create a genuine issue of material fact of misappropriation by Defendants." *See generally* [R. 274-3 (Excerpted Drake Deposition); R. 274-4 (Excerpted Drake Deposition)].

Phoenix argues evidence of Defendants' misappropriation is unavailable due to Coralina's destruction of it. [R. 290, p. 3]. Phoenix suggests "communication relating to the Defendants' purchase and sale of 25 Elemet belt filter presses would most certainly have shown whether

Defendants copied Phoenix's trade secrets, gave those to Elemet, and whether Elemet used direct copies of those trade secrets to produce their belt filter presses and processes." *Id.* at 2.

Magistrate Judge Edwards' Report and Recommendation provided the following regarding Coralina's spoliation of relevant evidence:

> Phoenix has demonstrated that the destroyed technical documents and communications related to the DTEK and Dobropolskaya projects would have been relevant to two contested issues - whether Defendants misappropriated Phoenix's trade secrets by providing confidential information or trade secrets to Elemet . . . [and] whether Defendants' transactions with Elemet violated Phoenix's Distributor Agreement with Trading Corp. Based on this analysis, Phoenix has put forth admissible evidence demonstrating that Coralina negligently destroyed relevant technical documents and communications from their transactions with Elemet.

[R. 391, p. 21]. In determining the proper sanction for Defendants' spoliation, Magistrate Judge Edwards considered Phoenix's request for "the 'death penalty' sanction of summary judgment in its favor," but found the "less severe sanction" of an adverse inference at trial more appropriate. *Id.* at p. 33–34. Again, neither party objected to Magistrate Judge Edwards' Report and Recommendation, and this Court fully adopted it. *See* [R. 396]. This leaves a crucial question of fact squarely in the hands of the factfinder to determine whether, after considering the adverse-inference instruction,[15] Phoenix has sufficiently proven each element to prevail on its KUTSA claim. To grant summary judgment for Phoenix at this stage would be to impose the same "death

---

[15] The adverse-inference instruction shall read as follows:

> The jury will be instructed that it may presume that technical documents and communications related to Coralina's transactions with Elemet were in Coralina's control and that Coralina had a duty to preserve such evidence.

> The jury may presume that Coralina breached that duty by allowing these technical documents and communications to be destroyed.

> The jury may presume that the information contained in these technical documents and communications would have supported Phoenix's breach of contract and KUTSA claims and would have been adverse to Coralina's defenses.

[R. 396, p. 3].

penalty sanction" that it expressly decided *not* to when it adopted Magistrate Judge Edwards' Report and Recommendation. Likewise, to grant summary judgment for Defendants would require the Court to ignore the adverse-inference instruction Phoenix will receive at trial.

### E.   CONCLUSION

For the reasons set forth above, the Court finds that Technology Corp. lacks capacity to be sued under Delaware law absent appointment of a receiver or body corporate by Delaware Court of Chancery. The Court will therefore grant Defendants' Motion for Summary Judgment or to Dismiss Phoenix's claims against Technology Corp. [R. 271] and dismiss Phoenix's claims against Technology Corp. without prejudice.

The Court further finds that there is a genuine issue of material fact with respect to Defendants' alleged breach of the confidentiality provision and damages for Phoenix's breach of contract claims (Count I) and its alter ego claims that could lead a reasonable jury to find for either party, even after all reasonable inferences are drawn in the other's favor. The Court will therefore deny Phoenix's Motion for Partial Summary Judgment [R. 264] and Defendants' Motion for Partial Summary Judgment [R. 278].

The Court further finds that there is a genuine issue of material fact with respect to Phoenix's KUTSA claims (Count III) that could lead a reasonable jury to find for either party, even after all reasonable inferences are drawn in the other's favor. The Court will therefore deny Phoenix's Motion for Partial Summary Judgment [R. 267] and Defendants' Motion for Partial Summary Judgment [R. 276].

Accordingly, **IT IS HEREBY ORDERED** as follows:

1.   Defendants' Motion for Summary Judgment or in the Alternative to Dismiss for Misjoinder as to Phoenix's Claims Against Capital Equipment & Technology

Corporation [**R. 271**] is **GRANTED**. Phoenix's claims against Technology Corp. are **dismissed without prejudice**.

2. Phoenix's Motion for Partial Summary Judgment for Breach of Contract Against All Defendants [**R. 264**] is **DENIED**.

3. Phoenix's Motion for Partial Summary Judgment for Violations of the Kentucky Uniform Trade Secrets Act [**R. 267**] is **DENIED**.

4. Defendants' Motion for Summary Judgment Against Phoenix's Trade Secret Claims [**R. 276**] is **DENIED**.

5. Defendant Coralina Engineering, LLC and Alexander Chudnovets' Motion for Summary Judgment for Lack of Personal Jurisdiction and on Breach of Contract and Alter Ego Claims [**R. 278**] is **DENIED**.

6.  Defendants' Objections [**R. 306; R. 307; R. 318; R. 319**] are **OVERRULED** to the extent outlined above.

This the 30th day of September, 2022.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY